1  CHRISTOPHER D. BEATTY (State Bar No. 266466)
   cbeatty@millerbarondess.com
2  MINH-VAN T. DO (State Bar No. 314201)
   mdo@millerbarondess.com
3  ADAM P. STILLMAN (State Bar No. 317071)
   astillman@millerbarondess.com
4  MILLER BARONDESS, LLP
   1999 Avenue of the Stars, Suite 1000
5  Los Angeles, California 90067
   Telephone:  (310) 552-4400
6  Facsimile:  (310) 552-8400

7  Attorneys for Plaintiffs

8              **UNITED STATES DISTRICT COURT**

9             **CENTRAL DISTRICT OF CALIFORNIA**

10

11  CHARLES BUFFIN, an individual;            **CASE NO.**
    MAXWELL LEVINE, an individual;
12  STEVEN LEVINE, an individual              **COMPLAINT FOR**

13              Plaintiffs,                   **(1) BREACH OF FIDUCIARY
                                              DUTY**
14        v.                                  **(2) FRAUDULENT
                                              MISREPRESENTATION**
15  COMMUNITY.COM, INC., a                    **(3) INTENTIONAL
    Delaware corporation; MATTHEW            CONCEALMENT**
16  PELTIER, an individual; and DOES 1        **(4) FEDERAL SECURITIES
    through 10,                               VIOLATIONS**
17                                            **(5) CALIFORNIA SECURITIES
              Defendants.                     VIOLATIONS**
18                                            **(6) NEGLIGENT
                                              MISREPRESENTATION**
19                                            **(7) BREACH OF CONTRACT**
20                                            **(8) CONVERSION**
                                              **(9) VIOLATION OF CALIFORNIA
21                                            PENAL CODE § 496(C)**
22                                            **(10) DECLARATORY RELIEF**
                                              **(11) FINANCIAL ELDER ABUSE**
23
24
25
26                                            **[DEMAND FOR JURY TRIAL]**
27
28

471279.1 .1

COMPLAINT

Plaintiffs Charles Buffin ("Buffin"), Maxwell Levine ("Max Levine"), and Steven Levine ("Steven Levine") (collectively, "Plaintiffs") allege in their Complaint against Defendants Community.com, Inc. ("Community" or the "Company"), Matthew Peltier ("Peltier"), and Does 1-10, inclusive (collectively, "Defendants"), as follows:

## NATURE OF THE ACTION

1.      Community is a technology start-up that utilizes an app that permits its clients—including actors, musicians, athletes, and social media influencers—to communicate directly with their fans or followers through SMS text messaging.  Its stated purpose is to allow more meaningful dialogue between the celebrities and their "community" in a world dominated by a flurry of social media apps that can make fans feel invisible or disengaged.  Community's clients include, but are not limited to, Ashton Kutcher, Jennifer Lopez, John Legend, Paul McCartney, Amy Schumer, Marshmello, Kerry Washington, Sean "Diddy" Combs, Mark Cuban, Sophie Bush, and Ellen DeGeneres.

2.      The Company has raised tens of millions of dollars in financing from the likes of Ashton Kutcher and Guy Oseary.  The Company is believed to be currently raising money at a valuation of approximately $450 million.

3.      Buffin and Max Levine founded the Company in or about 2013. Originally, the Company was aimed at providing a platform for social media influencers to directly communicate and build personalized "tribes" or groups with their followers.

4.      Buffin and Max Levine both had business backgrounds and wanted to find someone with product expertise to help them build the Company.  Max Levine met Peltier in late 2013 and introduced him to Buffin.  Peltier appeared smart and had the technical expertise they were looking for.  Peltier soon thereafter joined the Company.  In mid-2014, Buffin and Max Levine decided that it was in the best interest of the Company for Peltier to take over as CEO.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

5.     The Company's first investor was Max Levine's father, Plaintiff Steven Levine.  Steven Levine invested $50,000 in Community when it was little more than an idea.  Peltier agreed to provide Steven Levine a 2.5% equity stake in the Company in return for this investment.

6.     The Company struggled to onboard users and produce significant revenue.  In or about the summer of 2017, Max Levine and Buffin left the Company to pursue other opportunities.  Peltier continued as CEO of the Company, directing its day-to-day operations.  Max Levine and Buffin each retained 750,000 shares of the Company upon their departure.

7.     Thereafter, Max Levine and Buffin relied on Peltier to keep them apprised of how the Company was doing.  In mid-2018, Peltier began to consistently communicate to Buffin and Max Levine that the Company was on the brink of failure and that the value of their shares was "whatever."  Peltier told Buffin and Max Levine that the Company was burning $40,000 a month and only had $70,000 left in the bank.

8.     In mid-2018, Peltier reached out to Buffin and Max Levine and began to float the idea of repurchasing their shares.  Peltier continued to put pressure on Buffin and Max Levine to sell and reinforced the idea that the Company was drowning and that their shares had no value.

9.     On October 29, 2018, Peltier gave Buffin and Max Levine an ultimatum: either the Company would go bankrupt and Buffin and Max Levine would lose their entire investment in the Company; or Buffin and Max Levine could sell their shares back to the Company for approximately $20,000, which would save the Company from insolvency and at least guarantee them some cash for their investment.

10.     Peltier expressed that this deal would be great for them because the shares of the Company were worthless.  Indeed, Peltier told Buffin the stock was worth a penny a share.  Peltier led Buffin and Max Levine to believe he was only

3

COMPLAINT

offering to buy their shares to do right by them.  Peltier coyly alluded to having two new founders coming on board during these conversations who would try to turn around this supposedly failing company but refused to disclose any further information.  Even after Buffin explicitly asked him who the new founders were and reminded him that he was a shareholder entitled to know this information, Peltier refused to divulge this information.

11.     Buffin and Max Levine signed Stock Repurchase Agreements on November 28, 2018, agreeing to sell back 600,000 of their shares for $22,002 each. This transaction constituted approximately 10% of the shares of the Company. Plaintiffs trusted and relied on Peltier not to swindle them.

12.     Peltier's statements to Buffin and Max Levine were fraudulent and clear breaches of his fiduciary duties.  Peltier materially misrepresented the Company's financial position.  He concealed the fact that Community was in the midst of negotiating (if it had not already sealed the deal) an investment round that was led by a venture capital firm owned by celebrity Ashton Kutcher and influential Hollywood talent agent Guy Oseary, whose clients include big-name artists like U2 and Madonna.  The Company was raising money at a valuation of approximately $180 million, and it went on to raise $35 million as part of this round.  All of this information was inconsistent with the dire picture that Peltier painted for Buffin and Max Levine.  Had Peltier told Buffin and Max Levine this information, they would not have agreed to sell back any of their shares.

13.     Worse, Community, through Peltier, has now taken the position that Steven Levine is not a shareholder of the Company, even though Steven Levine financed the growth of the Company with its first investment.  In fact, Peltier has repeatedly over the course of several years confirmed Steven Levine's status as an investor before just recently reversing course.

14.     Through this lawsuit, Plaintiffs seek what they are owed.  Their damages for Peltier's fraudulent misconduct, securities violations and breaches of

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

fiduciary duty are estimated to be in excess of $30 million.  In addition, due to the egregious nature of what happened here, punitive damages are appropriate.

## **PARTIES**

15.    Plaintiff Buffin is an individual residing in Los Angeles County.

16.    Plaintiff Max Levine is an individual residing in Los Angeles County.

17.    Plaintiff  Steven Levine is an individual residing in the State of New Jersey.

18.    Defendant Peltier is an individual residing in Los Angeles County.

19.    Upon information and belief, Defendant Community is a Delaware corporation that is headquartered in Los Angeles County.

20.    Plaintiffs are ignorant of the true names, capacities, relationships and extent of participation in the conduct herein alleged of the Defendants sued herein as DOES 1 through 10, inclusive, but on information and belief alleges that said Defendants are legally responsible to them.  Plaintiffs will amend this Complaint to allege the true names and capacities of the Doe Defendants when ascertained.

## **JURISDICTION AND VENUE**

21.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78aa.  The claims asserted herein arise under and are pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

22.    This Court has diversity jurisdiction over the claims between Plaintiff Steven Levine and Defendants which have an amount in controversy over $75,000, pursuant to 28 U.S.C. § 1332.

23.    This Court has supplemental jurisdiction over state law claims in this action pursuant to 28 U.S.C. § 1367 because they are related to the claims in this action within the original jurisdiction of this Court that they form part of the same case or controversy under Article III of the United States Constitution.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

24.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).
Defendants reside in this district;  and many of the acts, omissions, and transactions
giving rise to the claims herein, including the false and misleading statements made
to Plaintiffs with respect to Defendants' repurchase of Plaintiffs' Company shares,
occurred in this district.

25.     In connection with the acts and omissions alleged in this Complaint,
Defendants, direct or indirectly, used the means and instrumentalities of interstate
commerce, including but not limited to the use of phones for calls and texting, e-
mails, and the internet.

**FACTUAL BACKGROUND**

**A.     Overview Of Community**

26.     Community assigns a phone number to its clients (e.g., actors, athletes,
influencers, artists), which permits them to use the app to text directly with their
fans, and the fans can text the celebrity directly back.  For example, if a musician is
on tour, he or she can use the Community app to text fans in a specific city
announcing an upcoming concert there and when they arrive in that city, he or she
can send a text to fans in that area asking for recommendations about local
restaurants.

27.     The direct line of communication allows celebrities to create a more
intimate "community" with their fan base, and lets them bypass the media, the so-
called internet trolls and bullies, and the toxic culture that persists in many other
social media platforms such as Facebook, Instagram, Twitter, and Snapchat.  It has
been reported that at least as of January 2020, Community has about 500 artists and
celebrities, or "Community leaders," on board, and tens of thousands more on the
waiting list to join.  Current users of Community include, but are not limited to,
Ashton Kutcher, Jennifer Lopez, John Legend, Paul McCartney, Amy Schumer,
Marshmello, Kerry Washington, Sean "Diddy" Combs, Mark Cuban, Sophie Bush,
and Ellen DeGeneres.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

28.     Community has received favorable press from major publications like The New York Times, USA Today, Variety, Billboard, TechCrunch, Wired, Fast Company, and Oprah Magazine.

29.     While Community launched as a vehicle for celebrities, it intends to scale and broaden its reach to other people and entities that have an audience they want to reach, such as traditional salespeople, churches, politicians and community organizers.

30.     Community is currently raising tens of millions of dollars in investments at a valuation of approximately $450 million.

**B.     <u>Max Levine And Buffin Co-Found The Company</u>**

31.     In 2013, Max Levine and Buffin had the idea to create an internet platform that would make it easier for social media influencers to interact with their fans and followers.  The idea was to flip the top-down and linear fashion in which most social media platforms work, and instead create a space that would make fans feel more visible and influencers feel more engaged with their base.

32.     At the time of the Company's founding, Max Levine was the Company's Chief Executive Officer ("CEO"), and Max Levine and Buffin were the sole shareholders.

33.     Max Levine and Buffin both had business backgrounds, and they decided to bring someone on board to help build the Company's technology.

34.     In or around the end of 2013, Max Levine met Peltier at a networking event in New York City.  Peltier had the product development experience that Max Levine and Buffin were looking for.  Peltier was brought on as the product manager.

35.     Community launched under the name Shimmur as a web-based application.  It has been described as a Reddit-style product.

36.     Buffin had a good relationship with Peltier from the start.  Buffin trusted Peltier, and thought he was extremely smart and talented.  They built a strong friendship based upon mutual trust and respect.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

37.    In fact, all three co-founders, Buffin, Max Levine, and Peltier, lived together from early 2015 to April 2016 and thereafter lived in the same apartment complex.  Buffin and Peltier also attended the wedding of Max Levine's sister.

38.    In 2014, Buffin, Max Levine, and Peltier collectively decided Peltier should take over as CEO.  In or around April 2014, Peltier became CEO, and the parties also altered the capital structure of the Company: 40% to Peltier, and 15% each to Max Levine and Buffin (the remaining stock was either reserved for the stock pool or vested in others not a party to this lawsuit).

39.    Throughout 2014, the parties continued to work on developing the product.

## C.    The Company's Early Fundraising Efforts

40.    The Company's first investment came from Max Levine's father, Steven Levine.  In or about 2014, Steven Levine made three separate investments in the Company totaling $50,000: $8,500 made in January 2014 for the company's pre-development stage; $24,000 in February/March 2014 for the Company's development stage; and $17,500 in April 2014 for the Company's post-development stage.

41.    Peltier promised Steven Levine a 2.5% equity stake in the Company in return for this investment.  Steven Levine's equity investment was documented in an April 16-17, 2014 email chain between Steven Levine and Peltier.  On April 16, 2014, Peltier sent an email to Steven Levine telling him that the Company was "proposing an offer of 2.5% equity for your investment" but that "the proposed convertible note is still on the table as well."  Peltier calculated Steven Levine's equity as follows, adding in a "risk premium (RP)":

$$\$50,000/\$3,000,000 - 1.666666\% * 1.5 \,(RP) = \sim 2.5\%$$

42.    That same day, Steven Levine and Peltier had a phone call during which Steven Levine told Peltier that he was accepting the equity offer rather than the convertible note proposal.  Peltier followed up with an email confirming their

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

conversation, stating: "The benefits for you are equally great and this ensures a return on you [sic] investment.  Max Levine, Buffin, and I unanimously agree this is the route we would like to take."

43.     Steven Levine's investment was the Company's sole investment for quite some time.  In the latter part of 2014, Peltier started meeting with potential investors in Los Angeles.  In early 2015, Pelter was able to raise small amounts from various investors in the range of $5,000-$20,000.

44.     In 2015, the Company started to grow as the team added more engineers to develop the product.  Its app was launched for the first time in or around the beginning of 2016.  However, the Company was still in its early stages and still had little working capital.

45.     Therefore, Max Levine loaned the Company money so that it could cover its expenses.  Between January 2015 and August 2016, Max Levine lent the Company approximately $28,857.  These loans were to cover expenses including the Company's payroll, rent, and bills.

46.     In 2016, Peltier continued to raise money from other investors, and the team worked to onboard more influencers onto the app.  Community raised about half a million dollars that year.

47.     In 2017, Community applied to and got accepted into Tech Stars, a competitive start-up incubator.  At this point, Community had a team of 12 employees and was raising a seed fundraising round.  Buffin played a pivotal role in getting the Company accepted into Tech Stars by sending a tweet to one of the people running the program, which got the Company a meeting.

48.     Community nevertheless struggled to take off.  While it had a decent following of about 15,000 to 20,000 followers on Instagram, it struggled to gain users and scale.

49.     In or around 2017, the Company began to incorporate into its technology SMS texting, which is where the entertainer could use the app to send

Miller Baroness, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1    SMS texts to his or her followers.  In or around 2018, the product started operating

2    under the d/b/a of Community.  Subsequently, Community officially changed its

3    name with the Delaware Secretary of State.

4    **D.**    **Buffin And Max Levine Leave The Company; And, According To**

5           **Peltier, The Company Continues To Struggle**

6          50.    In or about the Summer of 2017, Max Levine, Buffin, and Peltier

7    determined that it would be in the best interests of the Company for Max Levine and

8    Buffin to leave the Company.  Buffin and Max Levine wanted to pursue other

9    opportunities and felt that Peltier was capable of running the Company without

10   them.  Both Buffin and Max Levine left the Company on good terms.

11         51.    After their departures, Buffin and Max Levine each retained 750,000

12   common stock shares in the Company.

13         52.    In or around mid-Summer of 2017, after Max Levine and Buffin left

14   the Company, Steven Levine called Peltier to discuss his investment.  Steven Levine

15   wanted to know what was going to happen with the Company now that his son, Max

16   Levine, was no longer going to be directly involved.  Steven Levine spoke with

17   Peltier and offered Community a discount in exchange for the return of his $50,000

18   investment.

19         53.    During this call, Peltier acknowledged Steven Levine's 2.5%

20   investment in the Company and reassured Steven Levine that the money was best

21   left in the Company because he was working on a new strategy that could turn the

22   Company around.  Steven Levine trusted Peltier and believed that Peltier would

23   protect Steven Levine's interests and rights because Peltier had worked closely with

24   his son and Buffin.  Steven Levine thus agreed to leave his investment in the

25   Company.

26         54.    On or around January 28, 2018, Peltier, on behalf of Community,

27   entered into a contractual agreement to reimburse Max Levine for the money he had

28   loaned the Company.  Peltier signed a contract stating that the "Company will

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

reimburse you for these expenses…."  Max Levine timely submitted the expenses for reimbursement, per the terms of the agreement.

55.   However, Peltier kept pushing off paying Max Levine back and eventually took the inexplicable position that no money was owed.  Max Levine literally subsidized Peltier so he could live in LA and work at Community, and then Max Levine got stiffed.

56.   On March 26, 2018, Peltier provided an investor update on the Company in which he said the Company was burning approximately $40,000 a month and raising a small investment round for runway into early 2019.

57.   Thereafter, Peltier began to communicate to Max Levine and Buffin that the Company was failing and their shares were worthless.  For example, on or about May 11, 2018, in discussions about the value of the shares, Buffin expressed concern about his incomplete knowledge about how the Company was doing: "Lol you guys know what the shares can be worth much better than I do hence why you're shooting for more, I get it.  I just personally feel like I'm getting dicked around and don't appreciate it."

58.   Peltier responded by assuring his friend that this was not the case: "but for real, because the share[s] are w.e. [whatever] at this point, and we have $70k in our bank lol I'm just going off what feels meaningful."

59.   Peltier told Buffin he would make him "a good cash offer on some shares over the summer when we get some money goin too.  think about, lml."

60.   On May 25, 2018, Peltier called Buffin.  During this call, Peltier reiterated that the Company only had $70,000 in the bank.

61.   These and similar statements reinforced to Buffin that the value of their shares was extremely low.  Peltier began making these statements in March 2018 to start laying the foundation for his fraud.

62.   On or about June 18, 2018, Peltier called Buffin and floated that the idea of the Company repurchasing all of Buffin's and Max Levine's outstanding

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1   shares.  During this call, which lasted about 20 minutes, Peltier offered $10,000-

2   $15,000 to each of Buffin and Max Levine.  Peltier told Buffin that he was trying to

3   buy back shares from other key contributors as well.  Peltier conveyed to Buffin and

4   Max Levine that he was just trying to do the "right thing" for all of the Company's

5   shareholders.

6          63.    Over the next several months, Peltier continued to push Buffin and

7   Max Levine to sell back their shares.  The parties spoke on several occasions,

8   including via phone on August 14, 2018.  Peltier floated some numbers to Max

9   Levine and Buffin to put some pressure on them but never made a formal offer for

10  the shares repurchase.

11         64.    Peltier continued to paint a bleak picture of the Company and its

12  finances in these discussions.  Peltier made vague references to trying to "clean up"

13  the Company's capitalization table because they had a "small" investment closing

14  soon, but never offered any further detail or information.  These statements were

15  intended to prime Max Levine and Buffin for a low-ball repurchase offer that Peltier

16  would soon thereafter make.

17         65.    On October 29, 2018, Peltier called Buffin to give him and Max Levine

18  an ultimatum on the repurchase of their shares and to walk Buffin through the

19  Company's position.  Peltier told Buffin on this phone call that there were only two

20  options left for the Company given its poor financial condition: (1) the Company

21  would either go bankrupt and Buffin and Max Levine would be left with nothing; or

22  (2) Buffin and Max Levine could sell back their shares to the Company for

23  approximately $20,000, which would save them all the time and legal costs

24  associated with filing for bankruptcy, allow Community to make payroll for a few

25  more months, and allow Max Levine and Buffin to walk away with guaranteed cash

26  in their pockets.

27         66.    Peltier told Buffin during this October 29, 2018 call that the

28  Company's shares were only worth a penny per share, or somewhere in that

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

"range," and thus a purchase price in the $20,000 range would be a great deal for Max Levine and Buffin.  Peltier told Buffin that such a purchase price would essentially give Plaintiffs a windfall—three times the value of the Company's shares.

67.     Peltier's ultimatum was confirmed in a phone call and multiple texts the next day, November 1, 2018.  Buffin called Peltier, with whom he continued to have a close relationship, to get some clarity on the situation.  Buffin expressed that he wanted more insight into the finances of the Company so he could make an informed decision.  On this phone call, Peltier repeated the same ultimatum and told Buffin that the $20,000 he was offering to each of Max Levine and Buffin was a generous offer, would provide the Company some runway for a couple more months and would give the Company the only way to avoid bankruptcy.

68.     The conversation then continued via text message during which Peltier again confirmed his ultimatum:

> <u>Buffin</u>: Is there an option to sell half and keep half?
>
> Peltier: unfortunately, i don't think they'd go for that. kinda all or nothing if we're gonna try n roll forward vs clean reset. cash either goes to legal or shareholders if that makes sense. latter is better for all . . .
>
> <u>Buffin</u>: Can you lay out options in a list form please?
>
> . . .
>
> <u>Peltier</u>: same as we talked about the other night as options.  there arnt really any.  we either try n make something work or we just have to go back to the drawing board

69.     In the same text message chain, Buffin again told Peltier that he preferred a cash and equity option and asked Peltier about the Company's potential upsides.  Peltier played coy, responding in a manner that conveyed he saw no upside to the Company and wished there was:

> <u>Buffin</u>: Would be great to still see some longer term upside which is why I asked about cash + equity.

1    <u>Peltier</u>: you're telling me lol.

2

3    70.    Peltier then emphasized that this would be a good deal for them while

4    at the same time helping out the Company financially.  In particular, Peltier said,

5    "end of the day it's your call.  it would help us out tremendously to be honest and

6    you can at least control your outcome.  it's still a pretty massive return considering

7    the shares started at $.00001 lol but think about it. otherwise we'll need to recap

8    further or take other riskier/shitty routes."

9    71.    Buffin responded, summarizing that this other route, as Peltier had

10   explained previously, would be to "get stroked and move on with nothing lol."

11   72.    Peltier confirmed this was the only other option: "right, we just need to

12   clean cap to get all parties to help us move forward" and suggested this transaction

13   was essential for the Company to stay in business.

14   73.    In the same text chain, Buffin also directly asked Peltier about the two

15   new founders that Peltier alluded to during their phone call the day prior.  Peltier

16   refused to give Buffin that information.  Even when Buffin reminded Peltier that he

17   was a shareholder of the Company and thus entitled to this information, Peltier blew

18   him off and completely ignored the request:

19   <u>Buffin</u>: I understand and wanna make this smooth for you guys.  Who
     are the two partner/co founder types you guys are bringing on?

20   <u>Peltier</u>: aight lmk [let me know] when you can please cause we gotta
21   make moves here soon and can't get into that unfortunately, it's
     complicated but this is all part of how thatle turn out.  think about it,
22   hit me tm or wkend.

23   <u>Buffin</u>: Word just curious considering I'm a shareholder.

24   74.    Over the next several weeks in November 2018, Peltier ramped up his

25   communications with Buffin in efforts to get Buffin and Max Levine on board with

26   the repurchase of their stock.  Peltier made repeated affirmations that this was the

27   only route available that would permit the Company to survive, that the shares were

28   worthless, the Company had limited prospects and was on death's door.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

75.    On November 8, 2018, Buffin called Peltier to get some additional clarity on the situation and continued to express his hesitation.  Peltier, again, reaffirmed that the only two options were those he previously discussed with Buffin. Based on Peltier's statements and representations, Buffin told Peltier on this call that he and Max Levine wanted to move forward with selling back their shares for a purchase price in the range of $20,000.

76.    In or about mid-November 2018, Peltier sent Buffin and Max Levine a draft Stock Repurchase Agreement.  Peltier repeatedly assured them that this was the best way forward for the Company and the only way to ensure Buffin and Max Levine got any return on their investment.

77.    On November 29, 2018, Peltier called Max Levine to try and seal the deal.  During that call, Peltier repeated the same story he had been telling Plaintiffs for months—that the Company was on the verge of bankruptcy and that the only way it could survive is if Buffin and Max Levine would sell back their shares. During the call, Max Levine raised the fact that the Company still owed him for the loans he provided to cover the Company's expenses.

78.    Peltier became frustrated with Max Levine, accusing him of holding up the repurchase process and accusing him of not being a "team player."  Ultimately, Peltier and Max Levine were able to reach a mutual understanding on that call, and Peltier acknowledged Max Levine's loans to the Company and Steven Levine's equity investment in this phone call.

79.    Buffin and Max Levine entered into a Stock Repurchase Agreement agreeing to sell back 600,000 shares in the Company for $22,002.  Peltier signed the Stock Purchase Agreement on behalf of the Company.  At this purchase price, the approximate price per share was $0.036.  Max Levine and Buffin ultimately agreed to this purchase price and thought they were getting a fair price for their shares because Peltier told them that the Company's share value was de minimus.

80.    After executing the Stock Repurchase Agreements, Max Levine and

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400     FAX: (310) 552-8400

1    Buffin each retained 75,000 shares in the Company.

2    **E.**     **Max Levine And Buffin Uncover Defendants' Fraudulent Conduct, And**

3          **Defendants Renege On Their Other Agreements With Plaintiffs**

4          81.    On December 8, 2018, about a week and a half after selling back their

5    shares to Defendants, Max Levine and Buffin were informed that the Company was

6    starting to grow rapidly because it was working with a company named Maverick, a

7    music management group at Live Nation founded and formerly run by Guy Oseary.

8    Maverick is a collective of Hollywood superstar managers, whose ranks include the

9    managers of Britney Spears, The Weeknd, and Paul McCartney.

10         82.    This news came as a shock to Buffin and Max Levine.  It was the first

11   time that they learned that a big industry name like Oseary was involved with

12   Community at all.  Peltier never mentioned Oseary or any companies affiliated with

13   him during any time that the parties were negotiating the repurchase of Buffin's and

14   Max Levine's shares.  The Community product is premised on the involvement of

15   celebrities having direct communications with their fans.  The involvement of such

16   an influential person as Oseary—who is in the entertainment business with a large

17   network  of talent—would have significantly altered the calculus for Buffin and

18   Max Levine when they were negotiating the repurchase of their shares.

19         83.    The next month, on January 29, 2019, Ashton Kutcher, the celebrity

20   actor, tweeted out his "phone number" to the public.  Turns out, this number was not

21   his personal phone number but a Community phone number.  Kutcher's tweet was a

22   publicity stunt to stir interest in Community, and it did just that.  Multiple media

23   outlets picked up on it and began reporting about Community.  This was the first

24   time that Buffin and Max Levine learned that Kutcher was involved in the

25   Company.

26         84.    On February 7, 2019, Peltier emailed Buffin to catch up.  In that same

27   email, Peltier asked his assistant to schedule a "hang on the books" between Peltier

28   and Buffin.  This further raised Buffin's suspicions that something large had

471279.1 .1

recently happened to the Company. Peltier had never had an assistant at the Company before because the teams had always been relatively small. Peltier would not need an assistant unless the Company's size had grown tremendously.

85.    In or about June 2019, Peltier sent Steven Levine a text message asking Steven Levine whether the Company could repurchase his shares.

86.    In or around mid-late July 2019, Peltier called Steven Levine to follow up on his offer for Defendants to repurchase Steven Levine's shares. Peltier told Steven Levine that Defendants were also buying out other early investors. Peltier offered to return Steven Levine's investment through a "consulting agreement."

87.    Steven Levine asked Peltier to give him an update on what was going on with the Company to prompt the repurchase offer. Peltier did not provide Steven Levine with any substantive information. Peltier did not mention any of the Company's fundraising efforts—no mention of the $35 million investment, Guy Oseary, or Ashton Kutcher.

88.    On July 25, 2019, Tech Crunch, a reputable startup and technology news publication, published an article reporting that the Sound Ventures partners, Oseary and Kutcher, led a $35 million investment round in Community. The article stated, "The Santa Monica-based company has raised nearly $35 million in the form of two convertible notes following a recapitalization that occurred alongside its rebranding earlier this year. . . ." Additionally, the Tech Crunch article reported that the Company has been valued "at upwards of $200 million."

89.    These numbers and the glowing overview of the Company stood in stark contrast to what Peltier led Buffin and Max Levine to believe was the dire financial condition of the Company and its limited prospects.

90.    Max Levine immediately informed Steven Levine of the Tech Crunch article. Steven Levine, too, was shocked to learn about the $35 million investment led by Sound Ventures. Steven Levine had spoken with Peltier just days before the article came out, and Peltier never mentioned a single thing about the Company

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1    obtaining a multi-million dollar investment months prior.

2        91.    Defendants intentionally kept this material information from Steven

3    Levine, despite the fact that he was a shareholder.  It soon thereafter became clear to

4    Steven Levine that Defendants had no intention to treat him fairly or formally

5    acknowledge his rights as a shareholder in the Company.  This was confirmed as

6    subsequently Peltier refused to acknowledge Steven Levine's status as a

7    shareholder.

8        92.    The timing of these events clearly illustrates that Peltier knew he had

9    Oseary and Kutcher as likely investors in Community (if they had not already been

10   locked in) during the parties' negotiation of the repurchase.  They were the two

11   "founders" mentioned by Peltier in his conversations.  In fact, it was just nine days

12   after Buffin and Max Levine signed the Stock Repurchase Agreements that they

13   learned of Oseary's involvement in the Company.

14       93.    In addition, Steven Levine's 2.5% equity stake in the Company has still

15   not been formally recognized, and the Company has failed to pay Max Levine back

16   approximately $15,212.  In fact, Defendants have now reversed course and are

17   denying that Steven Levine was ever an investor and a 2.5% shareholder.

## FIRST CAUSE OF ACTION

### (Breach of Fiduciary Duty)

### *(By Buffin and Max Levine Against Peltier And Doe Defendants)*

21       94.    Plaintiffs repeat and reallege each and every foregoing and subsequent

22   allegation contained in the Complaint, and further allege as follows:

23       95.    Directors and officers of a corporation owe fiduciary duties to the

24   corporation's shareholders.  This fiduciary duty includes an obligation to disclose

25   fully and fairly all material information within the board's control when it seeks

26   shareholder action.  As such, Peltier, as the CEO and as a director of Community,

27   owed Buffin and Max Levine a fiduciary duty to disclose to them all material

28   information pertaining to Defendants' repurchase of Plaintiffs' Company shares.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

96.     As CEO and as a director of the Company, Peltier was privy to special facts only within his control, and not only failed to disclose these facts to Plaintiffs, but made misrepresentations to Plaintiffs regarding the status of the Company, the value of Plaintiffs' shares and the identities of the new high-profile investors that Peltier was bringing on board.

97.     Peltier breached his fiduciary duty to Buffin and Max Levine by acting against their interests, including but not limited to:

a.  Misrepresenting to Buffin and Max Levine throughout 2018 that the financial prospects and outlook for the Company were dire;

b.  Misrepresenting to Buffin and Max Levine, on or about October 29, 2018 and on multiple subsequent occasions, that the Company would go bankrupt and that Buffin and Max Levine would lose any chance of making any money on their investment in the Company if Buffin and Max Levine did not sell back their shares at that time;

c.  Misrepresenting to Buffin and Max Levine that the only way to ensure they would get cash in their pockets was to sell back their shares to the Company in November 2018;

d.  Misrepresenting to Buffin and Max Levine that the value of the Company's shares was essentially worthless ("whatever") and only worth a penny per share;

e.  Misrepresenting to Buffin and Max Levine that they were getting a good deal and a "massive" return on their investment through the Stock Repurchase Agreement which gave them $0.036 per share because the Company's shares were really only worth a penny per share;

f.  Actively concealing from Buffin and Max Levine, despite having a duty to disclose this information, the names of the Company's

Miller Barondess, LLP
ATTORNEYS AT LAW
1999 Avenue of The Stars, Suite 1000   Los Angeles, California 90067
Tel: (310) 552-4400   Fax: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

high-profile investors or potential investors—Hollywood talent manager Guy Oseary and celebrity Ashton Kutcher;

g.  Actively concealing from Buffin and Max Levine, despite having a duty to disclose this information, that negotiations were underway, near complete, or already completed for a $35 million investment round led by Sound Ventures, a venture capital fund founded by Ashton Kutcher and Guy Oseary;

h.  Actively concealing from Buffin and Max Levine that the Company had achieved significant technological breakthroughs that would increase the value of the Company;

i.  Actively concealing from Buffin and Max Levine, despite having a duty to disclose this information, that the Company was raising money at higher valuations than those presented to Buffin and Max Levine, including at a valuation of approximately $180 million;

j.  Actively concealing from Buffin and Max Levine, despite having a duty to disclose this information, that a $35 million investment round led by Sound Ventures would significantly change the financial prospects of the Company and its share value.

98.    Buffin and Max Levine's reliance on these misrepresentations or omissions directly and proximately caused injury and pecuniary loss to Buffin and Max Levine for which they are each entitled to an award of compensatory damages believed to be in excess of $25 million.

99.    Peltier acted with the intent of depriving Buffin and Max Levine of their rights and causing injury to them. The conduct was despicable and subjected Buffin and Max Levine to unjust hardship.  The conduct was malicious, fraudulent and oppressive, and was committed with a conscious disregard for Buffin's and Max Levine's rights.  Accordingly, Buffin and Max Levine are entitled to an award of

471279.1 .1

1  punitive or exemplary damages in an amount sufficient to punish Peltier and to

2  make an example of him.

## SECOND CAUSE OF ACTION

### (Fraudulent Misrepresentation)

### *(By Buffin and Max Levine Against Defendants)*

6      100.   Plaintiffs repeat and reallege each and every foregoing and subsequent

7  allegation contained in the Complaint, and further allege as follows:

8      101.   As CEO of the Company and as a board member, Peltier owed a

9  fiduciary duty to Buffin and Max Levine, who were shareholders of the Company.

10 Peltier controlled the operations of the Company and had special knowledge of its

11 finances, future plans, prospective transactions, and prospects.  Peltier's fiduciary

12 duty to Plaintiffs required him to disclose all special facts relating to the Company's

13 finances, future plans, prospective transactions, prospects, and similar information,

14 and to do so in a truthful manner, during the negotiations of Defendants' repurchase

15 of Plaintiffs' Company shares.

16     102.   Defendants misrepresented to Plaintiffs the financial state and outlook

17 of the Company and made representations that the Company was in a dire state and

18 on the brink of insolvency.  These statements were false or misleading because

19 Defendants were already undergoing negotiations regarding, if they had not already

20 obtained, a $35 million investment round that was led by Sound Ventures, a venture

21 capital fund founded by Ashton Kutcher and Guy Oseary.  Defendants made many

22 of these representations to Buffin knowing that Buffin would convey the message to

23 Max Levine, which Buffin did.  These false representations include:

24         a. On or about August 14, 2018, Peltier called Buffin and told him

25            Defendants needed to "clean up" the Company's capitalization

26            table because they had a "small" investment closing soon;

27         b. On or about October 29, 2018, and on multiple subsequent

28            occasions, Peltier told Buffin that there were only two options

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

left for the Company given its poor financial condition: (1) the Company would either go bankrupt and Buffin and Max Levine would be left with nothing from their investment in the Company; or (2) Buffin and Max Levine could sell back their shares to the Company for approximately $20,000, which would save them all the time and legal costs associated with filing for bankruptcy, and allow Max Levine and Buffin to walk away with guaranteed cash in their pockets;

c. On or about November 1, 2018, Peltier reiterated these two options to Buffin and told him that "there arnt really any" other options and that Buffin and Max Levine couldn't sell back just half of their shares because it was "kinda all or nothing";

d. On or about November 1, 2018, Buffin asked Peltier to confirm that the only other option would be to "get stroked and move on with nothing lol," to which Peltier responded, "[R]ight, we just need to clean cap to get all parties to help us move forward";

e. On or about November 1, 2018, after Buffin told Peltier he wanted to "see some longer upside" in the Company, Peltier responded, "you're telling me lol"; and

f. On or about November 29, 2018, Peltier called Max Levine and repeated the same ultimatum—that the Company was on the verge of insolvency and could not survive if Buffin and Max Levine did not sell back their shares.

103.   Defendants also misrepresented the value of the Company shares. These statements were misleading because Defendants made them without providing Plaintiffs with all relevant disclosures relating to the Company's investment led by Sound Ventures, which affected the Company's share value. Defendants made many of these representations to Buffin knowing that Buffin

22

1 would convey the message to Max Levine, which Buffin did.  These false

2 representations include:

    a. On or about May 11, 2018, Peltier texted Buffin that the share
       value of the Company "are w.e. [whatever] at this point, and we
       have $70k in our bank lol"; and

    b. On or about October 29, 2018, Peltier called Buffin and told him
       that the Company shares were worth a penny.

    c. Throughout his discussions with Buffin in October and
       November of 2018, Peltier expressed that the cash offer was
       generous given the meager share value of the Company.

104.   Defendants also misrepresented that they were acting in the best
interests of all of the shareholders, including Buffin and Max Levine.  Defendants
made many of these representations to Buffin knowing that Buffin would convey the
message to Max Levine, which Buffin did.  These false representations include:

    a. On or about June 18, 2018, Peltier called Buffin and told him
       that Defendants wanted to repurchase Plaintiffs' shares as well as
       shares from other former and current employees because
       Defendants wanted to do the "right thing" for all the
       shareholders;

    b. On or about October 29, 2018, Peltier called Buffin and told him
       that selling back his shares for approximately $20,000 would be
       the only way for Max Levine and Buffin to obtain a return on
       their investment in the Company;

    c. On or about October 29, 2018, Peltier called Buffin and told him
       that a $22,002 purchase price for each of Max Levine's and
       Buffin's 600,000 shares (which equates to $0.036/share) was a
       good deal given that the Company's shares were worth just a
       penny; and

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

d. On or about November 1, 2018, Peltier texted Buffin to tell him that selling back his shares for $22,002 would still give Plaintiffs a "massive return considering the shares started at $.00001 lol."

105.   Defendants knew that these representations were false and that the information they omitted or concealed from Buffin and Max Levine was material to their decision on whether to sell back their Company shares, or were made with utter disregard and reckless indifference to the truth.

106.   By making the misrepresentations, Defendants intended to induce Buffin and Max Levine to sell back their Company shares at a nominal price that was based on a significantly understated valuation of the Company.  Defendants knew and understood that Buffin and Max Levine would act in reliance on the false representations or omissions by agreeing to sell back their shares.

107.   Buffin and Max Levine's reliance on these misrepresentations or omissions was foreseeable, reasonable, and justified.  Indeed, Buffin and Max Levine repeatedly expressed hesitation to Defendants about selling back their Company shares in part because they had very little insight into the finances and financial outlook of the Company.  Peltier, as the CEO and person responsible for running the day-to-day operations of the Company, had a duty to provide Buffin and Max Levine with relevant and material information and insight into the Company finances.  Buffin and Max Levine trusted Peltier, who was not only an officer of the Company but their former co-founder, to provide such information during the parties' negotiation of the stock repurchase.  Peltier assured Buffin and Max Levine that it was in the best interests of the Company and in the best interests of Buffin and Max Levine to sell back their shares.

108.   As a direct and proximate result of Plaintiffs' reliance, Buffin and Max Levine each entered into a stock repurchase agreement whereby each of them sold back 600,000 Company shares for $22,002.  This caused injury and pecuniary loss to Buffin and Max Levine because unbeknownst to them, Defendants had already

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

raised, or were on the cusp of raising, a $35 million investment led by Sound Ventures, and the valuation of the Company was closer to $200 million.  Buffin and Max Levine would not have entered into the Stock Repurchase Agreement had Defendants not made their material misrepresentations or omissions.  Buffin and Max Levine are thus entitled to an award of compensatory damages believed to be in excess of $25 million.  Alternatively, Buffin and Max Levine are entitled to rescission of each Stock Purchase Agreement as a result of Defendants' fraudulent conduct.

109.   The conduct of Defendants was committed with the intent of depriving Buffin and Max Levine of their rights and causing injury to them.  The conduct was despicable and subjected Buffin and Max Levine to unjust hardship.  The conduct was malicious, fraudulent and oppressive, and was committed with a conscious disregard for Buffin's and Max Levine's rights.  Accordingly, Buffin and Max Levine are entitled to an award of punitive or exemplary damages in an amount sufficient to punish Defendants and to make an example of them.

## THIRD CAUSE OF ACTION

### (Intentional Concealment)

#### (By Buffin and Max Levine Against Defendants)

110.   Plaintiffs repeat and reallege each and every foregoing and subsequent allegation contained in the Complaint, and further allege as follows:

111.   As CEO of the Company and as a board member, Peltier owed a fiduciary duty to Buffin and Max Levine, who were shareholders of the Company. Peltier controlled the operations of the Company and had special knowledge of its finances, future plans, prospective transactions, and prospects.  Peltier's fiduciary duty to Plaintiffs required him to disclose all special facts relating to the Company's finances, future plans, prospective transactions, prospects, and similar information, and to do so in a truthful manner, during the negotiations of Defendants' repurchase of Plaintiffs' Company shares.

112.   Defendants failed to disclose special facts relating to the Company's financial condition and prospects during the negotiations of Defendants' repurchase of Plaintiffs' Company shares in order to induce Plaintiffs into selling their shares to them.  Peltier concealed the true financial outlook of the Company and the identity of its new high-profile investors in hopes of swindling Plaintiffs to sell their shares to him at a nominal amount so that Defendants could make a windfall.  These concealments include:

a.  Actively concealing from Buffin and Max Levine, despite having a duty to disclose this information, the names of the Company's high-profile investors or potential investors—including Hollywood talent manager Guy Oseary and celebrity Ashton Kutcher;

b.  Actively concealing from Buffin and Max Levine, despite having a duty to disclose this information, that negotiations were underway, near complete, or already completed for a $35 million investment round led by Sound Ventures, a venture capital fund founded by Ashton Kutcher and Guy Oseary;

c.  Actively concealing from Buffin and Max Levine, despite having a duty to disclose this information, that the Company was raising, or having discussions to raise, money at a valuation of approximately $180 million;

d.  Actively concealing from Buffin and Max Levine, despite having a duty to disclose this information, that a $35 million investment round led by Sound Ventures would significantly change the financial prospects of the Company and its share value; and

e.  Actively concealing from Buffin and Max Levine that the Company had achieved significant technological breakthroughs that would significantly increase the value of the Company.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

113.   Defendants also failed to disclose information relating to the Company's financial state and outlook, including the fact that Defendants were already undergoing negotiations regarding, if they had not already obtained, a $35 million investment round led by Sound Ventures.  In addition, Defendants failed to disclose other valuations and projections for the Company that contradicted with the financial picture being painted by Defendants for Buffin and Max Levine.  This concealment of material facts and information rendered their representations to Buffin and Max Levine misleading, including the following representations:

a. On or about August 14, 2018, Peltier called Buffin and told him Defendants needed to "clean up" the Company's capitalization table because they had a small investment closing soon;

b. On or about October 29, 2018, and on multiple subsequent occasions, Peltier told Buffin that there were only two options left for the Company given its poor financial condition: (1) the Company would either go bankrupt and Buffin and Max Levine would be left with nothing from their investment in the Company; or (2) Buffin and Max Levine could sell back their shares to the Company for approximately $20,000, which would save them all the time and legal costs associated with filing for bankruptcy, and allow Max Levine and Buffin to walk away with guaranteed cash in their pockets;

c. On or about November 1, 2018, Peltier reiterated these two options to Buffin and told him that "there arnt really any" other options and that Buffin and Max Levine couldn't sell back just half of their shares because it was "kinda all or nothing";

d. On or about November 1, 2018, Buffin asked Peltier to confirm that the only other option would be to "get stroked and move on with nothing lol," to which Peltier responded, "[R]ight, we just

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

need to clean cap to get all parties to help us move forward";

e. On or about November 1, 2018, after Buffin told Peltier he wanted to "see some longer upside" in the Company, Peltier responded, "you're telling me lol"; and

f. On or about November 29, 2018, Peltier called Max Levine and repeated the same ultimatum—that the Company was on the verge of insolvency and could not survive if Buffin and Max Levine did not sell back their shares.

114. Defendants' failure to disclose all material facts to Buffin and Max Levine also rendered their representations regarding the value of the Company shares misleading. These statements were misleading because Defendants made them without providing Plaintiffs with all relevant disclosures relating to the Company's investment round led by Sound Ventures, which affected the Company's share value. These misleading representations include:

a. On or about May 11, 2018, Peltier texted Buffin that the share value of the Company "are w.e. [whatever] at this point, and we have $70k in our bank lol"; and

b. On or about October 29, 2018, Peltier called Buffin and told him that the Company shares were worth a penny.

115. Defendants' failure to disclose all material facts to Buffin and Max Levine also rendered their representations that they were acting in the best interests of all of the shareholders, including Buffin and Max Levine, misleading. These misleading representations include:

a. On or about June 18, 2018, Peltier called Buffin and told him that Defendants wanted to repurchase Plaintiffs' shares as well as shares from other former and current employees because Defendants wanted to do the "right thing" for all the shareholders;

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

b.  On or about October 29, 2018, Peltier called Buffin and told him that selling back his shares for approximately $20,000 would be the only way for Max Levine and Buffin to obtain a return on their investment in the Company;

c.  On or about October 29, 2018, Peltier called Buffin and told him that a $22,002 purchase price for each of Max Levine's and Buffin's 600,000 shares (which equates to $0.036/share) was a good deal given that the Company shares were worth just a penny; and

d.  On or about November 1, 2018, Peltier texted Buffin to tell him that selling back his shares for $22,002 would still give Plaintiffs a "massive return considering the shares started at $.00001 lol."

116.   Defendants had a duty to disclose this information, not only because of Peltier's fiduciary duties, but also because, having made statements, Defendants had a duty to provide other information that would put those statements in proper context.

117.   Defendants knew that the information they omitted or concealed from Buffin and Max Levine was material to their decision on whether to sell back their Company shares for $22,002.

118.   By making the omissions, Defendants intended to induce Buffin and Max Levine to sell back their Company shares at a nominal price that was based on a significantly understated valuation of the Company.  Defendants knew and understood that Buffin and Max Levine would act in reliance on the false representations or omissions by agreeing to sell back their shares.

119.   Buffin and Max Levine's reliance on these omissions was foreseeable, reasonable, and justified.  Indeed, Buffin and Max Levine repeatedly expressed hesitation to Defendants about selling back their Company shares in part because they had very little insight into the finances and financial outlook of the Company.

Peltier, as the CEO and person responsible for running the day-to-day operations of the Company, was the only person that could provide Buffin and Max Levine with relevant and material information and insight into the Company finances. Buffin and Max Levine trusted Peltier, who was not only an officer of the Company but their former co-founder, to provide such information during the parties' negotiation of the stock repurchase. Peltier assured Buffin and Max Levine that it was in the best interests of the Company and in the best interests of Buffin and Max Levine to sell back their shares.

120. As a direct and proximate result of their reliance, Buffin and Max Levine each entered into a stock repurchase agreement whereby each of them sold back 600,000 Company shares for $22,002. This caused injury and pecuniary loss to Buffin and Max Levine because unbeknownst to them, Defendants had already raised, or were having discussions to raise, a $35 million investment round led by Sound Ventures at a valuation around $180 million. Buffin and Max Levine would not have entered into the Stock Repurchase Agreement had Defendants not made their material omissions. Buffin and Max Levine are thus entitled to an award of compensatory damages believed to be in excess of $25 million. Alternatively, Buffin and Max Levine are entitled to rescission of each Stock Purchase Agreement as a result of Defendants' fraudulent conduct.

121. The conduct of Defendants was committed with the intent of depriving Buffin and Max Levine of their rights and causing injury to them. The conduct was despicable and subjected Buffin and Max Levine to unjust hardship. The conduct was malicious, fraudulent and oppressive, and was committed with a conscious disregard for Buffin's and Max Levine's rights. Accordingly, Buffin and Max Levine are entitled to an award of punitive or exemplary damages in an amount sufficient to punish Defendants and to make an example of them.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

**<u>FOURTH CAUSE OF ACTION</u>**

**(Violation of § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5**

**Promulgated Thereunder, 17 C.F.R. § 240.10b-5)**

***(By Buffin and Max Levine Against Defendants)***

122.   Plaintiffs repeat and reallege each and every foregoing and subsequent allegation contained in the Complaint, and further allege as follows:

123.   As CEO of the Company and as a board member, Peltier owed a fiduciary duty to Buffin and Max Levine, who were shareholders of the Company. Peltier controlled the operations of the Company and had special knowledge of its finances, future plans, prospective transactions, and prospects.  Peltier's fiduciary duty to Plaintiffs required him to disclose all material facts relating to the Company's finances, future plans, prospective transactions, prospects, and similar information, and to do so in a truthful manner, during the negotiations of Defendants' repurchase of Plaintiffs' Company shares.

124.   Defendants, directly or indirectly, by the use of means or instrumentalities of interstate commerce, including but not limited to the use of phones for calls and texting, e-mail, and the internet, engaged in a course of conduct that violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by (a) employing a device, scheme, or artifice to defraud Plaintiffs; (b) making an untrue statement of material fact or omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaging in an act, practice, or course of business which operated or would operate as a fraud or deceit upon Plaintiffs, in connection with the repurchase of Plaintiffs' Company shares.

125.   Specifically, Defendants misrepresented to Plaintiffs the financial state and outlook of the Company, and made representations that the Company was in a dire state and on the brink of insolvency.  These statements were false or misleading because Defendants were already undergoing negotiations regarding, if they had not

already obtained, a $35 million investment round led by Sound Ventures, a venture capital fund founded by Ashton Kutcher and Guy Oseary, and had experienced other business events that significantly improved the outlook for the Company. Defendants made many of these representations to Buffin knowing that Buffin would convey the message to Max Levine, which Buffin did.  These false representations include:

a.   On or about August 14, 2018, Peltier called Buffin and told him Defendants needed to "clean up" the Company's capitalization table because they had a small investment closing soon;

b.   On or about October 29, 2018, and on multiple subsequent occasions, Peltier told Buffin over the phone that there were only two options left for the Company given its poor financial condition: (1) the Company would either go bankrupt and Buffin and Max Levine would be left with nothing from their investment in the Company; or (2) Buffin and Max Levine could sell back their shares to the Company for approximately $20,000, which would save them all the time and legal costs associated with filing for bankruptcy, and allow Max Levine and Buffin to walk away with guaranteed cash in their pockets;

c.   On or about November 1, 2018, Peltier reiterated these two options to Buffin and told him that "there arnt really any" other options and that Buffin and Max Levine couldn't sell back just half of their shares because it was "kinda all or nothing";

d.   On or about November 1, 2018, Buffin asked Peltier to confirm that the only other option would be to "get stroked and move on with nothing lol," to which Peltier responded, "[R]ight, we just need to clean cap to get all parties to help us move forward";

e.   On or about November 1, 2018, after Buffin told Peltier he

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

wanted to "see some longer upside" in the Company, Peltier responded, "you're telling me lol"; and

f. On or about November 29, 2018, Peltier called Max Levine and repeated the same ultimatum—that the Company was on the verge of insolvency and could not survive if Buffin and Max Levine did not sell back their shares.

126.   Defendants also misrepresented the value of the Company shares. These statements were misleading because Defendants made them without providing Plaintiffs with all relevant disclosures relating to the Company's investment led by Sound Ventures, which affected the Company's share value. Defendants made many of these representations to Buffin knowing that Buffin would convey the message to Max Levine, which Buffin did.  These false representations include:

a. On or about May 11, 2018, Peltier texted Buffin that the share value of the Company "are w.e. [whatever] at this point, and we have $70k in our bank lol"; and

b. On or about October 29, 2018, Peltier called Buffin and told him that the Company shares were worth a penny;

c. Throughout his discussions with Buffin in October and November of 2018, Peltier expressed that the cash offer was generous given the meager share value of the Company.

127.   Defendants also misrepresented that they were acting in the best interests of all of the shareholders, including Buffin and Max Levine.  Defendants made many of these representations to Buffin knowing that Buffin would convey the message to Max Levine, which Buffin did.  These false representations include:

a. On or about June 18, 2018, Peltier called Buffin and told him that Defendants wanted to repurchase Plaintiffs' shares as well as shares from other former and current employees because

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

Defendants wanted to do the "right thing" for all the shareholders;

b.  On or about October 29, 2018, Peltier called Buffin and told him that selling back his shares for approximately $20,000 would be the only way for Max Levine and Buffin to obtain a return on their investment in the Company;

c.  On or about October 29, 2018, Peltier called Buffin and told him that a $22,002 purchase price for each of Max Levine's and Buffin's 600,000 shares (which equates to $0.036/share) was a good deal given that the Company shares were worth just a penny; and

d.  On or about November 1, 2018, Peltier texted Buffin to tell him that selling back his shares for $22,002 would still give Plaintiffs a "massive return considering the shares started at $.00001 lol."

128.  Defendants failed to disclose these special facts relating to the Company's financial condition and prospects during the negotiations of Defendants' repurchase of Plaintiffs' Company shares in order to induce Plaintiffs into selling their shares to them.  Peltier concealed the true financial outlook of the Company and the identity of its new high-profile investors in hopes of swindling Plaintiffs to sell their shares to him at a nominal amount so that Defendants could make a windfall.  These concealments include:

a.  Actively concealing from Buffin and Max Levine, despite having a duty to disclose this information, the names of the Company's high-profile investors or potential investors—Hollywood talent manager Guy Oseary and celebrity Ashton Kutcher;

b.  Actively concealing from Buffin and Max Levine, despite having a duty to disclose this information, that negotiations were underway, near complete, or already completed for a $35 million

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

investment in the Company led by Sound Ventures, a venture

capital fund founded by Ashton Kutcher and Guy Oseary;

c. Actively concealing from Buffin and Max Levine, despite having

a duty to disclose this information, that the Company was raising

money at valuations well in excess of those communicated to

Buffin and Max Levine, including a valuation of approximately

$180 million; and

d. Actively concealing from Buffin and Max Levine, despite having

a duty to disclose this information, that new or anticipated

investment rounds would significantly change the financial

prospects of the Company and its share value;

e. Actively concealing the technological successes of the Company

and investor and client interest in those successes.

129. Defendants knew that the information they omitted or concealed from Buffin and Max Levine was material to their decision on whether to sell back their Company shares for $22,002. The facts alleged herein indicate that Defendants acted with scienter towards Plaintiffs.

130. By making the misrepresentations and omissions, Defendants intended to induce Buffin and Max Levine to sell back their Company shares at a nominal price that was based on a significantly understated valuation of the Company. Defendants knew and understood that Buffin and Max Levine would act in reliance on the false representations or omissions by agreeing to sell back their shares.

131. Buffin and Max Levine's reliance on these omissions was foreseeable, reasonable, and justified. Indeed, Buffin and Max Levine repeatedly expressed hesitation to Defendants about selling back their Company shares in part because they had very little insight into the finances and financial outlook of the Company. Peltier, as the CEO and person responsible for running the day-to-day operations of the Company, was the only person that could provide Buffin and Max Levine with

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

relevant and material information and insight into the Company finances.  Buffin and Max Levine trusted Peltier, who was not only an officer of the Company but their former co-founder, to provide such information during the parties' negotiation of the stock repurchase.  Peltier assured Buffin and Max Levine that it was in the best interests of the Company and in the best interests of Buffin and Max Levine to sell back their shares.

132.   As a direct and proximate result of Plaintiffs' reliance, Buffin and Max Levine each entered into a stock repurchase agreement whereby each of them sold back 600,000 Company shares for $22,002.  This caused injury and pecuniary loss to Buffin and Max Levine because unbeknownst to them, Defendants had already raised, or were having discussions to raise, a $35 million investment round led by Sound Ventures, at a Company valuation of $180 million.  Buffin and Max Levine would not have entered into the Stock Repurchase Agreement had Defendants not made their material omissions.  Buffin and Max Levine are thus entitled to an award of compensatory damages believed to be in excess of $25 million.

## FIFTH CAUSE OF ACTION

### (Violation of § 20(a) of the Exchange Act, 15 U.S.C. § 78(t))
### *(By Buffin and Max Levine Against Peltier And Doe Defendants)*

133.   Plaintiffs repeat and reallege each and every foregoing and subsequent allegation contained in the Complaint, and further allege as follows:

134.   Peltier is, and was at all relevant times, the CEO and a board member of the Company, and thus a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act.  By virtue of his executive position, Peltier had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the dissemination of information and statements made to Buffin and Max Levine in connection with Defendants' repurchase of Plaintiffs' Company shares.

135.   In particular, Peltier had direct involvement in the day-to-day

471279.1 .1
36
COMPLAINT

operations of the Company, including its fundraising efforts.  Thus, Peltier had the power to and indeed did exert control or influence over the negotiations of and execution of Buffin's and Max Levine's Stock Repurchase Agreements.  In fact, Peltier was the sole signatory on behalf of the Company on the Stock Repurchase Agreements.

136.   As set forth above, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 by their acts and omissions alleged herein.  By virtue of his position as a controlling person of the Company, Peltier is jointly and severally liable pursuant to Section 20(a) of the Exchange Act.

137.   As a direct and proximate result of Peltier's wrongful conduct, Buffin and Max Levine each entered into a stock repurchase agreement whereby each of them sold back 600,000 Company shares for $22,002.  This caused injury and pecuniary loss to Buffin and Max Levine because unbeknownst to them, Defendants had already raised, or were having discussions to raise, a $35 million investment led by Sound Ventures, and the Company had been valued at approximately $180 million.  Buffin and Max Levine would not have entered into the Stock Repurchase Agreement had Defendants not made their material omissions.  Buffin and Max Levine are thus entitled to an award of compensatory damages believed to be in excess of $25 million.

## SIXTH CAUSE OF ACTION

**(Securities Fraud, Violation of California Corp. Code §§ 25401, 25501, 25504)**
*(By Buffin and Max Levine Against Defendants)*

138.   Plaintiffs repeat and reallege each and every foregoing and subsequent allegation contained in the Complaint, and further allege as follows:

139.   The California Corporate Securities Laws of 1968, California Corporations Code section 25401 ("Section 25401"), states that "[i]t is unlawful for any person to offer or sell a security in this state, or to buy or offer to buy a security in this state, by means of any written or oral communication that includes an untrue

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1    statement of a material fact or omits to state a material fact necessary to make the

2    statements made, in the light of the circumstances under which the statements were

3    made, not misleading."

4        140.   Section 25501 of the Corporations Code imposes civil liability for any

5    person who violates Section 25401.  Section 25501 states, in part, "Any person who

6    violates Section 25401 shall be liable to the person who purchases a security from

7    him or sells a security to him, who may sue either for rescission or for damages (if

8    the plaintiff or the defendant, as the case may be, no longer owns the security),

9    unless the defendant proves that the plaintiff knew the facts concerning the untruth

10   or omission or that the defendant exercised reasonable care and did not know (or if

11   he had exercised reasonable care would not have known) of the untruth or

12   omission."

13       141.   Section 25504 extends the civil liability under Section 25501 to "every

14   principal executive officer or director of a corporation so liable" and "every

15   employee of a person so liable who materially aids in the act or transaction

16   constituting the violation" (among others) who are thus jointly and severally liable

17   "unless the other person who is so liable had no knowledge of or reasonable grounds

18   to believe in the existence of the facts by reason of which the liability is alleged to

19   exist."

20       142.   As CEO and a board member of the Company, Peltier owed a fiduciary

21   duty to Buffin and Max Levine, who were shareholders of the Company.  Peltier

22   controlled the operations of the Company and had knowledge of its finances.

23   Peltier's fiduciary duty to Plaintiffs required him to disclose all material facts and to

24   do so in a truthful manner during the negotiations of Defendants' repurchase of

25   Buffin's and Max Levine's shares.

26       143.   Defendants misrepresented to Plaintiffs the financial state and outlook

27   of the Company, and made representations that the Company was in a dire state and

28   on the brink of insolvency.  These statements were false or misleading because

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

Defendants were already undergoing negotiations regarding, if they had not already obtained, a $35 million investment round led by Sound Ventures, a venture capital fund founded by Ashton Kutcher and Guy Oseary.  Defendants made many of these representations to Buffin knowing that Buffin would convey the message to Max Levine, which Buffin did.  These false representations include:

    a.  On or about August 14, 2018, Peltier called Buffin and told him Defendants needed to "clean up" the Company's capitalization table because they had a "small" investment closing soon;

    b.  On or about October 29, 2018, and on multiple subsequent occasions, Peltier told Buffin over the phone that there were only two options left for the Company given its poor financial condition: (1) the Company would either go bankrupt and Buffin and Max Levine would be left with nothing from their investment in the Company; or (2) Buffin and Max Levine could sell back their shares to the Company for approximately $20,000, which would save them all the time and legal costs associated with filing for bankruptcy, and allow Max Levine and Buffin to walk away with guaranteed cash in their pockets;

    c.  On or about November 1, 2018, Peltier reiterated these two options to Buffin and told him that "there arnt really any" other options and that Buffin and Max Levine couldn't sell back just half of their shares because it was "kinda all or nothing";

    d.  On or about November 1, 2018, Buffin asked Peltier to confirm that the only other option would be to "get stroked and move on with nothing lol," to which Peltier responded, "[R]ight, we just need to clean cap to get all parties to help us move forward";

    e.  On or about November 1, 2018, after Buffin told Peltier he wanted to "see some longer upside" in the Company, Peltier

Miller Barondess, LLP
Attorneys at Law
1999 Avenue of The Stars, Suite 1000 Los Angeles, California 90067
Tel: (310) 552-4400   Fax: (310) 552-8400

responded, "you're telling me lol"; and

f. On or about November 29, 2018, Peltier called Max Levine and repeated the same ultimatum—that the Company was on the verge of insolvency and could not survive if Buffin and Max Levine did not sell back their shares.

144.   Defendants also misrepresented the value of the Company shares. These statements were misleading because Defendants made them without providing Plaintiffs with all relevant disclosures relating to the Company's investment round led by Sound Ventures, which affected the Company's share value.  Defendants made many of these representations to Buffin knowing that Buffin would convey the message to Max Levine, which Buffin did.  These false representations include:

a. On or about May 11, 2018, Peltier texted Buffin that the share value of the Company "are w.e. [whatever] at this point, and we have $70k in our bank lol";

b. On or about October 29, 2018, Peltier called Buffin and told him that the Company shares were worth a penny; and

c. Throughout his discussions with Buffin in October and November of 2018, Peltier expressed that the cash offer was generous given the meager share value of the Company.

145.   Defendants also misrepresented that they were acting in the best interests of all of the shareholders, including Buffin and Max Levine.  Defendants made many of these representations to Buffin knowing that Buffin would convey the message to Max Levine, which Buffin did.  These false representations include:

a. On or about June 18, 2018, Peltier called Buffin and told him that Defendants wanted to repurchase Plaintiffs' shares as well as shares from other former and current employees because Defendants wanted to do the "right thing" for all the

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

shareholders;

    b. On or about October 29, 2018, Peltier called Buffin and told him that selling back his shares for approximately $20,000 would be the only way for Max Levine and Buffin to obtain a return on their investment in the Company;

    c. On or about October 29, 2018, Peltier called Buffin and told him that a $22,002 purchase price for each of Max Levine's and Buffin's 600,000 shares (which equates to $0.036/share) was a good deal given that the Company shares were worth just a penny; and

    d. On or about November 1, 2018, Peltier texted Buffin to tell him that selling back his shares for $22,002 would still give Plaintiffs a "massive return considering the shares started at $.00001 lol."

146.   Defendants failed to disclose these special facts relating to the Company's financial condition and prospects during the negotiations of Defendants' repurchase of Plaintiffs' Company shares in order to induce Plaintiffs into selling their shares to them.  Peltier concealed the true financial outlook of the Company and the identity of its new high-profile investors in hopes of swindling Plaintiffs to sell their shares to him at a nominal amount so that Defendants could make a windfall.  These concealments include:

    a. Actively concealing from Buffin and Max Levine, despite having a duty to disclose this information, the names of the Company's high-profile investors or potential investors—Hollywood talent manager Guy Oseary and celebrity Ashton Kutcher;

    b. Actively concealing from Buffin and Max Levine, despite having a duty to disclose this information, that negotiations were underway, near complete, or already completed for a $35 million investment round led by Sound Ventures, a venture capital fund

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

41
COMPLAINT

founded by Ashton Kutcher and Guy Oseary;

c.  Actively concealing from Buffin and Max Levine, despite having a duty to disclose this information, other valuations of the Company, including the approximately $180 million valuation used for the round led by Sound Ventures; and

d.  Actively concealing from Buffin and Max Levine, despite having a duty to disclose this information, that a $35 million investment round led by Sound Ventures would significantly change the financial prospects of the Company and its share value.

147.  Defendants knew that the information they omitted or concealed from Buffin and Max Levine was material to their decision on whether to sell back their Company shares for $22,002.

148.  By making the misrepresentations or omissions, Defendants intended to induce Buffin and Max Levine to sell back their Company shares at a nominal price that was based on a significantly understated valuation of the Company.  Defendants knew and understood that Buffin and Max Levine would act in reliance on the false representations or omissions by agreeing to sell back their shares.

149.  Buffin and Max Levine's reliance on these misrepresentations or omissions was foreseeable, reasonable, and justified.  Indeed, Buffin and Max Levine repeatedly expressed hesitation to Defendants about selling back their Company shares in part because they had very little insight into the finances and financial outlook of the Company.  Peltier, as the CEO and person responsible for running the day-to-day operations of the Company, was the only person that could provide Buffin and Max Levine with relevant and material information and insight into the Company finances.  Buffin and Max Levine trusted Peltier, who was not only an officer of the Company but their former co-founder, to provide such information during the parties' negotiation of the stock repurchase.  Peltier assured Buffin and Max Levine that it was in the best interests of the Company and in the

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1  best interests of Buffin and Max Levine to sell back their shares.

2      150.   As a direct and proximate result of Plaintiffs' reliance, Buffin and Max

3  Levine each entered into a stock repurchase agreement whereby each of them sold

4  back 600,000 Company shares for $22,002.  This caused injury and pecuniary loss

5  to Buffin and Max Levine because unbeknownst to them, Defendants had already

6  raised, or were in discussions to raise, a $35 million investment round led by Sound

7  Ventures, and that the valuation of the Company was actually around $180 million.

8  Buffin and Max Levine would not have entered into the Stock Repurchase

9  Agreement had Defendants not made their material misrepresentations or omissions.

10  Buffin and Max Levine are thus entitled to an award of compensatory damages

11  believed to be in excess of $25 million.  Alternatively, Buffin and Max Levine are

12  entitled to rescission of each Stock Purchase Agreement as a result of Defendants'

13  fraudulent conduct.

## SEVENTH CAUSE OF ACTION

14

15                              **(Negligent Misrepresentation)**

16                    ***(By Buffin and Max Levine Against Defendants)***

17      151.   Plaintiffs repeat and reallege each and every foregoing and subsequent

18  allegation contained in the Complaint, and further allege as follows:

19      152.   As alleged herein, and in the alternative to Defendants fraudulently

20  making various false or misleading representations of material facts, Defendants

21  misrepresented to Plaintiffs the financial state and outlook of the Company, and

22  made representations that the Company was in a dire state and on the brink of

23  insolvency.  Defendants made many of these representations to Buffin knowing that

24  Buffin would convey the message to Max Levine, which Buffin did.  These false

25  representations include:

26                    a. On or about August 14, 2018, Peltier called Buffin and told him

27                       Defendants needed to "clean up" the Company's capitalization

28                       table because they had a "small" investment closing soon;

471279.1 .1

43

COMPLAINT

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

b.   On or about October 29, 2018, and on multiple subsequent occasions, Peltier told Buffin that there were only two options left for the Company given its poor financial condition: (1) the Company would either go bankrupt and Buffin and Max Levine would be left with nothing from their investment in the Company; or (2) Buffin and Max Levine could sell back their shares to the Company for approximately $20,000, which would save them all the time and legal costs associated with filing for bankruptcy, and allow Max Levine and Buffin to walk away with guaranteed cash in their pockets;

c.   On or about November 1, 2018, Peltier reiterated these two options to Buffin and told him that "there arnt really any" other options and that Buffin and Max Levine couldn't sell back just half of their shares because it was "kinda all or nothing";

d.   On or about November 1, 2018, Buffin asked Peltier to confirm that the only other option would be to "get stroked and move on with nothing lol," to which Peltier responded, "[R]ight, we just need to clean cap to get all parties to help us move forward";

e.   On or about November 1, 2018, after Buffin told Peltier he wanted to "see some longer upside" in the Company, Peltier responded, "you're telling me lol"; and

f.   On or about November 29, 2018, Peltier called Max Levine and repeated the same ultimatum—that the Company was on the verge of insolvency and could not survive if Buffin and Max Levine did not sell back their shares.

153.   Defendants also misrepresented the value of the Company shares. These statements were misleading because Defendants made them without providing Plaintiffs with all relevant disclosures relating to the Company's

44

COMPLAINT

investment led by Sound Ventures, which affected the Company's share value. Defendants made many of these representations to Buffin knowing that Buffin would convey the message to Max Levine, which Buffin did.  These false representations include:

     a. On or about May 11, 2018, Peltier texted Buffin that the share value of the Company "are w.e. [whatever] at this point, and we have $70k in our bank lol";

     b. On or about October 29, 2018, Peltier called Buffin and told him that the Company shares were worth a penny; and

     c. Throughout his discussions with Buffin in October and November of 2018, Peltier expressed that the cash offer was generous given the meager share value of the Company.

154.   Defendants also misrepresented that they were acting in the best interests of all of the shareholders, including Buffin and Max Levine.  Defendants made many of these representations to Buffin knowing that Buffin would convey the message to Max Levine, which Buffin did.  These false representations include:

     a. On or about June 18, 2018, Peltier called Buffin and told him that Defendants wanted to repurchase Plaintiffs' shares as well as shares from other former and current employees because Defendants wanted to do the "right thing" for all the shareholders;

     b. On or about October 29, 2018, Peltier called Buffin and told him that selling back his shares for approximately $20,000 would be the only way for Max Levine and Buffin to obtain a return on their investment in the Company;

     c. On or about October 29, 2018, Peltier called Buffin and told him that a $22,002 purchase price for each of Max Levine's and Buffin's 600,000 shares (which equates to $0.036/share) was a

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

good deal given that the Company shares were worth just a penny; and

d. On or about November 1, 2018, Peltier texted Buffin to tell him that selling back his shares for $22,002 would still give Plaintiffs a "massive return considering the shares started at $.00001 lol."

155.   Defendants failed to disclose material facts relating to the Company's financial condition and prospects during the negotiations of Defendants' repurchase of Plaintiffs' Company shares in order to induce Plaintiffs into selling their shares to them.  These material omissions include:

a. Actively concealing from Buffin and Max Levine, despite having a duty to disclose this information, the names of the Company's high-profile investors or potential investors—Hollywood talent manager Guy Oseary and celebrity Ashton Kutcher;

b. Actively concealing from Buffin and Max Levine, despite having a duty to disclose this information, that negotiations were underway, near complete, or already completed for a $35 million investment round led by Sound Ventures;

c. Actively concealing from Buffin and Max Levine, despite having a duty to disclose this information, other valuations for the Company, including the valuation of approximately $180 million used for the $35 million investment round led by Sound Ventures; and

d. Actively concealing from Buffin and Max Levine, despite having a duty to disclose this information, that a $35 million investment round led by Sound Ventures would significantly change the financial prospects of the Company and its share value.

156.   Defendants made each of these false representations without reasonable grounds for believing them to be true.  Defendants knew, or should have known,

that negotiations were underway or already completed for a $35 million investment from influential, high-profile investors and that such an investment would materially raise the Company's share price and thus valuation.

157.   By making the misrepresentations, Defendants intended to induce Buffin and Max Levine to sell back their Company shares at a nominal price that was based on a significantly understated valuation of the Company.  Defendants knew and understood that Buffin and Max Levine would act in reliance on the false representations by agreeing to sell back their shares.

158.   Buffin and Max Levine's reliance on these misrepresentations was foreseeable, reasonable, and justified.  Indeed, Buffin and Max Levine repeatedly expressed hesitation to Defendants about selling back their Company shares in part because they had very little insight into the finances and financial outlook of the Company.  Peltier, as the CEO and person responsible for running the day-to-day operations of the Company, was the only person that could provide Buffin and Max Levine with relevant and material information and insight into the Company finances.  Buffin and Max Levine trusted Peltier, who was not only an officer of the Company but their former co-founder, to provide such information during the parties' negotiation of the stock repurchase.  Peltier assured Buffin and Max Levine that it was in the best interests of the Company and in the best interests of Buffin and Max Levine to sell back their shares.

159.   As a direct and proximate result of Plaintiffs' reliance, Buffin and Max Levine each entered into a stock repurchase agreement whereby each of them sold back 600,000 Company shares for $22,002.  This caused injury and pecuniary loss to Buffin and Max Levine because unbeknownst to them, Defendants had already raised, or were on the cusp of raising, a $35 million investment led by Sound Ventures, at a Company valuation of $180 million.  Buffin and Max Levine are thus entitled to an award of compensatory damages believed to be in excess of $25 million.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

## EIGHTH CAUSE OF ACTION

### (Breach of Contract)

### *(By Max Levine Against Community)*

160.   Plaintiffs repeat and reallege each and every foregoing and subsequent allegation contained in the Complaint, and further allege as follows:

161.   Max Levine and Community, through its agent Peltier, entered into numerous agreements whereby Max Levine would loan Community certain funds to pay off Community's payroll and other operating expenses between January 2015 and August 2016.  Community agreed to pay back those loans on numerous occasions.  Max Levine has loaned the Company approximately $28,857 in total.

162.   In a Separation Agreement entered into on or around January 28, 2018, the Company agreed to finally make good on the outstanding amounts owed.  The contract states that Max Levine would submit his outstanding business expenses and the "Company will reimburse you for these expenses…."  Max Levine timely submitted the expenses for reimbursement.

163.   Community has breached the parties' agreements by failing to pay Max Levine back in full.  Approximately $15,212 remains outstanding.

164.   This breach directly and proximately caused injury and pecuniary loss to Max Levine, for which he is entitled to an award of compensatory damages in the amount of $15,212 plus interest.

## NINTH CAUSE OF ACTION

### (Breach of Contract)

### *(By Steven Levine Against Community)*

165.   Plaintiffs repeat and reallege each and every foregoing and subsequent allegation contained in the Complaint, and further allege as follows:

166.   On or about April 16, 2014, Peltier emailed Steven Levine with a 2.5% equity stake offer in return for Steven Levine's $50,000 investment.  In this email, Peltier referred to Steven Levine's $50,000 contribution to the Company as an

1    investment.  Peltier also offered in this email to structure the investment as

2    convertible debt if Steven Levine preferred.

3        167.   Shortly thereafter, Steven Levine spoke on the phone with Peltier and

4    accepted the offer for 2.5% equity; he told Peltier he was not interested in the

5    convertible debt offer.

6        168.   Steven Levine trusted Peltier, with whom he had a close relationship by

7    virtue of his son's business relationship with Peltier.

8        169.   In or about mid-Summer 2017, after his son Max Levine left the

9    Company, Steven Levine approached Peltier about buying out his investment in the

10   Company.  Peltier reassured Steven Levine that his investment was best left in the

11   Company because they were working on a new strategy that could turn the

12   Company around.  Based on this explanation from Peltier, Steven Levine decided to

13   stop negotiating for a buyout of his investment and continued to believe his

14   investment was secure.

15       170.   Even as recently as June 2019, Peltier acknowledged Steven Levine's

16   2.5% investment.  Around that time, Peltier approached Steven Levine through a

17   text message and phone call about Community buying out Steven Levine's 2.5%

18   interest.  Peltier expressed that Defendants were making similar offers to other early

19   investors.  Notably, in this conversation, Peltier failed to disclose anything about the

20   Company's recent successes, such as the $35 million investment led by Sound

21   Ventures.

22       171.   However, later in 2019, Defendants changed their position.  They

23   denied that Steven Levine was an investor in the Company at all, let alone a 2.5%

24   interest holder.  This was the first time Defendants ever communicated to Steven

25   Levine that they did not recognize him as a shareholder, let alone a 2.5%

26   shareholder.

27       172.   It only became apparent to Steven Levine after Defendants reversed

28   course that Peltier had defrauded him and been stringing him along for years.  The

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

statements Peltier made to Steven Levine in 2014, 2017 and 2019 were all fraudulent and intended to induce Steven Levine to believe his investment was secure when it was not.

173.   Community breached its agreement with Steven Levine by, among other things, failing to convey to Steven Levine shares in the Company amounting to a 2.5% equity stake.

174.   Steven Levine performed all conditions, covenants, and promises required on his part to be performed, except for those conditions, covenants, or promises which were excused by Community or that Community prevented him from performing by the acts or omissions on the part of Community and its agent Peltier.

175.   This breach directly and proximately caused injury and pecuniary loss to Steven Levine, for which he is entitled to an award of compensatory damages believed to be in excess of $5 million.

176.   Alternatively, Steven Levine is entitled to a judicial order demanding that Community specifically perform according to the terms of the parties' agreement, including properly executing and transferring to Steven Levine shares in Community reflecting his 2.5% equity interest.

## **TENTH CAUSE OF ACTION**

### **(Breach of Fiduciary Duty)**

### ***(By Steven Levine Against Peltier And Doe Defendants)***

177.   Plaintiffs repeat and reallege each and every foregoing and subsequent allegation contained in the Complaint, and further allege as follows:

178.   Directors and officers of a corporation owe fiduciary duties to the corporation's shareholders.  This fiduciary duty includes an obligation to recognize a shareholder's status and equity stake in the corporation.

179.   On or about April 16, 2014, Peltier emailed Steven Levine with a 2.5% equity stake offer in return for Steven Levine's $50,000 investment.  In this email,

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

Peltier referred to Steven Levine's $50,000 contribution to the Company as an investment. Peltier also offered in this email to structure the investment as convertible debt if Steven Levine preferred.

180. Shortly thereafter, Steven Levine spoke on the phone with Peltier and accepted the offer for 2.5% equity; he told Peltier he was not interested in the convertible debt offer.

181. Steven Levine trusted Peltier, with whom he had a close relationship by virtue of his son's business relationship with Peltier.

182. In or about mid-Summer 2017, after his son Max Levine left the Company, Steven Levine approached Peltier about buying out his investment in the Company. Peltier reassured Steven Levine that his investment was best left in the Company because they were working on a new strategy that could turn the Company around. Based on this explanation from Peltier, Steven Levine decided to stop negotiating for a buyout of his investment and continued to believe his investment was secure.

183. Even as recently as June 2019, Peltier acknowledged Steven Levine's 2.5% investment. Around that time, Peltier approached Steven Levine through a text message and phone call about Community buying out Steven Levine's 2.5% interest. Peltier expressed that Defendants were making similar offers to other early investors. Notably, in this conversation, Peltier failed to disclose anything about the Company's recent successes, such as the $35 million investment led by Sound Ventures.

184. However, later in 2019, Defendants changed their position. They denied that Steven Levine was an investor in the Company at all, let alone a 2.5% interest holder. This was the first time Defendants ever communicated to Steven Levine that they did not recognize him as a shareholder, let alone a 2.5% shareholder.

185. It only became apparent to Steven Levine after Defendants reversed

Miller Barondess, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

course that Peltier had defrauded him and been stringing him along for years.  The

statements Peltier made to Steven Levine in 2014, 2017 and 2019 were all

fraudulent and intended to induce Steven Levine to believe his investment was

secure when it was not.

186.   Peltier breached his fiduciary duty to Steven Levine, a shareholder in

the Company with a 2.5% equity stake, by, in 2019 and thereafter, failing and

refusing to recognize Steven Levine as a shareholder of the Company and his

accompanying equity stake and other shareholder rights, including by failing and

refusing to transfer to Steven Levine his shares in the Company.

187.   Peltier's conduct has directly and proximately caused injury and

pecuniary loss to Steven Levine for which he is entitled to an award of

compensatory damages believed to be in excess of $5 million.

188.   Peltier acted with the intent of depriving Steven Levine of his rights

and causing injury to him.  The conduct was despicable and subjected Steven Levine

to unjust hardship.  The conduct was malicious, fraudulent and oppressive, and was

committed with a conscious disregard for Steven Levine's rights.  Accordingly,

Steven Levine is entitled to an award of punitive or exemplary damages in an

amount sufficient to punish Peltier and to make an example of him.

## ELEVENTH CAUSE OF ACTION

### (Fraud)

### *(By Steven Levine Against Defendants)*

189.   Plaintiffs repeat and reallege each and every foregoing and subsequent

allegations contained in the Complaint, and further allege as follows:

190.   On or about April 16, 2014, Peltier emailed Steven Levine with a 2.5%

equity stake offer in return for Steven Levine's $50,000 investment.  In this email,

Peltier referred to Steven Levine's $50,000 contribution to the Company as an

investment.  Peltier also offered in this email to structure the investment as

convertible debt if Steven Levine preferred.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

191.   Shortly thereafter, Steven Levine spoke on the phone with Peltier and accepted the offer for 2.5% equity; he told Peltier he was not interested in the convertible debt offer.

192.   Steven Levine trusted Peltier, with whom he had a close relationship by virtue of his son's business relationship with Peltier.

193.   In or about mid-Summer 2017, after his son Max Levine left the Company, Steven Levine approached Peltier about buying out his investment in the Company.  Peltier reassured Steven Levine that his investment was best left in the Company because they were working on a new strategy that could turn the Company around.  Based on this explanation from Peltier, Steven Levine decided to stop negotiating for a buyout of his investment and continued to believe his investment was secure.

194.   Even as recently as June 2019, Peltier acknowledged Steven Levine's 2.5% investment.  Around that time, Peltier approached Steven Levine through a text message and phone call about Community buying out Steven Levine's 2.5% interest.  Peltier expressed that Defendants were making similar offers to other early investors.  Notably, in this conversation, Peltier failed to disclose anything about the Company's recent successes, such as the $35 million investment led by Sound Ventures.

195.   However, later in 2019, Defendants changed their position.  They denied that Steven Levine was an investor in the Company at all, let alone a 2.5% interest holder.  This was the first time Defendants ever communicated to Steven Levine that they did not recognize him as a shareholder, let alone a 2.5% shareholder.

196.   It only became apparent to Steven Levine after Defendants reversed course that Peltier had defrauded him and been stringing him along for years.  The statements Peltier made to Steven Levine in 2014, 2017 and 2019 were all fraudulent and intended to induce Steven Levine to believe his investment was

secure when it was not.

197.   Steven Levine relied on Defendants' false or misleading representations to invest $50,000 in the Company and to not take action until 2019. Steven Levine's reliance on these misrepresentations and omissions was foreseeable, reasonable, and justified.  Steven Levine trusted Peltier, who acted as the Company's agent, to deliver on his promise.

198.   As a direct and proximate result of Steven Levine's reliance on Defendants' misrepresentations and omissions, Steven Levine has suffered injury and pecuniary loss and is thus entitled to an award of compensatory damages believed to be in excess of $5 million.

## TWELFTH CAUSE OF ACTION

**(Violation of § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 Promulgated Thereunder, 17 C.F.R. § 240.10b-5))**

***(By Steven Levine Against Defendants)***

199.   Plaintiffs repeat and reallege each and every foregoing and subsequent allegations contained in the Complaint, and further allege as follows:

200.   Defendants, directly or indirectly, by the use of means or instrumentalities of interstate commerce, including but not limited to the use of phones for calls and texting, e-mail, and the internet, engaged in a course of conduct that violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by (a) employing a device, scheme, or artifice to defraud Plaintiff; (b) making an untrue statement of material fact or omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaging in an act, practice, or course of business which operated or would operate as a fraud or deceit upon Plaintiff, in connection with obtaining Steven Levine's $50,000 investment in the Company.

201.   On or about April 16, 2014, Peltier emailed Steven Levine with a 2.5% equity stake offer in return for Steven Levine's $50,000 investment.  In this email,

Miller Barondess, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

Peltier referred to Steven Levine's $50,000 contribution to the Company as an investment. Peltier also offered in this email to structure the investment as convertible debt if Steven Levine preferred.

202. Shortly thereafter, Steven Levine spoke on the phone with Peltier and accepted the offer for 2.5% equity; he told Peltier he was not interested in the convertible debt offer.

203. Steven Levine trusted Peltier, with whom he had a close relationship by virtue of his son's business relationship with Peltier.

204. In or about mid-Summer 2017, after his son Max Levine left the Company, Steven Levine approached Peltier about buying out his investment in the Company. Peltier reassured Steven Levine that his investment was best left in the Company because they were working on a new strategy that could turn the Company around. Based on this explanation from Peltier, Steven Levine decided to stop negotiating for a buyout of his investment and continued to believe his investment was secure.

205. Even as recently as June 2019, Peltier acknowledged Steven Levine's 2.5% investment. Around that time, Peltier approached Steven Levine through a text message and phone call about Community buying out Steven Levine's 2.5% interest. Peltier expressed that Defendants were making similar offers to all of its early investors. Notably, in this conversation, Peltier failed to disclose anything about the Company's recent successes, such as the $35 million investment led by Sound Ventures.

206. However, later in 2019, Defendants changed their position. They denied that Steven Levine was an investor in the Company at all, let alone a 2.5% interest holder. This was the first time Defendants ever communicated to Steven Levine that they did not recognize him as a shareholder, let alone a 2.5% shareholder.

207. It only became apparent to Steven Levine after Defendants reversed

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

course that Peltier had defrauded him and been stringing him along for years. The statements Peltier made to Steven Levine in 2014, 2017 and 2019 were all fraudulent and intended to induce Steven Levine to believe his investment was secure when it was not.

208.    Steven Levine relied on Defendants' false or misleading representations and invested $50,000 in the Company and to not take action until 2019. Steven Levine's reliance on these misrepresentations and omissions was foreseeable, reasonable, and justified. Steven Levine trusted Peltier, who acted as the Company's agent, to deliver on his promise. The facts alleged herein indicate that Defendants acted with scienter towards Plaintiff.

209.    As a direct and proximate result of Steven Levine's reliance on Defendants' misrepresentations and omissions, Steven Levine has suffered injury and pecuniary loss and is thus entitled to an award of compensatory damages believed to be in excess of $5 million.

## THIRTEENTH CAUSE OF ACTION

### (Violation of § 20(a) of the Exchange Act, 15 U.S.C. § 78(t))

#### *(By Steven Levine Against Peltier And Doe Defendants)*

210.    Plaintiffs repeat and reallege each and every foregoing and subsequent allegation contained in the Complaint, and further allege as follows:

211.    Peltier is, and was at all relevant times, the CEO and a board member of the Company, and thus a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act. By virtue of his executive position, Peltier had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the offer of a 2.5% equity stake to Steven Levine in return for his $50,000 investment in the Company.

212.    In particular, Peltier had direct involvement in the day-to-day operations and the power to control or influence the negotiations of and execution of any investments made in the Company. In fact, Peltier did exert that control and

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1  influence, including by negotiating and communicating directly with Steven Levine

2  regarding his investment and 2.5% equity stake in the Company.

3      213.   As set forth above, Defendants violated Section 10(b) of the Exchange

4  Act and Rule 10b-5 by their acts or omissions alleged herein.  By virtue of his

5  position as a controlling person of the Company, Peltier is jointly and severally

6  liable pursuant to Section 20(a) of the Exchange Act.

7      214.   As a direct and proximate result of Peltier's wrongful conduct, Steven

8  Levine has suffered injury and pecuniary loss, and is thus entitled to an award of

9  compensatory damages believed to be in excess of $5 million.

10              **FOURTEENTH CAUSE OF ACTION**

11  **(Securities Fraud, Violation of California Corp. Code §§ 25401, 25501, 25504)**

12              ***(By Steven Levine Against Defendants)***

13      215.   Plaintiffs repeat and reallege each and every foregoing and subsequent

14  allegations contained in the Complaint, and further allege as follows:

15      216.   Section 25401 states that "[i]t is unlawful for any person to offer or sell

16  a security in this state, or to buy or offer to buy a security in this state, by means of

17  any written or oral communication that includes an untrue statement of a material

18  fact or omits to state a material fact necessary to make the statements made, in the

19  light of the circumstances under which the statements were made, not misleading."

20      217.   Section 25501 of the Corporations Code imposes civil liability for any

21  person who violates Section 25401.  Section 25501 states, in part, "Any person who

22  violates Section 25401 shall be liable to the person who purchases a security from

23  him or sells a security to him, who may sue either for rescission or for damages (if

24  the plaintiff or the defendant, as the case may be, no longer owns the security),

25  unless the defendant proves that the plaintiff knew the facts concerning the untruth

26  or omission or that the defendant exercised reasonable care and did not know (or if

27  he had exercised reasonable care would not have known) of the untruth or

28  omission."

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

218.   Section 25504 extends the civil liability under Section 25501 to "every principal executive officer or director of a corporation so liable" and "every employee of a person so liable who materially aids in the act or transaction constituting the violation" (among others) who are thus jointly and severally liable "unless the other person who is so liable had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist."

219.   On or about April 16, 2014, Peltier emailed Steven Levine with a 2.5% equity stake offer in return for Steven Levine's $50,000 investment.  In this email, Peltier referred to Steven Levine's $50,000 contribution to the Company as an investment.  Peltier also offered in this email to structure the investment as convertible debt if Steven Levine preferred.

220.   Shortly thereafter, Steven Levine spoke on the phone with Peltier and accepted the offer for 2.5% equity; he told Peltier he was not interested in the convertible debt offer.

221.   Steven Levine trusted Peltier, with whom he had a close relationship by virtue of his son's business relationship with Peltier.

222.   In or about mid-Summer 2017, after his son Max Levine left the Company, Steven Levine approached Peltier about buying out his investment in the Company.  Peltier reassured Steven Levine that his investment was best left in the Company because they were working on a new strategy that could turn the Company around.  Based on this explanation from Peltier, Steven Levine decided to stop negotiating for a buyout of his investment and continued to believe his investment was secure.

223.   Even as recently as June 2019, Peltier acknowledged Steven Levine's 2.5% investment.  Around that time, Peltier approached Steven Levine through a text message and phone call about Community buying out Steven Levine's 2.5% interest.  Peltier expressed that Defendants were making similar offers to all of its

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

early investors.  Notably, in this conversation, Peltier failed to disclose anything about the Company's recent successes, such as the $35 million investment led by Sound Ventures.

224.   However, later in 2019, Defendants changed their position.  They denied that Steven Levine was an investor in the Company at all, let alone a 2.5% interest holder.  This was the first time Defendants ever communicated to Steven Levine that they did not recognize him as a shareholder, let alone a 2.5% shareholder.

225.   It only became apparent to Steven Levine after Defendants reversed course that Peltier had defrauded him and been stringing him along for years.  The statements Peltier made to Steven Levine in 2014, 2017 and 2019 were all fraudulent and intended to induce Steven Levine to believe his investment was secure when it was not.

226.   Steven Levine relied on Defendants' false or misleading representations and invested $50,000 in the Company.  Steven Levine's reliance on these misrepresentations and omissions was foreseeable, reasonable, and justified. Steven Levine trusted Peltier, who acted as the Company's agent, to deliver on his promise.  The facts alleged herein indicate that Defendants acted with scienter towards Plaintiff.

227.   As a direct and proximate result of Steven Levine's reliance on Defendants' misrepresentations and omissions, Steven Levine has suffered injury and pecuniary loss and is thus entitled to an award of compensatory damages believed to be in excess of $5 million.

## FIFTEENTH CAUSE OF ACTION

### (Negligent Misrepresentation)

### *(By Steven Levine Against Defendants)*

228.   Plaintiffs repeat and reallege each and every foregoing and subsequent allegations contained in the Complaint, and further allege as follows:

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

229.   As alleged herein, and in the alternative to Defendants fraudulently making misrepresentations or omissions of material facts, Defendants made misrepresentations or omissions to Steven Levine regarding his investment in the Company without reasonable grounds for believing them to be true.

230.   On or about April 16, 2014, Peltier emailed Steven Levine with a 2.5% equity stake offer in return for Steven Levine's $50,000 investment.  In this email, Peltier referred to Steven Levine's $50,000 contribution to the Company as an investment.  Peltier also offered in this email to structure the investment as convertible debt if Steven Levine preferred.

231.   Shortly thereafter, Steven Levine spoke on the phone with Peltier and accepted the offer for 2.5% equity; he told Peltier he was not interested in the convertible debt offer.

232.   Steven Levine trusted Peltier, with whom he had a close relationship by virtue of his son's business relationship with Peltier.

233.   In or about mid-Summer 2017, after his son Max Levine left the Company, Steven Levine approached Peltier about buying out his investment in the Company.  Peltier reassured Steven Levine that his investment was best left in the Company because they were working on a new strategy that could turn the Company around.  Based on this explanation from Peltier, Steven Levine decided to stop negotiating for a buyout of his investment and continued to believe his investment was secure.

234.   Even as recently as June 2019, Peltier acknowledged Steven Levine's 2.5% investment.  Around that time, Peltier approached Steven Levine through a text message and phone call about Community buying out Steven Levine's 2.5% interest.  Peltier expressed that Defendants were making similar offers to all of its early investors.  Notably, in this conversation, Peltier failed to disclose anything about the Company's recent successes, such as the $35 million investment led by Sound Ventures.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

235.   However, later in 2019, Defendants changed their position.  They denied that Steven Levine was an investor in the Company at all, let alone a 2.5% interest holder.  This was the first time Defendants ever communicated to Steven Levine that they did not recognize him as a shareholder, let alone a 2.5% shareholder.

236.   Defendants knew, or should have known, that Defendants were not going to recognize Steven Levine as a shareholder in the Company.

237.   Defendants made the misrepresentations intending to induce Steven Levine to make a $50,000 investment in the Company.

238.   Steven Levine's reliance on these misrepresentations was foreseeable, reasonable, and justified.

239.   As a direct and proximate result of Steven Levine's reliance, Steven Levine invested $50,000 in the Company.  This caused injury and pecuniary loss to Steven Levine, and he is entitled to damages in an amount to be determined but exceeding $5 million.

## SIXTEENTH CAUSE OF ACTION

### (Conversion)

### (By Steven Levine Against Defendants)

240.   Plaintiffs repeat and reallege each and every foregoing and subsequent allegations contained in the Complaint, and further allege as follows:

241.   On or about April 16, 2014, Peltier emailed Steven Levine with a 2.5% equity stake offer in return for Steven Levine's $50,000 investment.  In this email, Peltier referred to Steven Levine's $50,000 contribution to the Company as an investment.  Peltier also offered in this email to structure the investment as convertible debt if Steven Levine preferred.

242.   Shortly thereafter, Steven Levine spoke on the phone with Peltier and accepted the offer for 2.5% equity; he told Peltier he was not interested in the convertible debt offer.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

243.   Steven Levine trusted Peltier, with whom he had a close relationship by virtue of his son's business relationship with Peltier.

244.   In or about mid-Summer 2017, after his son Max Levine left the Company, Steven Levine approached Peltier about buying out his investment in the Company.  Peltier reassured Steven Levine that his investment was best left in the Company because they were working on a new strategy that could turn the Company around.  Based on this explanation from Peltier, Steven Levine decided to stop negotiating for a buyout of his investment and continued to believe his investment was secure.

245.   Even as recently as June 2019, Peltier acknowledged Steven Levine's 2.5% investment.  Around that time, Peltier approached Steven Levine through a text message and phone call about Community buying out Steven Levine's 2.5% interest.  Peltier expressed that Defendants were making similar offers to all of its early investors.  Notably, in this conversation, Peltier failed to disclose anything about the Company's recent successes, such as the $35 million investment led by Sound Ventures.

246.   However, later in 2019, Defendants changed their position.  They denied that Steven Levine was an investor in the Company at all, let alone a 2.5% interest holder.  This was the first time Defendants ever communicated to Steven Levine that they did not recognize him as a shareholder, let alone a 2.5% shareholder.

247.   The Defendants therefore took the $50,000 investment but have refused to transfer to Steven Levine his shares in the Company without any authority.

248.   Defendants' conduct was the direct and proximate cause of Steven Levine's damages in an amount to be determined but exceeding $5 million.

249.   The Company, through its agent Peltier, acted with the intent of depriving Steven Levine of his rights and causing injury to him.  The conduct was despicable and subjected Steven Levine to unjust hardship.  The conduct was

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

malicious, fraudulent and oppressive, and was committed with a conscious disregard for Steven Levine's rights.  Accordingly, Steven Levine is entitled to an award of punitive or exemplary damages in an amount sufficient to punish the Company and Peltier and to make an example of them.

### SEVENTEENTH CAUSE OF ACTION

### (Violation Of California Penal Code § 496(c))

### *(By Steven Levine Against Defendants)*

250.   Plaintiffs repeat and reallege each and every foregoing and subsequent allegations contained in the Complaint, and further allege as follows:

251.   California Penal Code section 496(a) imposes criminal penalties against any person "who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained."

252.   California Penal Code section 496(c) permits "[a]ny person who has been injured by a violation of subdivision (a) . . . [to] bring an action for three times the amount of actual damages, if any, sustained by the plaintiff, costs of suit, and reasonable attorney's fees."

253.   On or about April 16, 2014, Peltier emailed Steven Levine with a 2.5% equity stake offer in return for Steven Levine's $50,000 investment.  In this email, Peltier referred to Steven Levine's $50,000 contribution to the Company as an investment.  Peltier also offered in this email to structure the investment as convertible debt if Steven Levine preferred.

254.   Shortly thereafter, Steven Levine spoke on the phone with Peltier and accepted the offer for 2.5% equity; he told Peltier he was not interested in the convertible debt offer.

255.   Steven Levine trusted Peltier, with whom he had a close relationship by

MILLER BARONDESS, LLP<br>ATTORNEYS AT LAW<br>1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067<br>TEL: (310) 552-4400   FAX: (310) 552-8400

1    virtue of his son's business relationship with Peltier.

2        256.   In or about mid-Summer 2017, after his son Max Levine left the

3    Company, Steven Levine approached Peltier about buying out his investment in the

4    Company.  Peltier reassured Steven Levine that his investment was best left in the

5    Company because they were working on a new strategy that could turn the

6    Company around.  Based on this explanation from Peltier, Steven Levine decided to

7    stop negotiating for a buyout of his investment and continued to believe his

8    investment was secure.

9        257.   Even as recently as June 2019, Peltier acknowledged Steven Levine's

10   2.5% investment.  Around that time, Peltier approached Steven Levine through a

11   text message and phone call about Community buying out Steven Levine's 2.5%

12   interest.  Peltier expressed that Defendants were making similar offers to all of its

13   early investors.  Notably, in this conversation, Peltier failed to disclose anything

14   about the Company's recent successes, such as the $35 million investment led by

15   Sound Ventures.

16       258.   However, later in 2019, Defendants changed their position.  They

17   denied that Steven Levine was an investor in the Company at all, let alone a 2.5%

18   interest holder.  This was the first time Defendants ever communicated to Steven

19   Levine that they did not recognize him as a shareholder, let alone a 2.5%

20   shareholder.

21       259.   The Company took the $50,000 investment but Defendants have

22   refused to transfer to Steven Levine his shares in the Company without any

23   authority.  Defendants have no right, title, or other valid interest in Steven Levine's

24   shares in the Company.  The Defendants' misappropriation of Steven Levine's

25   shares constituted theft.

26       260.   The Company's conduct was the direct and proximate cause of Steven

27   Levine's damages in an amount to be determined but exceeding $5 million.  Under

28   California Penal Code section 496(c), Steven Levine is entitled to three times the

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

amount of his actual damages, plus costs and attorneys' fees.

## EIGHTEENTH CAUSE OF ACTION

### (Declaratory Relief)

### *(By Steven Levine Against Defendants)*

261.   Plaintiffs repeat and reallege each and every foregoing and subsequent allegations contained in the Complaint, and further allege as follows:

262.   An actual controversy now exists between Steven Levine and Defendants.  Steven Levine, on the one hand, claims that he is a shareholder of the Company and is entitled to a 2.5% equity stake.  Defendants, on the other hand, wrongfully claim that Steven Levine is not a shareholder and/or refuse to recognize his status as a shareholder by refusing to transfer to Steven Levine his shares in the Company and/or do not recognize his 2.5% interest.

263.   Steven Levine requests a judicial declaration that he is a shareholder of the Company with an equity stake of 2.5%, or in the alternative, that Steven Levine is entitled to compensation from the Company for his 2.5% equity ownership interest.  A judicial declaration is necessary and appropriate so that the parties may ascertain their respective rights, duties, and obligations.

## NINETEENTH CAUSE OF ACTION

### (Financial Elder Abuse California Welfare & Institutions Code § 15610.30, *et seq.*)

### *(By Steven Levine Against Defendants)*

264.   Plaintiffs repeat and reallege each and every foregoing and subsequent allegations contained in the Complaint, and further allege as follows:

265.   California Welfare and Institutions Code ("WIC") section 15610.30(a)(1) and (2) state that financial abuse of an elder takes place when one "[t]akes, secretes, appropriates, obtains, or retains real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both"  or "[a]ssists in taking, secreting, appropriating, obtaining, or retaining real or personal

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

property of an elder or dependent adult for a wrongful use or with intent to defraud, or both."

266.   WIC section 15610.30(b) states that a person takes property for wrongful use "if, among other things, the person or entity takes, secretes, appropriates, obtains, or retains the property and the person or entity knew or should have known that this conduct is likely to be harmful to the elder or dependent adult."

267.   Steven Levine is over 65 years old; therefore, he is an elder pursuant to WIC section 15610.27.

268.   On or about April 16, 2014, Peltier emailed Steven Levine with a 2.5% equity stake offer in return for Steven Levine's $50,000 investment.  In this email, Peltier referred to Steven Levine's $50,000 contribution to the Company as an investment.  Peltier also offered in this email to structure the investment as convertible debt if Steven Levine preferred.

269.   Shortly thereafter, Steven Levine spoke on the phone with Peltier and accepted the offer for 2.5% equity; he told Peltier he was not interested in the convertible debt offer.

270.   Steven Levine trusted Peltier, with whom he had a close relationship by virtue of his son's business relationship with Peltier.

271.   In or about mid-Summer 2017, after his son Max Levine left the Company, Steven Levine approached Peltier about buying out his investment in the Company.  Peltier reassured Steven Levine that his investment was best left in the Company because they were working on a new strategy that could turn the Company around.  Based on this explanation from Peltier, Steven Levine decided to stop negotiating for a buyout of his investment and continued to believe his investment was secure.

272.   Even as recently as June 2019, Peltier acknowledged Steven Levine's 2.5% investment.  Around that time, Peltier approached Steven Levine through a text message and phone call about Community buying out Steven Levine's 2.5%

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

interest.  Peltier expressed that Defendants were making similar offers to all of its early investors.  Notably, in this conversation, Peltier failed to disclose anything about the Company's recent successes, such as the $35 million investment led by Sound Ventures.

273.   However, later in 2019, Defendants changed their position.  They denied that Steven Levine was an investor in the Company at all, let alone a 2.5% interest holder.  This was the first time Defendants ever communicated to Steven Levine that they did not recognize him as a shareholder, let alone a 2.5% shareholder.

274.   The Company took the $50,000 investment but Defendants have refused to transfer to Steven Levine his shares in the Company without any authority.  Defendants have no right, title, or other valid interest in Steven Levine's shares in the Company.  The Defendants' misappropriation of Steven Levine's shares constituted theft.

275.   Defendants acted with the intent of depriving Steven Levine of his rights and causing injury to him.  Defendants knew that by taking Steven Levine's investment and depriving him of his equity, they would cause him harm.

276.   Defendants' conduct was the direct and proximate cause of Steven Levine's damages in an amount to be determined but exceeding $5 million.

277.   Defendants conduct was despicable and subjected Steven Levine to unjust hardship.  The conduct was malicious, fraudulent and oppressive, and was committed with a conscious disregard for Steven Levine's rights.  Accordingly, Steven Levine is entitled to an award of punitive or exemplary damages in an amount sufficient to punish Defendants and to make an example of them.

278.   As a result of the Company and Peltier's elder abuse, the Company and Peltier are also liable for Steven Levine's reasonable attorneys' fees and costs pursuant to WIC section 15657.5(a).

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs respectfully pray for judgment against Defendants, as follows:

(1)     For general and consequential damages according to proof at trial;

(2)     For punitive damages;

(3)     For treble damages under California Penal Code section 496(c);

(4)     For attorneys' fees;

(5)     For costs;

(6)     For prejudgment and post-judgment interest;

(7)     For rescission of the Stock Repurchase Agreements;

(8)     For specific performance conveying shares in the Company to Steven Levine reflecting his 2.5% interest in the Company;

(9)     For restitutionary damages;

(10)    For declaratory relief; and

(11)    For such other and further relief as the Court may deem just and proper.

DATED:  August  20, 2020            MILLER BARONDESS, LLP


By: _____
            CHRISTOPHER D. BEATTY
            Attorneys for Plaintiffs

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

# **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial.

DATED:  August 20, 2020          MILLER BARONDESS, LLP


By: _____
        CHRISTOPHER D. BEATTY
        Attorneys for Plaintiffs