1 | CHRISTOPHER D. BEATTY (State Bar No. 266466)
cbeatty@millerbarondess.com
2 | MINH-VAN T. DO (State Bar No. 314201)
mdo@millerbarondess.com
3 | ADAM P. STILLMAN (State Bar No. 317071)
astillman@millerbarondess.com
4 | MILLER BARONDESS, LLP
1999 Avenue of the Stars, Suite 1000
5 | Los Angeles, California 90067
Telephone:  (310) 552-4400
6 | Facsimile:  (310) 552-8400

7 | Attorneys for Plaintiffs

8 | **UNITED STATES DISTRICT COURT**

9 | **CENTRAL DISTRICT OF CALIFORNIA**

10 |

11 | CHARLES BUFFIN, an individual; MAXWELL LEVINE, an individual; STEVEN LEVINE, an individual

**CASE NO. 2:20-cv-07552 SVW (JPRx)**

13 | Plaintiffs,

**FIRST AMENDED COMPLAINT FOR**

14 | v.

**(1) BREACH OF FIDUCIARY DUTY**

15 | COMMUNITY.COM, INC., a Delaware corporation; MATTHEW PELTIER, an individual; and DOES 1 through 10, inclusive,

**(2) FRAUDULENT MISREPRESENTATION**
**(3) INTENTIONAL CONCEALMENT**

17 | Defendants.

**(4) FEDERAL SECURITIES VIOLATIONS**
**(5) CALIFORNIA SECURITIES VIOLATIONS**
**(6) NEGLIGENT MISREPRESENTATION**
**(7) BREACH OF CONTRACT**
**(8) CONVERSION**
**(9) VIOLATION OF CALIFORNIA PENAL CODE § 496(c)**
**(10) DECLARATORY RELIEF**
**(11) FINANCIAL ELDER ABUSE**
**(12) UNJUST ENRICHMENT**

**[DEMAND FOR JURY TRIAL]**

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

496932.2

Plaintiffs Charles Buffin ("Buffin"), Maxwell Levine ("Max Levine"), and Steven Levine (collectively, "Plaintiffs") allege in their Complaint against Defendants Community.com, Inc. ("Community" or the "Company"), Matthew Peltier ("Peltier"), and Does 1-10, inclusive (collectively, "Defendants"), as follows:

## NATURE OF THE ACTION

1.      Community is a technology start-up that utilizes an app that permits its clients—including actors, musicians, athletes, and social media influencers—to communicate directly with their fans or followers through SMS text messaging.  Its stated purpose is to allow more meaningful dialogue between the celebrities and their "community" in a world dominated by a flurry of social media apps that can make fans feel invisible or disengaged.  Community's clients include, but are not limited to, Ashton Kutcher, Jennifer Lopez, John Legend, Paul McCartney, Amy Schumer, Marshmello, Kerry Washington, Sean "Diddy" Combs, Mark Cuban, Sophie Bush, and Ellen DeGeneres.

2.      The Company has raised tens of millions of dollars in financing from the likes of Ashton Kutcher and Guy Oseary.  The Company is believed to be currently raising money at a valuation of approximately $450 million.

3.      Buffin and Max Levine founded the Company in or about 2013.  Originally, the Company was aimed at providing a platform for social media influencers to directly communicate and build personalized "tribes" or groups with their followers.

4.      Buffin and Max Levine both had business backgrounds and wanted to find someone with product expertise to help them build the Company.  Max Levine met Peltier in late 2013 and introduced him to Buffin.  Peltier appeared smart and had the technical expertise they were looking for.  Peltier soon thereafter joined the Company.  In 2014, Buffin and Max Levine decided that it was in the best interest of the Company for Peltier to take over as CEO.

5.      The Company's first investor was Max Levine's father, Plaintiff Steven

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1   Levine.  Steven Levine invested $50,000 in Community when it was little more than

2   an idea.  Peltier, on behalf of Community, agreed to provide Steven Levine a 2.5%

3   equity stake in the Company in return for this investment.

4        6.        The Company struggled to onboard users and produce significant

5   revenue.  In or about the summer of 2017, Max Levine and Buffin left the Company

6   to pursue other opportunities.  Peltier continued as CEO of the Company, directing

7   its day-to-day operations.  Max Levine and Buffin each retained 750,000 shares of

8   the Company upon their departure.

9        7.        Thereafter, Max Levine and Buffin relied on Peltier to keep them

10  apprised of how the Company was doing.  In mid-2018, Peltier began to consistently

11  communicate to Buffin and Max Levine that the Company was on the brink of

12  failure and that the value of their shares was "whatever."  Peltier reached out to

13  Buffin and Max Levine and began to float the idea of repurchasing their shares.

14  Peltier continued to put pressure on Buffin and Max Levine to sell and reinforced

15  the idea that the Company was drowning and that their shares had no value.

16       8.        On October 29, 2018, Peltier gave Buffin and Max Levine an

17  ultimatum: either the Company would go bankrupt and Buffin and Max Levine

18  would lose their entire investment in the Company; or Buffin and Max Levine could

19  sell their shares back to the Company for approximately $20,000, which would save

20  the Company from insolvency and at least guarantee them some cash for their

21  investment.

22       9.        Peltier expressed that this deal would be great for them because the

23  shares of the Company were worthless.  Indeed, Peltier told Buffin the stock was

24  worth a penny a share.  Peltier led Buffin and Max Levine to believe he was only

25  offering to buy their shares to do right by them.  Peltier coyly alluded to having two

26  new founders coming on board during these conversations who would try to turn

27  around this supposedly failing company but refused to disclose any further

28  information.  Even after Buffin explicitly asked him who the new founders were and

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

reminded him that he was a shareholder entitled to know this information, Peltier refused to divulge this information.  Below, the misstatements made by Peltier to Buffin and Max Levine over the course of several months are set forth with specificity.

10.     Buffin and Max Levine signed Stock Repurchase Agreements on November 28, 2018, agreeing to sell back 600,000 of their shares for $22,002 each. This transaction constituted approximately 10% of the shares of the Company. Plaintiffs trusted and relied on Peltier, their friend, not to swindle them.

11.     Peltier's statements to Buffin and Max Levine were fraudulent and clear breaches of his fiduciary duties.  Peltier materially misrepresented the Company's financial position.  He did not disclose that Community had closed a multimillion dollar investor round more than a month *before* Buffin and Max Levine sold their shares.  As part of that round, through their venture capital firm Sound Ventures, celebrity Ashton Kutcher and influential Hollywood talent agent Guy Oseary, whose clients include big-name artists like U2 and Madonna, came on board the Company as co-founders.  Other Sound Ventures employees, like Molly Swenson, also began working at Community during this time and the Company was beta testing its product with A list celebrities, like Tim McGraw and G-Eazy, that Oseary was introducing to the Company.  The Company was also working on raising more money during this time period, with the help of Kutcher and Oseary, at valuations in excess of $100 million, all while simultaneously negotiating a transaction with Buffin and Max Levine at a Company valuation of about $200k.  In the coming months, Community raised $35 million as part of this round.

12.     Peltier was involved in all of these events and therefore knew that the statements he was making to Buffin and Max Levine to induce them to sell were false.  Had Peltier made accurate statements to Buffin and Max Levine, they would not have agreed to sell back any of their shares.

13.     Worse, Community, through Peltier, has now taken the position that

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

Steven Levine is not a shareholder of the Company, even though Steven Levine financed the growth of the Company with its first investment.  In fact, Peltier has repeatedly over the course of several years confirmed Steven Levine's status as an investor before just recently reversing course.

14.    Through this lawsuit, Plaintiffs seek what they are owed.  Their damages for Peltier's fraudulent misconduct, securities violations and breaches of fiduciary duty are estimated to be in excess of $30 million.  In addition, due to the egregious nature of what happened here, punitive damages are appropriate.

## PARTIES

15.    Plaintiff Buffin is an individual residing in Los Angeles County.

16.    Plaintiff Max Levine is an individual residing in Los Angeles County.

17.    Plaintiff  Steven Levine is an individual residing in the State of New Jersey.

18.    Defendant Peltier is an individual residing in Los Angeles County.

19.    Upon information and belief, Defendant Community is a Delaware corporation that is headquartered in Los Angeles County.

20.    Plaintiffs are ignorant of the true names, capacities, relationships and extent of participation in the conduct herein alleged of the Defendants sued herein as DOES 1 through 10, inclusive, but on information and belief allege that said Defendants are legally responsible to them.  Plaintiffs will amend this Complaint to allege the true names and capacities of the Doe Defendants when ascertained.

## JURISDICTION AND VENUE

21.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78aa.  The claims asserted herein arise under and are pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

22.    This Court has diversity jurisdiction over the claims between Plaintiff

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1   Steven Levine and Defendants which have an amount in controversy over $75,000,

2   pursuant to 28 U.S.C. § 1332.

3       23.    This Court has supplemental jurisdiction over state law claims in this

4   action pursuant to 28 U.S.C. § 1367 because they are related to the claims in this

5   action within the original jurisdiction of this Court that they form part of the same

6   case or controversy under Article III of the United States Constitution.

7       24.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

8   Defendants reside in this district;  and many of the acts, omissions, and transactions

9   giving rise to the claims herein, including the false and misleading statements made

10  to Plaintiffs with respect to Defendants' repurchase of Plaintiffs' Company shares,

11  occurred in this district.

12      25.    In connection with the acts and omissions alleged in this Complaint,

13  Defendants, directly or indirectly, used the means and instrumentalities of interstate

14  commerce, including but not limited to the use of phones for calls and texting, e-

15  mails, and the internet.

16  **FACTUAL BACKGROUND**

17  **A.**    **Overview Of Community**

18      26.    Community assigns a phone number to its clients (e.g., actors, athletes,

19  influencers, artists), which permits them to use the app to text directly with their

20  fans, and the fans can text the celebrity directly back.  For example, if a musician is

21  on tour, he or she can use the Community app to text fans in a specific city

22  announcing an upcoming concert there and when they arrive in that city, he or she

23  can send a text to fans in that area asking for recommendations about local

24  restaurants.

25      27.    The direct line of communication allows celebrities to create a more

26  intimate "community" with their fan base, and lets them bypass the media, the so-

27  called internet trolls and bullies, and the toxic culture that persists in many other

28  social media platforms such as Facebook, Instagram, Twitter, and Snapchat.  It has

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

been reported that at least as of January 2020, Community has about 500 artists and celebrities, or "Community leaders," on board, and tens of thousands more on the waiting list to join. Current users of Community include, but are not limited to, Ashton Kutcher, Jennifer Lopez, John Legend, Paul McCartney, Amy Schumer, Marshmello, Kerry Washington, Sean "Diddy" Combs, Mark Cuban, Sophie Bush, and Ellen DeGeneres.

28.   Community has received favorable press from major publications like The New York Times, USA Today, Variety, Billboard, TechCrunch, Wired, Fast Company, and Oprah Magazine.

29.   While Community launched as a vehicle for celebrities, it intends to scale and broaden its reach to other people and entities that have an audience they want to reach, such as traditional salespeople, churches, politicians and community organizers.

30.   Community is currently raising tens of millions of dollars in investments at a valuation of approximately $450 million.

**B.   Max Levine And Buffin Co-Found The Company**

31.   In 2013, Max Levine and Buffin had the idea to create an internet platform that would make it easier for social media influencers to interact with their fans and followers. The idea was to flip the top-down and linear fashion in which most social media platforms work, and instead create a space that would make fans feel more visible and influencers feel more engaged with their base.

32.   At the time of the Company's founding, Max Levine was the Company's Chief Executive Officer ("CEO"), and Max Levine and Buffin were the sole shareholders.

33.   Max Levine and Buffin both had business backgrounds, and they decided to bring someone on board to help build the Company's technology.

34.   In or around the end of 2013, Max Levine met Peltier at a networking event in New York City. Peltier had the product development experience that Max

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1    Levine and Buffin were looking for.  Peltier was brought on as the product manager.

2        35.    Community launched under the name Shimmur as a web-based

3    application.  It has been described as a Reddit-style product.

4        36.    Buffin had a good relationship with Peltier from the start.  Buffin

5    trusted Peltier, and thought he was extremely smart and talented.  They built a

6    strong friendship based upon mutual trust and respect.

7        37.    In fact, all three co-founders, Buffin, Max Levine, and Peltier, lived

8    together from early 2015 to April 2016 and thereafter lived in the same apartment

9    complex.  Buffin and Peltier also attended the wedding of Max Levine's sister.

10       38.    In 2014, Buffin, Max Levine, and Peltier collectively decided Peltier

11   should take over as CEO.  In or around April 2014, Peltier became CEO, and the

12   parties also altered the capital structure of the Company: 40% to Peltier, and 15%

13   each to Max Levine and Buffin (the remaining stock was either reserved for the

14   stock pool or vested in others not a party to this lawsuit).

15       39.    Throughout 2014, the parties continued to work on developing the

16   product.

17   **C.    The Company's Early Fundraising Efforts**

18       40.    The first investment in the Company was a $50,000 investment made

19   by Steven Levine.  Specific allegations regarding Steven Levine's investment are set

20   forth in the last section.

21       41.    Steven Levine's investment was the Company's sole investment for

22   quite some time.  In the latter part of 2014, Peltier started meeting with potential

23   investors in Los Angeles.  In early 2015, Peltier was able to raise small amounts

24   from various investors in the range of $5,000-$20,000.

25       42.    In 2015, the Company started to grow as the team added more

26   engineers to develop the product.  Its app was launched for the first time in or

27   around the beginning of 2016.  However, the Company was still in its early stages

28   and still had little working capital.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

43.     In 2016, Peltier continued to raise money from other investors, and the team worked to onboard more influencers onto the app.  Community raised about half a million dollars that year.

44.     In 2017, Community applied to and got accepted into Tech Stars, a competitive start-up incubator.  At this point, Community had a team of 12 employees and was raising a seed fundraising round.  Buffin played a pivotal role in getting the Company accepted into Tech Stars by sending a tweet to one of the people running the program, which got the Company a meeting.

45.     Community nevertheless struggled to take off.  While it had a decent following of about 15,000 to 20,000 followers on Instagram, it struggled to gain users and scale.

46.     In or around 2017, the Company began to incorporate into its technology SMS texting, allowing the entertainer to use the app to send SMS texts to his or her followers.  In or around 2018, the product started operating under the d/b/a of Community.  Subsequently, Community officially changed its name with the Delaware Secretary of State.

**D.     Buffin And Max Levine Leave The Company**

47.     In or about the summer of 2017, Max Levine, Buffin, and Peltier determined that it would be in the best interests of the Company for Max Levine and Buffin to leave the Company.  Buffin and Max Levine wanted to pursue other opportunities and felt that Peltier was capable of running the Company without them.  Both Buffin and Max Levine left the Company on good terms.

48.     After their departures, Buffin and Max Levine each retained 750,000 common stock shares in the Company.

**E.     Peltier Turns The Company Around (But Does Not Tell Plaintiffs)**

49.     Maverick is a music management group that is run by Guy Oseary, one of Hollywood's top music managers.  Maverick's artist roster includes Madonna, Aerosmith, Amy Schumer, U2, Paul McCartney, Pitbull, Shania Twain, Rascal

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

Flatts, Ricky Martin, and G-Eazy.

50.   Oseary, along with his business partner Ashton Kutcher, run the venture capital firm Sound Ventures.  They are active venture capital investors who have backed several well-known startups.

51.   Kutcher is a celebrity, known for his star roles on TV shows such as That '70s Show, The Ranch, Two And A Half Men, Punk'd, and Shark Tank, and movies such as Jobs, Killers, No Strings Attached, Valentine's Day, and What Happens In Vegas.  Kutcher has over 17 million Twitter followers.

52.   In March 2018, Maverick brought on Molly Swenson as its Chief Impact Officer and tasked Swenson with, among other things, finding disruptive technologies to bring to Oseary and Kutcher so they could invest in them. Swenson's venture capital partner is Noah Heller, who was also involved in searching for investments for Oseary and Kutcher.

53.   In the spring or early summer of 2018, Swenson and Heller met with Peltier, who demonstrated Community's new breakthroughs with texting to them. Specifically, he showed them how the Community app could be used to send mass texts to those who sign up to receive them and how this model allowed artists using Community to know more about, and connect with, their fans.

54.   In this meeting, Swenson and Heller immediately realized the potential of the product and how it would fit with the brand strategy of Oseary and Kutcher. As Swenson stated in an interview on April 24, 2020: "we were like, oh my God, I think we have to take this to Guy and Ashton immediately, because this might be what they were talking about when they said, how do we crack the code on access to all this capital."

55.   Swenson immediately presented the opportunity to Oseary.  Oseary was interested from the start and began vetting the opportunity.  He also promptly showed it to Kutcher.

56.   As stated by Swenson in her interview, in "Summer 2018"—shortly

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

after her initial meeting with Peltier—Swenson, Oseary and Kutcher had a meeting to discuss Community.  Oseary stated: "I've been looking for this for five years. This solves as a music manager, more than half of the biggest pain points we have when we're touring. . . ."

57.     Kutcher also expressed excitement about this product in this meeting. He noted: "oh great, I can stop tweeting now."  Kutcher expounded on how Community would allow him to target specific fans of each of his different shows and endeavors, whereas when he sends a tweet, it goes to all of his fans, even though they follow him for different reasons.

58.     As stated by Swenson, "Oseary got in touch with Peltier immediately" after this meeting.  As Oseary mused thereafter regarding his initial interest in Community: "After five years of trying to find someone who was working to solve these things, I went from zero to a hundred in 24 hours."

59.     At the time, Community had not publicly launched.  Indeed, the name Community had not been announced.  Community had signed up about 100 independent artists for beta testing with its product.  But it had not broken through and obtained any celebrity clients or scale for its product.  This changed very quickly now that Oseary and Kutcher were involved.

60.     Still in Summer 2018, Oseary and Kutcher decided to test out the product with one of Maverick's artists.  They decided to beta test it with G-Eazy, a famous rapper.  On tour that summer he shared his Community phone number and he received over 50,000 responses from fans.  They also beta tested the product with country music star Tim McGraw shortly thereafter.

61.     At least no later than August 2018, Community began to receive significant interest from a different investment group than Oseary and Kutcher's venture firm.

62.     But Community put these discussions on hold as Oseary and Kutcher offered to make a significant commitment to Community.  Peltier recognized that

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

teaming up with two well connected celebrities like Kutcher and Oseary would materially increase the prospects of the Company, as its business model depended on adoption of the product by celebrities.  In August 2018, Peltier began to excitedly tell investors about this opportunity with Kutcher and Oseary (but did not disclose it to Max Levine or Buffin).

63.     Peltier negotiated with and agreed to terms with Sound Ventures. Under this deal, Kutcher and Oseary made significant personal investments into the Company.  Oseary and Kutcher also joined the Company as advisors, taking on the title of co-founders, and agreed to help promote the product and raise money.  As Kutcher once described the role of Oseary with respect to Community, Oseary "incubated" Community.   In addition, Heller became the Chief Operating Officer of Community and Swenson also began working at Community, eventually taking on the title of Head of Global Partnerships.  Oseary and Kutcher also obtained significant control rights over Community as part of this transaction.

64.     Although the exact date these terms were agreed to and formalized is not known, it was by no later than October 13, 2018.  On or about that date, Peltier shared the deal documents with Community's investors (but not Max Levine or Buffin).  Thus, Oseary, Kutcher and their team were fully integrated into Community by October 2018.  For example, Heller's LinkedIn page states he began working at Community in August 2018.

65.     In this same October 2018 communication, Peltier also announced to the investors (but not Max Levine or Buffin) that he had raised more than $2 million for the Company as part of these new transactions.  This investment alone significantly increased the valuation of Community.

66.     And, beginning in October 2018, now with the help of Oseary and Kutcher, Community began raising another more significant investment round from celebrities and institutional investors and to do so at a valuation in excess of $100 million.  That round ended up raising $35 million at a valuation north of $100

Miller Barondess, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1 million over the next few months.

2   67.   Peltier, Kutcher, Oseary, Heller and Swenson also began to plan an

3 official launch of Community.  The planned date for this launch was January 2019.

4 **F.   Peltier's Communications With Plaintiffs Paint A Very Different Picture**

5   68.   On March 26, 2018, Peltier provided an investor update regarding the

6 Company in which he said the Company was burning approximately $40,000 a

7 month and raising a "small" investment round for runway into early 2019.

8   69.   Thereafter, Peltier began to communicate to Max Levine and Buffin

9 that the Company was failing and their shares were worthless.  For example, on or

10 about May 11, 2018, in discussions about the value of the shares, Buffin expressed

11 concern about his incomplete knowledge about how the Company was doing: "Lol

12 you guys know what the shares can be worth much better than I do hence why

13 you're shooting for more, I get it.  I just personally feel like I'm getting dicked

14 around and don't appreciate it."

15   70.   Peltier responded by assuring his friend that this was not the case: "but

16 for real, because the share[s] are w.e. [whatever] at this point, and we have $70k in

17 our bank lol I'm just going off what feels meaningful."

18   71.   Peltier told Buffin he would make him "a good cash offer on some

19 shares over the summer when we get some money goin too.  think about, lml."

20   72.   On May 25, 2018, Peltier called Buffin.  During this call, Peltier

21 reiterated that the Company only had $70,000 in the bank.  He again mentioned his

22 desire to do a share buyback.

23   73.   These and similar statements reinforced to Buffin that the value of their

24 shares was extremely low.  Peltier began making these statements in March and

25 May 2018 to start laying the foundation for his fraud.

26   74.   On or about June 18, 2018, Peltier called Buffin and floated the idea of

27 the Company repurchasing all of Buffin's and Max Levine's outstanding shares.

28 During this call, which lasted about 20 minutes, Peltier offered $10,000-$15,000 to

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

each of Buffin and Max Levine.  Peltier told Buffin that he was trying to buy back shares from other key contributors as well.  Peltier conveyed to Buffin and Max Levine that he was just trying to do the "right thing" for all of the Company's shareholders.

75.     This statement about his reason for raising the issue then was a misrepresentation.  Peltier was actively fundraising at this time and receiving significant investor attention from major players, like Sound Ventures.  Indeed, Peltier reached out around the same time that he began negotiating with Sound Ventures,   Peltier did not disclose these discussions to Buffin and Max Levine.

76.     Over the next several months, as his discussions with Sound Ventures became more serious and were eventually finalized, Peltier continued to push Buffin and Max Levine to sell back their shares while not mentioning these significant developments in the Company's prospects.

77.     The parties spoke on several occasions, including via phone on August 14, 2018.  Peltier floated some numbers to Max Levine and Buffin to put some pressure on them but never made a formal offer for the shares repurchase.

78.     Peltier continued to paint a bleak picture of the Company and its finances in these discussions.  Peltier made vague references to trying to "clean up" the Company's capitalization table because they had a "small" investment closing soon, but never offered any further detail or information.  These statements were intended to prime Max Levine and Buffin for a low-ball repurchase offer that Peltier would soon thereafter make.

79.     On October 29, 2018, Peltier called Buffin to give him and Max Levine an ultimatum on the repurchase of their shares and to walk Buffin through the Company's position.  Peltier told Buffin on this phone call that there were only two options left for the Company given its poor financial condition: (1) the Company would either go bankrupt and Buffin and Max Levine would be left with nothing; or (2) Buffin and Max Levine could sell back their shares to the Company for

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

approximately $20,000, which would save them all the time and legal costs associated with filing for bankruptcy, allow Community to make payroll for a few more months, and allow Max Levine and Buffin to walk away with guaranteed cash in their pockets.

80.     Peltier told Buffin during this October 29, 2018 call that the Company's shares were only worth a penny per share, or somewhere in that "range," and thus a purchase price in the $20,000 range would be a great deal for Max Levine and Buffin.  Peltier told Buffin that such a purchase price would essentially give Plaintiffs a windfall—three times the value of the Company's shares.

81.     Peltier's ultimatum was confirmed in a phone call and multiple texts on November 1, 2018.  On that day, Peltier reached out to Buffin, asking him "put any more thought into our chat?"

82.     Buffin responded that he and Max Levine would "feel good" about selling their shares for $10-15k each.  Peltier responded: "I'd like to get you a little more tbh.  Let me see what I can do."

83.     Buffin responded "More the merrier my friend, Appreciate you lookin out" to which Peltier responded "for the boys!"

84.     Peltier continued: "I'm thinking we'd be able to manage $25k ea. that's the number I've been thinkin about and feel good about.  wouldn't strap us terribly and I think the investors would support that/go for it.  just don't tell anyone I'm coming over the top of your offer lol."  These statements by Peltier reinforced Buffin's belief that his friend was working to get him a premium on his sale of the shares.

85.     As part of this exchange, Buffin also sought to confirm that he was getting a premium on his shares by asking: "And is there currently a share value? You said a penny?"  This was in reference to Peltier's statement in the October 29, 2018 call that the shares were worth a penny a share.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400     FAX: (310) 552-8400

86.     Although Peltier had just weeks before obtained in excess of $2 million in investments, Peltier stated "no set share value as we've never done a 409A." This was a misrepresentation. Community had just obtained $2 million in investments at a share value well in excess of a penny a share and was also in the process of raising money, now led by Sound Ventures, at a much higher share value.

87.     Buffin called Peltier, with whom he continued to have a close relationship, to get some clarity on the situation. Buffin expressed that he wanted more insight into the finances of the Company so he could make an informed decision. In this phone call, Peltier repeated the same ultimatum and told Buffin that the $20,000 he was offering to each of Max Levine and Buffin was a generous offer, would provide the Company some runway for a couple more months and would give the Company the only way to avoid bankruptcy.

88.     The conversation then continued via text message during which Peltier again confirmed his ultimatum:

Buffin: Is there an option to sell half and keep half?


Peltier: unfortunately, i don't think they'd go for that. kinda all or nothing if we're gonna try n roll forward vs clean reset. cash either goes to legal or shareholders if that makes sense. latter is better for all

. . .

Buffin: Can you lay out options in a list form please?

. . .

Peltier: same as we talked about the other night as options. there arnt really any. we either try n make something work or we just have to go back to the drawing board

89.     In the same text message chain, Buffin again told Peltier that he preferred a cash and equity option and asked Peltier about the Company's potential upsides. Peltier played coy, responding in a manner that conveyed he saw no upside

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

to the Company and wished there was:

> Buffin: Would be great to still see some longer term upside which is why I asked about cash + equity.

> Peltier: you're telling me lol.

90. Peltier then emphasized that this would be a good deal for them while at the same time helping out the Company financially. In particular, Peltier said, "end of the day it's your call. it would help us out tremendously to be honest and you can at least control your outcome. it's still a pretty massive return considering the shares started at $.00001 lol but think about it. otherwise we'll need to recap further or take other riskier/shitty routes."

91. Buffin responded, summarizing that this other route, as Peltier had explained previously, would be to "get stroked and move on with nothing lol."

92. Peltier confirmed this was the only other option: "right, we just need to clean cap to get all parties to help us move forward" and suggested this transaction was essential for the Company to stay in business.

93. In the same text chain, Buffin also directly asked Peltier about the two new founders that Peltier alluded to during their phone call the day prior. Peltier refused to give Buffin that information. Even when Buffin reminded Peltier that he was a shareholder of the Company and thus entitled to this information, Peltier blew him off and completely ignored the request:

> Buffin: I understand and wanna make this smooth for you guys. Who are the two partner/co founder types you guys are bringing on?

> Peltier: aight lmk [let me know] when you can please cause we gotta make moves here soon and can't get into that unfortunately, it's complicated but this is all part of how thatle turn out. think about it, hit me tm or wkend.

> Buffin: Word just curious considering I'm a shareholder.

94. Over the next several weeks in November 2018, Peltier ramped up his communications with Buffin in efforts to get Buffin and Max Levine on board with

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

the repurchase of their stock.  Peltier made repeated affirmations that this was the only route available that would permit the Company to survive, that the shares were worthless, and that the Company had limited prospects and was on death's door.

95.    On November 8, 2018, Buffin called Peltier to get some additional clarity on the situation and continued to express his hesitation.  Peltier, again, reaffirmed that the only two options were those he previously discussed with Buffin. Based on Peltier's statements and representations, Buffin told Peltier on this call that he and Max Levine wanted to move forward with selling back their shares for a purchase price in the range of $20,000.

96.    In or about mid-November 2018, Peltier sent Buffin and Max Levine a draft Stock Repurchase Agreement.  Peltier repeatedly assured them that this was the best way forward for the Company and the only way to ensure Buffin and Max Levine got any return on their investment.

97.    On November 29, 2018, Peltier called Max Levine to try and seal the deal.  During that call, Peltier repeated the same story he had been telling Plaintiffs for months—that the Company was on the verge of bankruptcy and that the only way it could survive was if Buffin and Max Levine would sell back their shares.

98.    Buffin and Max Levine entered into a Stock Repurchase Agreement agreeing to sell back 600,000 shares in the Company for $22,002.  Peltier signed the Stock Purchase Agreement on behalf of the Company.  At this purchase price, the approximate price per share was $0.036.  Max Levine and Buffin ultimately agreed to this purchase price and thought they were getting a fair price for their shares because Peltier told them that the Company's share value was de minimus and they were getting a premium on their value.

99.    Although the Stock Purchase Agreements state Buffin and Max Levine were informed about "a potential financing transaction with certain strategic investors, among others Salesforce," this actually never happened.  Never did Peltier mention a potential financing transaction with strategic investors or Salesforce.  He

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

referred only to a "small" bridge that would allow the Company to keep its doors open for another few months.

100.   In addition, this clause was never discussed and was slipped in by Defendants.  Neither Buffin nor Max Levine read or noticed the clause before signing.

101.   Moreover, the statement is also inaccurate because it refers to a potential financing when, in fact, a $2 million plus financing had been consummated no later than October 13, 2018 with strategic investors, namely Guy Oseary and Ashton Kutcher.  Thus, the inserted clause is itself a misstatement.  And, of course, the names of the strategic investors were never disclosed even though Defendants had a fiduciary duty to disclose this information.  That Defendants, when they decided to insert this clause, decided to not identify Ashton Kutcher and Guy Oseary by name, even though they had already invested in and were working at the Company, demonstrates the lack of candor exhibited by Defendants during these negotiations.

102.   After executing the Stock Repurchase Agreements, Max Levine and Buffin each retained 75,000 shares in the Company.

103.   There were numerous material events that were not disclosed to Max Levine and Buffin before they agreed to sell their shares on November 28, 2018 at a valuation for the Company of approximately $200,000:

- That the Company began negotiating with Oseary and Kutcher in Summer 2018;

- That Oseary's celebrity clients were beta testing the product in Summer 2018;

- That the Company entered into written agreements with Oseary and Kutcher by October 13, 2018;

- That Oseary and Kutcher were now advisors to and co-founders of the Company and were actively working to raise additional capital at a

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

valuation in excess of $100 million;

- That the Company had raised more than $2 million in October 2018;

- That Community was planning to officially "launch" in January 2019; and

- That as part of these financings, Community had performed recent valuations of the Company and these valuations were far in excess of any valuation disclosed to Max Levine and Buffin (who were told by Peltier that the valuation of $200k was high and would result in a windfall for them when they sold their shares).

## G. Max Levine And Buffin Uncover Defendants' Fraudulent Conduct, And Defendants Renege On Their Other Agreements With Plaintiffs

104. On or about December 8, 2018, about a week and a half after selling back their shares to Defendants, Max Levine and Buffin played basketball with Jeremy Kim, an employee of Jake Udell, one of Community's advisors.  Kim told them that the Company was starting to grow rapidly because it was working with Maverick, including Oseary.

105. This news came as a shock to Buffin and Max Levine.  It was the first time that they learned that a big industry name like Oseary was involved with Community at all.  Peltier never mentioned Oseary or any companies or celebrities affiliated with him during any time that the parties were negotiating the repurchase of Buffin's and Max Levine's shares.  Peltier had been on the phone with them about a week before and was telling them how poorly the Company was doing.  The Community product is premised on the involvement of celebrities having direct communications with their fans.  The involvement of such an influential person as Oseary—who is in the entertainment business with a large network of talent—would have significantly altered the calculus for Buffin and Max Levine when they were negotiating the repurchase of their shares.

106. Two days later, on December 10, 2018, Buffin texted Peltier and

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  mentioned the Maverick news, wanting to learn the backstory.  Peltier ignored that

2  request in a responsive text.

3      107.   But Peltier immediately chastised Kim for telling Buffin and Max

4  Levine about Maverick's involvement.  Kim texted Buffin *eight minutes* after

5  Buffin's text to Peltier, stating "yo I just got in trouble for telling u about the

6  Maverick stuff."  He also confirmed in this same exchange that "Maverick is

7  coming onboard."  He also said the information was not public yet so "try to stay

8  mum about it."

9      108.   The next month, on January 29, 2019, Kutcher tweeted out his "phone

10  number" to the public.  This number was not his personal phone number but a

11  Community phone number.  Kutcher's tweet was a publicity stunt to stir interest in

12  Community, and it did just that.  Multiple media outlets picked up on it and began

13  reporting about Community.  This was the first time that Buffin and Max Levine

14  learned that Kutcher was involved in the Company.

15      109.   As explained by Swenson in her interview, this tweet was a test run for

16  the Community product, to announce it and see if the phone carriers had the

17  bandwidth to handle the volume of texts.  Kutcher sent this tweet because he was an

18  investor in Community at this point.

19      110.   On February 7, 2019, Peltier emailed Buffin to catch up.  In that same

20  email, Peltier asked his assistant to schedule a "hang on the books" between Peltier

21  and Buffin.  This further raised Buffin's suspicions that something large had

22  recently happened to the Company.  Peltier had never had an assistant at the

23  Company before because the teams had always been relatively small.  Peltier would

24  not need an assistant unless the Company's size had grown tremendously.

25      111.   On April 8, 2019, Buffin had a meeting with Jeremy Delaplane, an

26  advisor for Community.  Delaplane told Buffin Community had raised tens of

27  millions of dollars by that point.

28      112.   On July 25, 2019, Tech Crunch, a reputable startup and technology

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

21

news publication, published an article reporting that the Sound Ventures partners, Oseary and Kutcher, led a $35 million investment round in Community.  The article stated, "The Santa Monica-based company has raised nearly $35 million in the form of two convertible notes following a recapitalization that occurred alongside its rebranding earlier this year. . . ."  Additionally, the Tech Crunch article reported that the Company has been valued "at upwards of $200 million."  Although announced in July, as evidenced by the statement by Delaplane in April, the bulk of this fundraising happened well prior to July.

113.   These numbers and the glowing overview of the Company provided in this article stood in stark contrast to what Peltier led Buffin and Max Levine to believe was the dire financial condition of the Company and its limited prospects. They sold their shares back less than six months earlier at a valuation of the Company of $200k.

**H.**     **Allegations As To Steven Levine**

114.   The Company's first investment came from Max Levine's father, Steven Levine.  The total amount invested was $50,000 and it was invested over the course of several months.  Steven Levine invested $8,500 in January 2014 for the Company's pre-development stage and $24,000 in February/March 2014 for the Company's development stage.  On or about April/May 2014, Steven Levine invested $17,500 for the Company's post-development stage.

115.   When the Company first approached Steven Levine seeking an investment, Peltier had not yet joined the Company.  Steven Levine wanted to help his son, Max Levine, who founded the Company with Buffin, and was looking for initial capital to get the Company off the ground.

116.   But Steven Levine is also a well-established businessman and thus knew that investing in a start-up company in return for equity provided him with the biggest potential upside, particularly due to the risk he would be taking in investing in such an early stage company.  Loans, on the other hand, do not offer the same

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1  potential for exponential gains if the start-up company becomes successful.  Steven

2  Levine therefore wanted equity in return for investing in the Company while

3  simultaneously helping his son's endeavors.

4         117.   Steven Levine discussed and agreed with both Max Levine and Buffin

5  that Steven Levine would receive equity in return for his investment in the

6  Company.  Max Levine, Buffin and Steven Levine agreed, however, that the

7  specific percentage of his equity stake would be determined at a later date.  The

8  Company was in dire need of cash at the time.  The first large portion of Steven

9  Levine's investment was to be used to hire a developer to make the web-based

10 version of the Company's product at that time.

11        118.   When Peltier joined the Company and took over as CEO, Max Levine

12 handed numerous responsibilities over to Peltier, including the negotiations and

13 finalizing of the specific terms of Steven Levine's equity interest, including Steven

14 Levine investing even more in the Company.  Steven Levine met Peltier on multiple

15 occasions and trusted Peltier given Peltier's relationship with his son, Max Levine,

16 and Buffin, who Steven Levine treated like family.  Steven Levine had multiple

17 conversations with Peltier to negotiate the amount of equity he would receive for the

18 money he provided to the Company.  Peltier took the lead for Community in

19 negotiating these terms with Steven Levine and providing Steven Levine with

20 updates on the Company's progress and its use of Steven Levine's investment.

21        119.   For example, on or about March 14, 2014, Buffin, Max Levine, Steven

22 Levine, and Peltier had a lunch meeting in New Brunswick, New Jersey.  The

23 purpose of the meeting was to discuss the prospects of the Company.  The Company

24 needed more capital from Steven Levine to continue progressing.  Therefore, part of

25 this meeting was to inform Steven Levine regarding what the Company's upcoming

26 expenses were and how his investments would be allocated—and to convince him to

27 invest more funds into the Company in exchange for equity.

28        120.   And, on March 20, 2014, Peltier emailed Steven Levine giving him an

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

update on "some solid alternatives to corporate entities" and giving his perspective on how the Company should be structured.  Peltier provided this update to Steven Levine because he knew Steven Levine was an equity stakeholder in the Company and that part of Steven Levine's investment was going to be used to pay for attorneys to set up the Company's corporate structure.

121.    Just a few days later, on March 25, 2014, Peltier sent Steven Levine another investor update regarding "Upcoming Costs."  Specifically, Peltier provided Steven Levine with "upcoming litigative cost projections and timeline" over the next two weeks and associated expenses.  Peltier informed Steven Levine that he would provide a further update once he contacted the Company's lawyer.  He concluded the email, "Let me know if you have any questions, otherwise, I'll be in touch."  Peltier continued to provide these updates because he knew that Steven Levine was funding the Company and was an equity stakeholder.

122.    Peltier ultimately proposed that Steven Levine take a 2.5% equity stake in the Company in return for his investment.  Steven Levine's equity investment was documented in an April 16-17, 2014 email chain between Steven Levine and Peltier.  On April 16, 2014, Peltier sent an email to Steven Levine telling him that the Company was "proposing an offer of 2.5% equity for your investment" but that "the proposed convertible note is still on the table as well."  Peltier calculated Steven Levine's equity as follows, adding in a "risk premium (RP)":

$50,000/$3,000,000 – 1.666666% * 1.5 (RP) = ~2.5%

123.    That same day, Steven Levine and Peltier had a phone call during which Steven Levine told Peltier that he was accepting the equity offer rather than the convertible note proposal.  Peltier followed up with an email confirming their conversation, stating: "The benefits for you are equally great and this ensures a return on you [sic] investment.  Max Levine, Buffin, and I unanimously agree this is the route we would like to take."

124.    Some of the $50,000 investment was not provided by Steven Levine

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400     FAX: (310) 552-8400

1   until after this email and agreement on the phone call.  For example, on May 22,

2   2014, Steven Levine put $5,000 into the Company as part of this deal he had made

3   with the Company.

4       125.   At no point did Steven Levine and Peltier ever discuss that Steven

5   Levine's $50,000 would be considered a loan rather than an equity investment in the

6   Company.  Steven Levine and Peltier never discussed any of the hallmarks of the

7   loan, such as interest rates or a payment schedule.

8       126.   Steven Levine would have never given the $50,000 to the Company as

9   a loan, and everyone involved always intended it to be an investment.  Steven

10  Levine relied on the promise of equity in deciding to invest in the Company.

11      127.   After Steven Levine and Peltier agreed on Steven Levine's 2.5% equity

12  interest, Peltier continued to treat Steven Levine like an equity stakeholder.  For

13  example, on May 12, 2014, Peltier emailed Steven Levine yet another investor

14  update regarding the Company's "May – August Expenses."  In the email, which

15  attached a detailed spreadsheet of monthly expenses, Peltier said to Steven Levine,

16  "Attached are the May - August expenses that would require the additional liquid

17  we had talked about.  These are the more certain expenses that that money would be

18  allocated to as we open the round and sustain during.  Let me know once you review

19  and we can setup a date/time to conference."

20      128.   In or around mid-summer of 2017, after Max Levine and Buffin left the

21  Company, Steven Levine called Peltier to discuss his investment.  Steven Levine

22  wanted to know what was going to happen with the Company now that his son, Max

23  Levine, was no longer going to be directly involved.  Steven Levine spoke with

24  Peltier and offered Community a discount in exchange for the return of his $50,000

25  investment.

26      129.   During this call, Peltier acknowledged Steven Levine's 2.5%

27  investment in the Company and reassured Steven Levine that the money was best

28  left in the Company because he was working on a new strategy that could turn the

Company around.  Steven Levine trusted Peltier and believed that Peltier would protect Steven Levine's interests and rights because Peltier had worked closely with his son and Buffin.  Steven Levine thus agreed to leave his investment in the Company.

130.   In or about June 2019, Peltier sent Steven Levine a text message asking Steven Levine whether the Company could repurchase his shares.

131.   In or around mid-late July 2019, Peltier called Steven Levine to follow up on his offer for Defendants to repurchase Steven Levine's shares.  Peltier told Steven Levine that Defendants were also buying out other early investors.  Peltier offered to return Steven Levine's investment through a "consulting agreement."

132.   Steven Levine asked Peltier to give him an update on what was going on with the Company to prompt the repurchase offer.  Peltier did not provide Steven Levine with any substantive information.  Peltier did not mention any of the Company's fundraising efforts—no mention of the $35 million investment, Guy Oseary, or Ashton Kutcher.

133.   Max Levine immediately informed Steven Levine of the Tech Crunch article.  Steven Levine, too, was shocked to learn about the $35 million investment led by Sound Ventures.  Steven Levine had spoken with Peltier just days before the article came out, and Peltier never mentioned a single thing about the Company obtaining a multi-million dollar investment months prior.

134.   Defendants intentionally kept this material information from Steven Levine, despite the fact that he was a shareholder.  It soon thereafter became clear to Steven Levine that Defendants had no intention to treat him fairly or formally acknowledge his rights as a shareholder in the Company.  This was confirmed as subsequently Peltier refused to acknowledge Steven Levine's status as a shareholder.

135.   In addition, Steven Levine's 2.5% equity stake in the Company has still not been formally recognized.  In fact, Defendants have now reversed course and are

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

denying that Steven Levine was ever an investor and a 2.5% shareholder.

## FIRST CAUSE OF ACTION

### (Breach of Fiduciary Duty)

### *(By Buffin and Max Levine Against Peltier and Doe Defendants)*

136.   Plaintiffs repeat and reallege each and every foregoing and subsequent allegation contained in the Complaint, and further allege as follows:

137.   As CEO of the Company and as a board member, Peltier owed a fiduciary duty to Buffin and Max Levine, who were shareholders of the Company. Peltier controlled the operations of the Company and had special knowledge of its finances, future plans, prospective transactions, and prospects.  Peltier's fiduciary duty to Plaintiffs required him to disclose all material facts relating to the Company's finances, future plans, prospective transactions, prospects, and similar information, and to do so in a truthful manner, during the negotiations of Defendants' repurchase of Plaintiffs' Company shares.

138.   Peltier breached this duty.

139.   As CEO and as a director of the Company, Peltier was privy to special facts only within his control, and not only failed to disclose these facts to Plaintiffs, but made misrepresentations to Plaintiffs regarding the status of the Company, the value of Plaintiffs' shares and the identities of the new high-profile investors that Peltier was bringing on board.

140.   **Peltier Makes Misstatements About Insolvency**:

    a. On or about October 29, 2018, and on multiple subsequent occasions, Peltier told Buffin over the phone that there were only two options left for the Company given its poor financial condition: (1) the Company would either go bankrupt and Buffin and Max Levine would be left with nothing from their investment in the Company; or (2) Buffin and Max Levine could sell back their shares to the Company for approximately $20,000,

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

which would save them all the time and legal costs associated with filing for bankruptcy, and allow Max Levine and Buffin to walk away with guaranteed cash in their pockets.

b.  On or about November 1, 2018, Buffin asked Peltier to confirm that the only other option would be to "get stroked and move on with nothing lol," to which Peltier responded, "[R]ight, we just need to clean cap to get all parties to help us move forward."

c.  On or about November 1, 2018, Peltier reiterated these two options to Buffin and told him that "there arnt really any" other options and that Buffin and Max Levine couldn't sell back just half of their shares because it was "kinda all or nothing."

d.  "kinda all or nothing if we're gonna try n roll forward vs clean reset, cash either goes to legal or shareholders if that makes sense.  latter is better for all."

e.  On or about November 29, 2018, Peltier called Max Levine and repeated the same ultimatum—that the Company was on the verge of insolvency and could not survive if Buffin and Max Levine did not sell back their shares.

141.   These representations about the supposed Hobson's choice of selling your shares for $20k or get nothing in bankruptcy were false and misleading and were stated with the requisite scienter because Peltier could not have believed they were true at the time they were made.

142.   There was no threat of bankruptcy at the time these statements were made.  Just weeks before Peltier said these things, Community had received in excess of $2 million in investments.  In addition, Oseary and Kutcher had come in as co-founders, and other members of their team, including Swenson and Heller, were employed by Community.  Community was, at the time, beta testing the product with Maverick's celebrity clients, and was preparing for a formal launch of

FIRST AMENDED COMPLAINT

496932.2

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1   the Company in January.  Community, with the fundraising efforts led by Sound

2   Ventures, was in the process of raising tens of million of more dollars and was

3   pursuing this fundraising at a much higher valuation.

4   143.   As such, Peltier did not, and could not, believe that he was facing a

5   choice between insolvency and buying these shares back at a company valuation of

6   $200k at the time he made the statements.  Even if he thought those were his options

7   at one point, he knew no later than October 13, 2018, when this new fundraising

8   round with Sound Ventures was disclosed to investors, that he no longer faced these

9   choices.  Yet the communications in question here all were made after October 13,

10  2018.

11  144.   **Peltier Misrepresented the Value of the Company's shares:**

12          a.  On or about October 29, 2018, Peltier called Buffin and told him

13              that the Company shares were worth a penny and thus that his

14              offer was a good deal.  This statement in the phone call was

15              summarized by Buffin in a November 1, 2018 text exchange,

16              when Buffin texted: "And is there currently a share value?  You

17              said a penny?"

18          b.  On or about November 1, 2018, Peltier texted Buffin to tell him

19              that selling back his shares for $22,002 would still give Plaintiffs

20              a "massive return considering the shares started at $.00001 lol."

21          c.  On or about May 11, 2018, Peltier texted Buffin that the share

22              value of the Company is "w.e. [whatever] at this point, and we

23              have $70k in our bank lol" and he continued to state that these

24              circumstances were the status quo throughout the negotiations.

25  145.   These statements were false and misleading, as Peltier knew at the time

26  he made them.  The statement in the October 29, 2018 phone call that the shares

27  were worth a penny was not true, and Peltier did not believe it was true at the time

28  he said it.  He had just two weeks before closed an investment round for more than

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1  $2 million at a share value higher than a penny a share.

2  146.   Moreover, the post-transaction valuation of Community was well in

3  excess of a penny a share now that Kutcher and Oseary had come in as co-founders,

4  agreed to be the face of the Company, and were actively helping with fundraising.

5  This had all occurred, as Peltier knew, at the time he was making these statements to

6  Plaintiffs.  Indeed, at the time these statements were made, Community, led by

7  Oseary and Kutcher, was leading a significant investment round and requesting

8  investments at a valuation in excess of $100 million.  Peltier, as CEO and head of

9  the board, knew these fundraising efforts were ongoing and knew of Kutcher and

10  Oseary's involvement.

11  147.   In addition, Peltier's statement on November 1, 2018 that there is "No

12  set share value as we've never done a 409A" was itself false and misleading.  The

13  Company did have set share values as a share value had been determined as part of

14  the transaction entered into no later than October 13, 2018 for in excess of $2

15  million to bring in Sound Ventures.  Peltier negotiated this transaction on behalf of

16  Community and therefore was aware of the share values used in the transaction.

17  148.   **Peltier made misstatements about the Company's Fundraising to

18  Date.**  Peltier stated on or around November 1, 2018 that they had a "small"

19  investment closing soon, which is what they would be able to use to buyout the

20  shares of Buffin and Max Levine.  Peltier referred to this as a "bridge" which would

21  allow this supposedly struggling company to continue operating for a few more

22  months.

23  149.   This statement was false and misleading.  The investment had already

24  closed, as it closed no later than October 13, 2018 when it was announced to

25  investors.  And the investment was not "small," particularly in the context of the

26  Company's prior fundraising.  The $2 million amount was approximately as much

27  as it had ever raised at one time.  An investment for millions of dollars led by

28  institutional and celebrity investors was anything but "small."

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

150.   **Peltier failed to disclose these special facts relating to the Company's financial condition and prospects during the negotiations of Defendants' repurchase of Plaintiffs' Company shares in order to induce Plaintiffs into selling their shares to them**.  Peltier breached his fiduciary duty by concealing the true financial outlook of the Company and the identity of its new high-profile investors in hopes of swindling Plaintiffs to sell their shares to him at a nominal amount so that Defendants could make a windfall.  These concealments include:

a. Actively concealing from Buffin and Max Levine, despite having a duty to disclose this information, the names of the Company's high-profile investors or potential investors—Hollywood talent manager Guy Oseary and celebrity Ashton Kutcher;

b. Actively concealing from Buffin and Max Levine, despite having a duty to disclose this information, that, in addition to already having raised in excess of $2 million, Community was actively, with the help of Kutcher and Oseary, working to raise tens of millions of dollars at a valuation for the Company in excess of $100 million;

c. Actively concealing that celebrities like G-Eazy and Tim McGraw had beta tested the product;

d. Actively concealing that the Company was preparing for a formal launch in January 2019, which would be led by a tweet from Kutcher to text him; and

e. Actively concealing from Buffin and Max Levine, despite having a duty to disclose this information, that new or anticipated investment rounds would significantly change the financial prospects of the Company and its share value.

151.   Peltier knew that the information they omitted or concealed from

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

Buffin and Max Levine was material to their decision on whether to sell back their Company shares for $22,002.

152.   By making the misrepresentations and omissions, Peltier intended to induce Buffin and Max Levine to sell back their Company shares at a nominal price that was based on a significantly understated valuation of the Company.  Peltier knew and understood that Buffin and Max Levine would act in reliance on the false representations or omissions by agreeing to sell back their shares.

153.   Buffin and Max Levine's reliance on these omissions was foreseeable, reasonable, and justified.  Indeed, Buffin and Max Levine repeatedly expressed hesitation to Defendants about selling back their Company shares in part because they had very little insight into the finances and financial outlook of the Company.  Peltier, as the CEO and person responsible for running the day-to-day operations of the Company, was the only person that could provide Buffin and Max Levine with relevant and material information and insight into the Company finances.

154.   Buffin and Max Levine trusted Peltier, who was not only an officer of the Company but their former co-founder, to provide such information during the parties' negotiation of the stock repurchase.  Peltier assured Buffin and Max Levine that it was in the best interests of the Company and in the best interests of Buffin and Max Levine to sell back their shares.  In fact, Peltier made statements to reassure Buffin and Max Levine that they could trust him and that he was looking out "for the boys!"  Peltier took advantage of his friendship with Buffin and Max Levine by reinforcing the belief that he was working to get them a good deal.

155.   As a direct and proximate result of Plaintiffs' reliance, Buffin and Max Levine each entered into a stock repurchase agreement whereby each of them sold back 600,000 Company shares for $22,002.  This caused injury and pecuniary loss to Buffin and Max Levine.  Buffin and Max Levine would not have entered into the Stock Repurchase Agreement had Peltier not made material omissions and concealments.  Buffin and Max Levine are thus entitled to an award of

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

compensatory damages believed to be in excess of $25 million.

## **SECOND CAUSE OF ACTION**

### **(Fraudulent Misrepresentation)**

### *(By Buffin and Max Levine Against Defendants)*

156.   Plaintiffs repeat and reallege each and every foregoing and subsequent allegation contained in the Complaint, and further allege as follows:

157.   As CEO of the Company and as a board member, Peltier owed a fiduciary duty to Buffin and Max Levine, who were shareholders of the Company. Peltier controlled the operations of the Company and had special knowledge of its finances, future plans, prospective transactions, and prospects.  Peltier's fiduciary duty to Plaintiffs required him to disclose all material facts relating to the Company's finances, future plans, prospective transactions, prospects, and similar information, and to do so in a truthful manner, during the negotiations of Defendants' repurchase of Plaintiffs' Company shares.

158.   Defendants misrepresented to Plaintiffs the financial state and outlook of the Company.  These false representations include:

159.   **Defendants Made Misstatements About Insolvency**:

    a.   On or about October 29, 2018, and on multiple subsequent occasions, Peltier told Buffin over the phone that there were only two options left for the Company given its poor financial condition: (1) the Company would either go bankrupt and Buffin and Max Levine would be left with nothing from their investment in the Company; or (2) Buffin and Max Levine could sell back their shares to the Company for approximately $20,000, which would save them all the time and legal costs associated with filing for bankruptcy, and allow Max Levine and Buffin to walk away with guaranteed cash in their pockets.

    b.   On or about November 1, 2018, Buffin asked Peltier to confirm

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

that the only other option would be to "get stroked and move on with nothing lol," to which Peltier responded, "[R]ight, we just need to clean cap to get all parties to help us move forward."

c. On or about November 1, 2018, Peltier reiterated these two options to Buffin and told him that "there arnt really any" other options and that Buffin and Max Levine couldn't sell back just half of their shares because it was "kinda all or nothing."

d. "kinda all or nothing if we're gonna try n roll forward vs clean reset, cash either goes to legal or shareholders if that makes sense.  latter is better for all."

e. On or about November 29, 2018, Peltier called Max Levine and repeated the same ultimatum—that the Company was on the verge of insolvency and could not survive if Buffin and Max Levine did not sell back their shares.

160.   These representations about the supposed Hobson's choice of selling your shares for $20k or get nothing in bankruptcy were false and misleading and were stated with the requisite scienter because Peltier could not have believed they were true at the time they were made.

161.   There was no threat of bankruptcy at the time these statements were made.  Just weeks before Peltier said these things, Community had received in excess of $2 million in investments.  In addition, Oseary and Kutcher had come in as co-founders, and other members of their team, including Swenson and Heller, were employed by Community.  Community was, at the time, beta testing the product with Maverick's celebrity clients, and was preparing for a formal launch of the Company in January.  Community, with the fundraising efforts led by Sound Ventures, was in the process of raising tens of million of more dollars and was pursuing this fundraising at a much higher valuation.

162.   As such, Peltier did not, and could not, believe that he was facing a

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

choice between insolvency and buying these shares back at a company valuation of $200k at the time he made the statements.  Even if he thought those were his options at one point, he knew no later than October 13, 2018, when this new fundraising round with Sound Ventures was disclosed to investors, that he no longer faced these choices.  Yet the communications in question here all were made after October 13, 2018.

163.   **Defendants misrepresented the value of the Company's shares:**

    a. On or about October 29, 2018, Peltier called Buffin and told him that the Company shares were worth a penny and thus that his offer was a good deal.  This statement in the phone call was summarized by Buffin in a November 1, 2018 text exchange, when Buffin texted: "And is there currently a share value?  You said a penny?"

    b. On or about November 1, 2018, Peltier texted Buffin to tell him that selling back his shares for $22,002 would still give Plaintiffs a "massive return considering the shares started at $.00001 lol."

    c. On or about May 11, 2018, Peltier texted Buffin that the share value of the Company is "w.e. [whatever] at this point, and we have $70k in our bank lol" and he continued to state that these circumstances were the status quo throughout the negotiations.

164.   These statements were false and misleading, as Peltier knew at the time he made them.  The statement in the October 29, 2018 phone call that the shares were worth a penny was not true, and Peltier did not believe it was true at the time he said it.  He had just two weeks before closed an investment round for more than $2 million at a share value higher than a penny a share.

165.   Moreover, the post-transaction valuation of Community was well in excess of a penny a share now that Kutcher and Oseary had come in as co-founders, agreed to be the face of the Company, and were actively helping with fundraising.

This had all occurred, as Peltier knew, at the time he was making these statements to Plaintiffs.  Indeed, at the time these statements were made, Community, led by Oseary and Kutcher, was leading a significant investment round and requesting investments at a valuation in excess of $100 million.  Peltier, as CEO and head of the board, knew these fundraising efforts were ongoing and knew of Kutcher and Oseary's involvement.

166.   In addition, Peltier's statement on November 1, 2018 that there is "No set share value as we've never done a 409A" was itself false and misleading.  The Company did have set share values as a share value had been determined as part of the transaction entered into no later than October 13, 2018 for in excess of $2 million to bring in Sound Ventures.  Peltier negotiated this transaction on behalf of Community and therefore was aware of the share values used in the transaction.

167.   **Defendants made misstatements about the Company's fundraising to date.**  Defendants stated on or around November 1, 2018 that they had a "small" investment closing soon, which is what they would be able to use to buyout the shares of Buffin and Max Levine.  Peltier referred to this as a "bridge" which would allow this supposedly struggling company to continue operating for a few more months.

168.   This statement was false and misleading.  The investment had already closed, as it closed no later than October 13, 2018 when it was announced to investors.  And the investment was not "small," particularly in the context of the Company's prior fundraising.  The $2 million amount was approximately as much as it had ever raised at one time.  An investment for millions of dollars led by institutional and celebrity investors was anything but "small."

169.   **Defendants failed to disclose these special facts relating to the Company's financial condition and prospects during the negotiations of Defendants' repurchase of Plaintiffs' Company shares in order to induce Plaintiffs into selling their shares**.  Peltier concealed the true financial outlook of

Miller Barondess, LLP
Attorneys at Law
1999 Avenue of The Stars, Suite 1000  Los Angeles, California 90067
Tel: (310) 552-4400   Fax: (310) 552-8400

the Company and the identity of its new high-profile investors in hopes of swindling Plaintiffs to sell their shares to him at a nominal amount so that Defendants could make a windfall.  These concealments include:

    a.  Actively concealing from Buffin and Max Levine, despite having a duty to disclose this information, the names of the Company's high-profile investors or potential investors—Hollywood talent manager Guy Oseary and celebrity Ashton Kutcher;

    b.  Actively concealing from Buffin and Max Levine, despite having a duty to disclose this information, that, in addition to already having raised in excess of $2 million, Community was actively, with the help of Kutcher and Oseary, working to raise tens of millions of dollars at a valuation for the Company in excess of $100 million;

    c.  Actively concealing that celebrities like G-Eazy and Tim McGraw had beta tested the product;

    d.  Actively concealing that the Company was preparing for a formal launch in January 2019, which would be led by a tweet from Kutcher to text him; and

    e.  Actively concealing from Buffin and Max Levine, despite having a duty to disclose this information, that new or anticipated investment rounds would significantly change the financial prospects of the Company and its share value.

170.   Defendants knew that the information they omitted or concealed from Buffin and Max Levine was material to their decision on whether to sell back their Company shares for $22,002.

171.   By making the misrepresentations and omissions, Defendants intended to induce Buffin and Max Levine to sell back their Company shares at a nominal price that was based on a significantly understated valuation of the Company.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

37

Defendants knew and understood that Buffin and Max Levine would act in reliance on the false representations or omissions by agreeing to sell back their shares.

172.    Buffin and Max Levine's reliance on these omissions was foreseeable, reasonable, and justified.  Indeed, Buffin and Max Levine repeatedly expressed hesitation to Defendants about selling back their Company shares in part because they had very little insight into the finances and financial outlook of the Company. Peltier, as the CEO and person responsible for running the day-to-day operations of the Company, was the only person that could provide Buffin and Max Levine with relevant and material information and insight into the Company finances.

173.    Buffin and Max Levine trusted Peltier, who was not only an officer of the Company but their former co-founder, to provide such information during the parties' negotiation of the stock repurchase.  Peltier assured Buffin and Max Levine that it was in the best interests of the Company and in the best interests of Buffin and Max Levine to sell back their shares.  In fact, Peltier made statements to reassure Buffin and Max Levine that they could trust him and that he was looking out "for the boys!"  Peltier took advantage of his friendship with Buffin and Max Levine by reinforcing the belief that he was working to get them a good deal.

174.    As a direct and proximate result of Plaintiffs' reliance, Buffin and Max Levine each entered into a stock repurchase agreement whereby each of them sold back 600,000 Company shares for $22,002.  This caused injury and pecuniary loss to Buffin and Max Levine because unbeknownst to them, Defendants had already raised, or were on the cusp of raising, a $35 million investment led by Sound Ventures, and the valuation of the Company was closer to $200 million.  Buffin and Max Levine would not have entered into the Stock Repurchase Agreement had Defendants not made their material misrepresentations or omissions.  Buffin and Max Levine are thus entitled to an award of compensatory damages believed to be in excess of $25 million.  Alternatively, Buffin and Max Levine are entitled to rescission of each Stock Purchase Agreement as a result of Defendants' fraudulent

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  conduct.

2  175.   The conduct of Defendants was committed with the intent of depriving

3  Buffin and Max Levine of their rights and causing injury to them.  The conduct was

4  despicable and subjected Buffin and Max Levine to unjust hardship.  The conduct

5  was malicious, fraudulent and oppressive, and was committed with a conscious

6  disregard for Buffin's and Max Levine's rights.  Accordingly, Buffin and Max

7  Levine are entitled to an award of punitive or exemplary damages in an amount

8  sufficient to punish Defendants and to make an example of them.

9  **THIRD CAUSE OF ACTION**

10  **(Intentional Concealment)**

11  ***(By Buffin and Max Levine Against Defendants)***

12  176.   Plaintiffs repeat and reallege each and every foregoing and subsequent

13  allegation contained in the Complaint, and further allege as follows:

14  177.   As CEO of the Company and as a board member, Peltier owed a

15  fiduciary duty to Buffin and Max Levine, who were shareholders of the Company.

16  Peltier controlled the operations of the Company and had special knowledge of its

17  finances, future plans, prospective transactions, and prospects.  Peltier's fiduciary

18  duty to Plaintiffs required him to disclose all material facts relating to the

19  Company's finances, future plans, prospective transactions, prospects, and similar

20  information, and to do so in a truthful manner, during the negotiations of

21  Defendants' repurchase of Plaintiffs' Company shares.

22  178.   **Defendants concealed special facts relating to the Company's**

23  **financial condition and prospects during the negotiations of Defendants'**

24  **repurchase of Plaintiffs' Company shares in order to induce Plaintiffs into**

25  **selling their shares**.  Peltier concealed the true financial outlook of the Company

26  and the identity of its new high-profile investors in hopes of swindling Plaintiffs to

27  sell their shares to him at a nominal amount so that Defendants could make a

28  windfall.  These concealments include:

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

a.  Actively concealing from Buffin and Max Levine, despite having a duty to disclose this information, the names of the Company's new high-profile investors and co-founders—Hollywood talent manager Guy Oseary and celebrity Ashton Kutcher, even though they had invested and come into the Company no later than October 13, 2018 and their team of employees as well, like Swenson, was also working already at the Company;

b.  Actively concealing from Buffin and Max Levine, despite having a duty to disclose this information, that, in addition to already having raised in excess of $2 million, Community was actively, with the help of Kutcher and Oseary, working to raise tens of millions of dollars at a valuation for the Company in excess of $100 million;

c.  Actively concealing that celebrities like G-Eazy and Tim McGraw had beta tested the product;

d.  Actively concealing that the Company was preparing for a formal launch in January 2019, which would be led by a tweet from Kutcher to text him; and

e.  Actively concealing from Buffin and Max Levine, despite having a duty to disclose this information, that new or anticipated investment rounds would significantly change the financial prospects of the Company and its share value.

179.  Defendants knew that the information they omitted or concealed from Buffin and Max Levine was material to their decision on whether to sell back their Company shares for $22,002.

180.  By concealing these special facts and making these misrepresentations and omissions, Defendants intended to induce Buffin and Max Levine to sell back their Company shares at a nominal price that was based on a significantly

496932.2

40

1   understated valuation of the Company.  Defendants knew and understood that

2   Buffin and Max Levine would act in reliance on the false representations or

3   omissions by agreeing to sell back their shares.

4       181.   Buffin and Max Levine's reliance on these omissions was foreseeable,

5   reasonable, and justified.  Indeed, Buffin and Max Levine repeatedly expressed

6   hesitation to Defendants about selling back their Company shares in part because

7   they had very little insight into the finances and financial outlook of the Company.

8   Peltier, as the CEO and person responsible for running the day-to-day operations of

9   the Company, was the only person that could provide Buffin and Max Levine with

10   relevant and material information and insight into the Company finances.

11       182.   Buffin and Max Levine trusted Peltier, who was not only an officer of

12   the Company but their former co-founder, to provide such information during the

13   parties' negotiation of the stock repurchase.  Peltier assured Buffin and Max Levine

14   that it was in the best interests of the Company and in the best interests of Buffin

15   and Max Levine to sell back their shares.  In fact, Peltier made statements to

16   reassure Buffin and Max Levine that they could trust him and that he was looking

17   out "for the boys!"  Peltier took advantage of his friendship with Buffin and Max

18   Levine by reinforcing the belief that he was working to get them a good deal.

19       183.   As a direct and proximate result of Plaintiffs' reliance, Buffin and Max

20   Levine each entered into a stock repurchase agreement whereby each of them sold

21   back 600,000 Company shares for $22,002.  Buffin and Max Levine would not have

22   entered into the Stock Repurchase Agreement had Defendants not concealed crucial

23   facts from Plaintiffs and made their material misrepresentations or omissions.

24   Buffin and Max Levine are thus entitled to an award of compensatory damages

25   believed to be in excess of $25 million.  Alternatively, Buffin and Max Levine are

26   entitled to rescission of each Stock Purchase Agreement as a result of Defendants'

27   fraudulent conduct.

28       184.   The conduct of Defendants was committed with the intent of depriving

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

Buffin and Max Levine of their rights and causing injury to them.  The conduct was despicable and subjected Buffin and Max Levine to unjust hardship.  The conduct was malicious, fraudulent and oppressive, and was committed with a conscious disregard for Buffin's and Max Levine's rights.  Accordingly, Buffin and Max Levine are entitled to an award of punitive or exemplary damages in an amount sufficient to punish Defendants and to make an example of them.

## **FOURTH CAUSE OF ACTION**

**(Violation of § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 Promulgated Thereunder, 17 C.F.R. § 240.10b-5)**

***(By Buffin and Max Levine Against Defendants)***

185.   Plaintiffs repeat and reallege each and every foregoing and subsequent allegation contained in the Complaint, and further allege as follows:

186.   As CEO of the Company and as a board member, Peltier owed a fiduciary duty to Buffin and Max Levine, who were shareholders of the Company. Peltier controlled the operations of the Company and had special knowledge of its finances, future plans, prospective transactions, and prospects.  Peltier's fiduciary duty to Plaintiffs required him to disclose all material facts relating to the Company's finances, future plans, prospective transactions, prospects, and similar information, and to do so in a truthful manner, during the negotiations of Defendants' repurchase of Plaintiffs' Company shares.

187.   Defendants, directly or indirectly, by the use of means or instrumentalities of interstate commerce, including but not limited to the use of phones for calls and texting, e-mail, and the internet, engaged in a course of conduct that violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by (a) employing a device, scheme, or artifice to defraud Plaintiffs; (b) making an untrue statement of material fact or omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaging in an act, practice, or course

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

of business which operated or would operate as a fraud or deceit upon Plaintiffs, in connection with the repurchase of Plaintiffs' Company shares.

188.   Defendants' false representations include:

189.   **Defendants Made Misstatements About Insolvency**:

a.  On or about October 29, 2018, and on multiple subsequent occasions, Peltier told Buffin over the phone that there were only two options left for the Company given its poor financial condition: (1) the Company would either go bankrupt and Buffin and Max Levine would be left with nothing from their investment in the Company; or (2) Buffin and Max Levine could sell back their shares to the Company for approximately $20,000, which would save them all the time and legal costs associated with filing for bankruptcy, and allow Max Levine and Buffin to walk away with guaranteed cash in their pockets.

b.  On or about November 1, 2018, Buffin asked Peltier to confirm that the only other option would be to "get stroked and move on with nothing lol," to which Peltier responded, "[R]ight, we just need to clean cap to get all parties to help us move forward."

c.  On or about November 1, 2018, Peltier reiterated these two options to Buffin and told him that "there arnt really any" other options and that Buffin and Max Levine couldn't sell back just half of their shares because it was "kinda all or nothing."

d.  "kinda all or nothing if we're gonna try n roll forward vs clean reset, cash either goes to legal or shareholders if that makes sense.  latter is better for all."

e.  On or about November 29, 2018, Peltier called Max Levine and repeated the same ultimatum—that the Company was on the verge of insolvency and could not survive if Buffin and Max

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

Levine did not sell back their shares.

190.   These representations about the supposed Hobson's choice of selling your shares for $20k or get nothing in bankruptcy were false and misleading and were stated with the requisite scienter because Peltier could not have believed they were true at the time they were made.

191.   There was no threat of bankruptcy at the time these statements were made.  Just weeks before Peltier said these things, Community had received in excess of $2 million in investments.  In addition, Oseary and Kutcher had come in as co-founders, and other members of their team, including Swenson and Heller, were employed by Community.  Community was, at the time, beta testing the product with Maverick's celebrity clients, and was preparing for a formal launch of the Company in January.  Community, with the fundraising efforts led by Sound Ventures, was in the process of raising tens of million of more dollars and was pursuing this fundraising at a much higher valuation.

192.   As such, Peltier did not, and could not, believe that he was facing a choice between insolvency and buying these shares back at a company valuation of $200k at the time he made the statements.  Even if he thought those were his options at one point, he knew no later than October 13, 2018, when this new fundraising round with Sound Ventures and agreement for Oseary and Kutcher to work at the Company was disclosed to investors and the deal, that he no longer faced these choices.  Yet the communications in question here all were made after October 13, 2018.

193.   **Defendants misrepresented the value of the Company's shares:**

   a. On or about October 29, 2018, Peltier called Buffin and told him that the Company shares were worth a penny and thus that his offer was a good deal.  This statement in the phone call was summarized by Buffin in a November 1, 2018 text exchange, when Buffin texted: "And is there currently a share value?  You

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1    said a penny?"

2      b.  On or about November 1, 2018, Peltier texted Buffin to tell him

3          that selling back his shares for $22,002 would still give Plaintiffs

4          a "massive return considering the shares started at $.00001 lol."

5      c.  On or about May 11, 2018, Peltier texted Buffin that the share

6          value of the Company is "w.e. [whatever] at this point, and we

7          have $70k in our bank lol" and he continued to state that these

8          circumstances were the status quo throughout the negotiations.

9    194.   These statements were false and misleading, as Peltier knew at the time

10 he made them.  The statement in the October 29, 2018 phone call that the shares

11 were worth a penny was not true, and Peltier did not believe it was true at the time

12 he said it.  He had just two weeks before closed an investment round for more than

13 $2 million at a share value higher than a penny a share.

14    195.   Moreover, the post-transaction valuation of Community was well in

15 excess of a penny a share now that the Company had brought in more than $2

16 million, Kutcher and Oseary had come in as co-founders, agreed to be the face of

17 the Company, and were actively helping with fundraising.  This had all occurred, as

18 Peltier knew, at the time he was making these statements to Plaintiffs.  Indeed, at the

19 time these statements were made, Community, led by Oseary and Kutcher, was

20 leading a significant investment round and requesting investments at a valuation in

21 excess of $100 million.  Peltier, as CEO and head of the board, knew these

22 fundraising efforts were ongoing and knew of Kutcher and Oseary's involvement

23 and therefore could not have believed the statements he made about share value to

24 Buffin and Max Levine.

25    196.   In addition, Peltier's statement on November 1, 2018 that there is "No

26 set share value as we've never done a 409A" was itself false and misleading.  The

27 Company did have set share values as a share value had been determined as part of

28 the transaction entered into no later than October 13, 2018 for in excess of $2

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

45

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

million to bring in Sound Ventures.  Peltier negotiated this transaction on behalf of Community and therefore was aware of the share values used in the transaction.

197.  **Defendants made misstatements about the Company's fundraising to date.**  Defendants stated on or around November 1, 2018 that they had a "small" investment closing soon, which is what they would be able to use to buyout the shares of Buffin and Max Levine.  Peltier referred to this as a "bridge" which would allow this supposedly struggling company to continue operating for a few more months.

198.  This statement was false and misleading.  The investment had already closed, as it closed no later than October 13, 2018 when it was announced to investors.  And the investment was not "small," particularly in the context of the Company's prior fundraising.  The $2 million amount was approximately as much as it had ever raised at one time.  An investment for millions of dollars led by institutional and celebrity investors was anything but "small."

199.  **Defendants failed to disclose these special facts relating to the Company's financial condition and prospects during the negotiations of Defendants' repurchase of Plaintiffs' Company shares in order to induce Plaintiffs into selling their shares to them**.  Peltier concealed the true financial outlook of the Company and the identity of its new high-profile investors in hopes of swindling Plaintiffs to sell their shares to him at a nominal amount so that Defendants could make a windfall.  These concealments include:

    a.  Actively concealing from Buffin and Max Levine, despite having a duty to disclose this information, the names of the Company's high-profile investors or potential investors—Hollywood talent manager Guy Oseary and celebrity Ashton Kutcher;

    b.  Actively concealing from Buffin and Max Levine, despite having a duty to disclose this information, that, in addition to already having raised in excess of $2 million, Community was actively,

with the help of Kutcher and Oseary, working to raise tens of millions of dollars at a valuation for the Company in excess of $100 million;

c.   Actively concealing that celebrities like G-Eazy and Tim McGraw had beta tested the product;

d.   Actively concealing that the Company was preparing for a formal launch in January 2019, which would be led by a tweet from Kutcher to text him; and

e.   Actively concealing from Buffin and Max Levine, despite having a duty to disclose this information, that new or anticipated investment rounds would significantly change the financial prospects of the Company and its share value.

200.   Defendants knew that the information they omitted or concealed from Buffin and Max Levine was material to their decision on whether to sell back their Company shares for $22,002.

201.   By making the misrepresentations and omissions, Defendants intended to induce Buffin and Max Levine to sell back their Company shares at a nominal price that was based on a significantly understated valuation of the Company. Defendants knew and understood that Buffin and Max Levine would act in reliance on the false representations or omissions by agreeing to sell back their shares.

202.   Buffin and Max Levine's reliance on these omissions was foreseeable, reasonable, and justified.  Indeed, Buffin and Max Levine repeatedly expressed hesitation to Defendants about selling back their Company shares in part because they had very little insight into the finances and financial outlook of the Company. Peltier, as the CEO and person responsible for running the day-to-day operations of the Company, was the only person that could provide Buffin and Max Levine with relevant and material information and insight into the Company finances.

203.   Buffin and Max Levine trusted Peltier, who was not only an officer of

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

the Company but their former co-founder, to provide such information during the parties' negotiation of the stock repurchase.  Peltier assured Buffin and Max Levine that it was in the best interests of the Company and in the best interests of Buffin and Max Levine to sell back their shares.  In fact, Peltier made statements to reassure Buffin and Max Levine that they could trust him and that he was looking out "for the boys!"  Peltier took advantage of his friendship with Buffin and Max Levine by reinforcing the belief that he was working to get them a good deal.

204.   As a direct and proximate result of Plaintiffs' reliance, Buffin and Max Levine each entered into a stock repurchase agreement whereby each of them sold back 600,000 Company shares for $22,002.  This caused injury and pecuniary loss to Buffin and Max Levine.  Buffin and Max Levine would not have entered into the Stock Repurchase Agreement had Defendants not made their material omissions and concealments.  Buffin and Max Levine are thus entitled to an award of compensatory damages believed to be in excess of $25 million.

## FIFTH CAUSE OF ACTION

### (Violation of § 20(a) of the Exchange Act, 15 U.S.C. § 78(t))

### *(By Buffin and Max Levine Against Peltier and Doe Defendants)*

205.   Plaintiffs repeat and reallege each and every foregoing and subsequent allegation contained in the Complaint, and further allege as follows:

206.   Peltier is, and was at all relevant times, the CEO and a board member of the Company, and thus a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act.  By virtue of his executive position, Peltier had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the dissemination of information and statements made to Buffin and Max Levine in connection with Defendants' repurchase of Plaintiffs' Company shares.

207.   In particular, Peltier had direct involvement in the day-to-day operations of the Company, including its fundraising efforts.  Thus, Peltier had the

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

power to and indeed did exert control or influence over the negotiations of and execution of Buffin's and Max Levine's Stock Repurchase Agreements.  In fact, Peltier was the sole signatory on behalf of the Company on the Stock Repurchase Agreements.

208.   As set forth above, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 by their acts and omissions alleged herein.  By virtue of his position as a controlling person of the Company, Peltier is jointly and severally liable pursuant to Section 20(a) of the Exchange Act.

209.   As a direct and proximate result of Peltier's wrongful conduct, Buffin and Max Levine each entered into a stock repurchase agreement whereby each of them sold back 600,000 Company shares for $22,002.  This caused injury and pecuniary loss to Buffin and Max Levine.  Buffin and Max Levine would not have entered into the Stock Repurchase Agreement had Defendants not made their material omissions and concealments.  Buffin and Max Levine are thus entitled to an award of compensatory damages believed to be in excess of $25 million.

## SIXTH CAUSE OF ACTION

### (Securities Fraud, Violation of California Corp. Code §§ 25401, 25501, 25504)
### *(By Buffin and Max Levine Against Defendants)*

210.   Plaintiffs repeat and reallege each and every foregoing and subsequent allegation contained in the Complaint, and further allege as follows:

211.   The California Corporate Securities Laws of 1968, California Corporations Code section 25401 ("Section 25401"), states that "[i]t is unlawful for any person to offer or sell a security in this state, or to buy or offer to buy a security in this state, by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading."

212.   Section 25501 of the Corporations Code imposes civil liability for any

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

person who violates Section 25401.  Section 25501 states, in part, "Any person who violates Section 25401 shall be liable to the person who purchases a security from him or sells a security to him, who may sue either for rescission or for damages (if the plaintiff or the defendant, as the case may be, no longer owns the security), unless the defendant proves that the plaintiff knew the facts concerning the untruth or omission or that the defendant exercised reasonable care and did not know (or if he had exercised reasonable care would not have known) of the untruth or omission."

213.   Section 25504 extends the civil liability under Section 25501 to "every principal executive officer or director of a corporation so liable" and "every employee of a person so liable who materially aids in the act or transaction constituting the violation" (among others) who are thus jointly and severally liable "unless the other person who is so liable had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist."

214.   As CEO of the Company and as a board member, Peltier owed a fiduciary duty to Buffin and Max Levine, who were shareholders of the Company. Peltier controlled the operations of the Company and had special knowledge of its finances, future plans, prospective transactions, and prospects.  Peltier's fiduciary duty to Plaintiffs required him to disclose all material facts relating to the Company's finances, future plans, prospective transactions, prospects, and similar information, and to do so in a truthful manner, during the negotiations of Defendants' repurchase of Plaintiffs' Company shares.

215.   Defendants false representations include:

216.   **Defendants Made Misstatements About Insolvency**:

    a.   On or about October 29, 2018, and on multiple subsequent occasions, Peltier told Buffin over the phone that there were only two options left for the Company given its poor financial

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

condition: (1) the Company would either go bankrupt and Buffin and Max Levine would be left with nothing from their investment in the Company; or (2) Buffin and Max Levine could sell back their shares to the Company for approximately $20,000, which would save them all the time and legal costs associated with filing for bankruptcy, and allow Max Levine and Buffin to walk away with guaranteed cash in their pockets.

b. On or about November 1, 2018, Buffin asked Peltier to confirm that the only other option would be to "get stroked and move on with nothing lol," to which Peltier responded, "[R]ight, we just need to clean cap to get all parties to help us move forward."

c. On or about November 1, 2018, Peltier reiterated these two options to Buffin and told him that "there arnt really any" other options and that Buffin and Max Levine couldn't sell back just half of their shares because it was "kinda all or nothing."

d. "kinda all or nothing if we're gonna try n roll forward vs clean reset, cash either goes to legal or shareholders if that makes sense.  latter is better for all."

e. On or about November 29, 2018, Peltier called Max Levine and repeated the same ultimatum—that the Company was on the verge of insolvency and could not survive if Buffin and Max Levine did not sell back their shares.

217.   These representations about the supposed Hobson's choice of selling your shares for $20k or get nothing in bankruptcy were false and misleading and were stated with the requisite scienter because Peltier could not have believed they were true at the time they were made.

218.   There was no threat of bankruptcy at the time these statements were made.  Just weeks before Peltier said these things, Community had received in

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

excess of $2 million in investments.  In addition, Oseary and Kutcher had come in as co-founders, and other members of their team, including Swenson and Heller, were employed by Community.  Community was, at the time, beta testing the product with Maverick's celebrity clients, and was preparing for a formal launch of the Company in January.  Community, with the fundraising efforts led by Sound Ventures, was in the process of raising tens of million of more dollars and was pursuing this fundraising at a much higher valuation.

219.   As such, Peltier did not, and could not, believe that he was facing a choice between insolvency and buying these shares back at a company valuation of $200k at the time he made the statements.  Even if he thought those were his options at one point, he knew no later than October 13, 2018, when this new fundraising round with Sound Ventures was disclosed to investors, that he no longer faced these choices.  Yet the communications in question here all were made after October 13, 2018.

220.   **Defendants misrepresented the value of the Company's shares:**

    a. On or about October 29, 2018, Peltier called Buffin and told him that the Company shares were worth a penny and thus that his offer was a good deal.  This statement in the phone call was summarized by Buffin in a November 1, 2018 text exchange, when Buffin texted: "And is there currently a share value?  You said a penny?"

    b. On or about November 1, 2018, Peltier texted Buffin to tell him that selling back his shares for $22,002 would still give Plaintiffs a "massive return considering the shares started at $.00001 lol."

    c. On or about May 11, 2018, Peltier texted Buffin that the share value of the Company is "w.e. [whatever] at this point, and we have $70k in our bank lol" and he continued to state that these circumstances were the status quo throughout the negotiations.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

221.   These statements were false and misleading, as Peltier knew at the time he made them.  The statement in the October 29, 2018 phone call that the shares were worth a penny was not true, and Peltier did not believe it was true at the time he said it.  He had just two weeks before closed an investment round for more than $2 million at a share value higher than a penny a share.

222.   Moreover, the post-transaction valuation of Community was well in excess of a penny a share now that Kutcher and Oseary had come in as co-founders, agreed to be the face of the Company, and were actively helping with fundraising.  This had all occurred, as Peltier knew, at the time he was making these statements to Plaintiffs.  Indeed, at the time these statements were made, Community, led by Oseary and Kutcher, was leading a significant investment round and requesting investments at a valuation in excess of $100 million.  Peltier, as CEO and head of the board, knew these fundraising efforts were ongoing and knew of Kutcher and Oseary's involvement.

223.   In addition, Peltier's statement on November 1, 2018 that there is "No set share value as we've never done a 409A" was itself false and misleading.  The Company did have set share values as a share value had been determined as part of the transaction entered into no later than October 13, 2018 for in excess of $2 million to bring in Sound Ventures.  Peltier negotiated this transaction on behalf of Community and therefore was aware of the share values used in the transaction.

224.   **Defendants made misstatements about the Company's fundraising to date.**  Defendants stated on or around November 1, 2018 that they had a "small" investment closing soon, which is what they would be able to use to buyout the shares of Buffin and Max Levine.  Peltier referred to this as a "bridge" which would allow this supposedly struggling company to continue operating for a few more months.

225.   This statement was false and misleading.  The investment had already closed, as it closed no later than October 13, 2018 when it was announced to

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  investors.  And the investment was not "small," particularly in the context of the

2  Company's prior fundraising.  The $2 million amount was approximately as much

3  as it had ever raised at one time.  An investment for millions of dollars led by

4  institutional and celebrity investors was anything but "small."

5      226.  **Defendants failed to disclose these special facts relating to the**

6  **Company's financial condition and prospects during the negotiations of**

7  **Defendants' repurchase of Plaintiffs' Company shares in order to induce**

8  **Plaintiffs into selling their shares**.  Peltier concealed the true financial outlook of

9  the Company and the identity of its new high-profile investors in hopes of swindling

10 Plaintiffs to sell their shares to him at a nominal amount so that Defendants could

11 make a windfall.  These concealments include:

12     a.  Actively concealing from Buffin and Max Levine, despite having

13         a duty to disclose this information, the names of the Company's

14         high-profile investors or potential investors—Hollywood talent

15         manager Guy Oseary and celebrity Ashton Kutcher;

16     b.  Actively concealing from Buffin and Max Levine, despite having

17         a duty to disclose this information, that, in addition to already

18         having raised in excess of $2 million, Community was actively,

19         with the help of Kutcher and Oseary, working to raise tens of

20         millions of dollars at a valuation for the Company in excess of

21         $100 million;

22     c.  Actively concealing that celebrities like G-Eazy and Tim

23         McGraw had beta tested the product;

24     d.  Actively concealing that the Company was preparing for a

25         formal launch in January 2019, which would be led by a tweet

26         from Kutcher to text him; and

27     e.  Actively concealing from Buffin and Max Levine, despite having

28         a duty to disclose this information, that new or anticipated

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

investment rounds would significantly change the financial prospects of the Company and its share value.

227.   Defendants knew that the information they omitted or concealed from Buffin and Max Levine was material to their decision on whether to sell back their Company shares for $22,002.

228.   By making the misrepresentations and omissions, Defendants intended to induce Buffin and Max Levine to sell back their Company shares at a nominal price that was based on a significantly understated valuation of the Company. Defendants knew and understood that Buffin and Max Levine would act in reliance on the false representations or omissions by agreeing to sell back their shares.

229.   Buffin and Max Levine's reliance on these omissions was foreseeable, reasonable, and justified.  Indeed, Buffin and Max Levine repeatedly expressed hesitation to Defendants about selling back their Company shares in part because they had very little insight into the finances and financial outlook of the Company. Peltier, as the CEO and person responsible for running the day-to-day operations of the Company, was the only person that could provide Buffin and Max Levine with relevant and material information and insight into the Company finances.

230.   Buffin and Max Levine trusted Peltier, who was not only an officer of the Company but their former co-founder, to provide such information during the parties' negotiation of the stock repurchase.  Peltier assured Buffin and Max Levine that it was in the best interests of the Company and in the best interests of Buffin and Max Levine to sell back their shares.  In fact, Peltier made statements to reassure Buffin and Max Levine that they could trust him and that he was looking out "for the boys!"  Peltier took advantage of his friendship with Buffin and Max Levine by reinforcing the belief that he was working to get them a good deal.

231.   As a direct and proximate result of Plaintiffs' reliance, Buffin and Max Levine each entered into a stock repurchase agreement whereby each of them sold back 600,000 Company shares for $22,002.  This caused injury and pecuniary loss

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

to Buffin and Max Levine because unbeknownst to them, Defendants had already raised, or were on the cusp of raising, a $35 million investment led by Sound Ventures, and the valuation of the Company was closer to $200 million. Buffin and Max Levine would not have entered into the Stock Repurchase Agreement had Defendants not made their material misrepresentations or omissions. Buffin and Max Levine are thus entitled to an award of compensatory damages believed to be in excess of $25 million. Alternatively, Buffin and Max Levine are entitled to rescission of each Stock Purchase Agreement as a result of Defendants' fraudulent conduct.

## SEVENTH CAUSE OF ACTION
### (Negligent Misrepresentation)
### *(By Buffin and Max Levine Against Defendants)*

232.   Plaintiffs repeat and reallege each and every foregoing and subsequent allegation contained in the Complaint, and further allege as follows:

233.   As CEO of the Company and as a board member, Peltier owed a fiduciary duty to Buffin and Max Levine, who were shareholders of the Company. Peltier controlled the operations of the Company and had special knowledge of its finances, future plans, prospective transactions, and prospects. Peltier's fiduciary duty to Plaintiffs required him to disclose all material facts relating to the Company's finances, future plans, prospective transactions, prospects, and similar information, and to do so in a truthful manner, during the negotiations of Defendants' repurchase of Plaintiffs' Company shares.

234.   As alleged herein, and in the alternative to Defendants fraudulently making various false or misleading representations of material facts, Defendants negligently misrepresented to Plaintiffs the financial state and outlook of the Company, and made representations that the Company was in a dire state and on the brink of insolvency. Defendants made many of these representations to Buffin knowing that Buffin would convey the message to Max Levine, which Buffin did.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400     FAX: (310) 552-8400

These false representations include:

235. **Defendants Made Misstatements About Insolvency**:

  a. On or about October 29, 2018, and on multiple subsequent occasions, Peltier told Buffin over the phone that there were only two options left for the Company given its poor financial condition: (1) the Company would either go bankrupt and Buffin and Max Levine would be left with nothing from their investment in the Company; or (2) Buffin and Max Levine could sell back their shares to the Company for approximately $20,000, which would save them all the time and legal costs associated with filing for bankruptcy, and allow Max Levine and Buffin to walk away with guaranteed cash in their pockets.

  b. On or about November 1, 2018, Buffin asked Peltier to confirm that the only other option would be to "get stroked and move on with nothing lol," to which Peltier responded, "[R]ight, we just need to clean cap to get all parties to help us move forward."

  c. On or about November 1, 2018, Peltier reiterated these two options to Buffin and told him that "there arnt really any" other options and that Buffin and Max Levine couldn't sell back just half of their shares because it was "kinda all or nothing."

  d. "kinda all or nothing if we're gonna try n roll forward vs clean reset, cash either goes to legal or shareholders if that makes sense.  latter is better for all."

  e. On or about November 29, 2018, Peltier called Max Levine and repeated the same ultimatum—that the Company was on the verge of insolvency and could not survive if Buffin and Max Levine did not sell back their shares.

236. These representations about the supposed Hobson's choice of selling

Miller Barondess, LLP
Attorneys at Law
1999 Avenue of The Stars, Suite 1000   Los Angeles, California 90067
Tel: (310) 552-4400   Fax: (310) 552-8400

your shares for $20k or get nothing in bankruptcy were false and misleading and were stated with the requisite scienter because Peltier could not have believed they were true at the time they were made.

237.   There was no threat of bankruptcy at the time these statements were made.  Just weeks before Peltier said these things, Community had received in excess of $2 million in investments.  In addition, Oseary and Kutcher had come in as co-founders, and other members of their team, including Swenson and Heller, were employed by Community.  Community was, at the time, beta testing the product with Maverick's celebrity clients, and was preparing for a formal launch of the Company in January.  Community, with the fundraising efforts led by Sound Ventures, was in the process of raising tens of million of more dollars and was pursuing this fundraising at a much higher valuation.

238.   As such, Peltier did not, and could not, believe that he was facing a choice between insolvency and buying these shares back at a company valuation of $200k at the time he made the statements.  Even if he thought those were his options at one point, he knew no later than October 13, 2018, when this new fundraising round with Sound Ventures was disclosed to investors, that he no longer faced these choices.  Yet the communications in question here all were made after October 13, 2018.

239.   **Defendants negligently misrepresented the value of the Company's shares:**

> a.  On or about October 29, 2018, Peltier called Buffin and told him that the Company shares were worth a penny and thus that his offer was a good deal.  This statement in the phone call was summarized by Buffin in a November 1, 2018 text exchange, when Buffin texted: "And is there currently a share value?  You said a penny?"
>
> b.  On or about November 1, 2018, Peltier texted Buffin to tell him

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

that selling back his shares for \$22,002 would still give Plaintiffs
a "massive return considering the shares started at \$.00001 lol."

c. On or about May 11, 2018, Peltier texted Buffin that the share
value of the Company is "w.e. [whatever] at this point, and we
have \$70k in our bank lol" and he continued to state that these
circumstances were the status quo throughout the negotiations.

240.  These statements were false and misleading, as Peltier knew at the time
he made them.  The statement in the October 29, 2018 phone call that the shares
were worth a penny was not true, and Peltier did not believe it was true at the time
he said it.  He had just two weeks before closed an investment round for more than
\$2 million at a share value higher than a penny a share.

241.  Moreover, the post-transaction valuation of Community was well in
excess of a penny a share now that Kutcher and Oseary had come in as co-founders,
agreed to be the face of the Company, and were actively helping with fundraising.
This had all occurred, as Peltier knew, at the time he was making these statements to
Plaintiffs.  Indeed, at the time these statements were made, Community, led by
Oseary and Kutcher, was leading a significant investment round and requesting
investments at a valuation in excess of \$100 million.  Peltier, as CEO and head of
the board, knew these fundraising efforts were ongoing and knew of Kutcher and
Oseary's involvement.

242.  In addition, Peltier's statement on November 1, 2018 that there is "No
set share value as we've never done a 409A" was itself false and misleading.  The
Company did have set share values as a share value had been determined as part of
the transaction entered into no later than October 13, 2018 for in excess of \$2
million to bring in Sound Ventures.  Peltier negotiated this transaction on behalf of
Community and therefore was aware of the share values used in the transaction.

243.  **Defendants made misstatements about the Company's fundraising
to date.**  Defendants stated on or around November 1, 2018 that they had a "small"

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1   investment closing soon, which is what they would be able to use to buyout the

2   shares of Buffin and Max Levine.  Peltier referred to this as a "bridge" which would

3   allow this supposedly struggling company to continue operating for a few more

4   months.

5         244.   This statement was false and misleading.  The investment had already

6   closed, as it closed no later than October 13, 2018 when it was announced to

7   investors.  And the investment was not "small," particularly in the context of the

8   Company's prior fundraising.  The $2 million amount was approximately as much

9   as it had ever raised at one time.  An investment for millions of dollars led by

10   institutional and celebrity investors was anything but "small."

11         245.   **Defendants failed to disclose these special facts relating to the**

12   **Company's financial condition and prospects during the negotiations of**

13   **Defendants' repurchase of Plaintiffs' Company shares in order to induce**

14   **Plaintiffs into selling their shares**.  Peltier concealed the true financial outlook of

15   the Company and the identity of its new high-profile investors in hopes of swindling

16   Plaintiffs to sell their shares to him at a nominal amount so that Defendants could

17   make a windfall.  These concealments include:

18             a.   Actively concealing from Buffin and Max Levine, despite having

19                a duty to disclose this information, the names of the Company's

20                high-profile investors or potential investors—Hollywood talent

21                manager Guy Oseary and celebrity Ashton Kutcher;

22             b.   Actively concealing from Buffin and Max Levine, despite having

23                a duty to disclose this information, that, in addition to already

24                having raised in excess of $2 million, Community was actively,

25                with the help of Kutcher and Oseary, working to raise tens of

26                millions of dollars at a valuation for the Company in excess of

27                $100 million;

28             c.   Actively concealing that celebrities like G-Eazy and Tim

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

McGraw had beta tested the product;

    d.  Actively concealing that the Company was preparing for a formal launch in January 2019, which would be led by a tweet from Kutcher to text him; and

    e.  Actively concealing from Buffin and Max Levine, despite having a duty to disclose this information, that new or anticipated investment rounds would significantly change the financial prospects of the Company and its share value.

246.  Defendants knew that the information they omitted or concealed from Buffin and Max Levine was material to their decision on whether to sell back their Company shares for $22,002.

247.  By making the misrepresentations and omissions, Defendants breached their duty to Plaintiffs and intended to induce Buffin and Max Levine to sell back their Company shares at a nominal price that was based on a significantly understated valuation of the Company.  Defendants knew and understood that Buffin and Max Levine would act in reliance on the false representations or omissions by agreeing to sell back their shares.

248.  Buffin and Max Levine's reliance on these omissions was foreseeable, reasonable, and justified.  Indeed, Buffin and Max Levine repeatedly expressed hesitation to Defendants about selling back their Company shares in part because they had very little insight into the finances and financial outlook of the Company.  Peltier, as the CEO and person responsible for running the day-to-day operations of the Company, was the only person that could provide Buffin and Max Levine with relevant and material information and insight into the Company finances.

249.  Buffin and Max Levine trusted Peltier, who was not only an officer of the Company but their former co-founder, to provide such information during the parties' negotiation of the stock repurchase.  Peltier assured Buffin and Max Levine that it was in the best interests of the Company and in the best interests of Buffin

1  and Max Levine to sell back their shares.  In fact, Peltier made statements to

2  reassure Buffin and Max Levine that they could trust him and that he was looking

3  out "for the boys!"  Peltier took advantage of his friendship with Buffin and Max

4  Levine by reinforcing the belief that he was working to get them a good deal.

5       250.   As a direct and proximate result of Plaintiffs' reliance on Defendants'

6  negligent misrepresentations, Buffin and Max Levine each entered into a stock

7  repurchase agreement whereby each of them sold back 600,000 Company shares for

8  $22,002.  This caused injury and pecuniary loss to Buffin and Max Levine because

9  unbeknownst to them, Defendants had already raised, or were on the cusp of raising,

10 a $35 million investment led by Sound Ventures, and the valuation of the Company

11 was closer to $200 million.  Buffin and Max Levine would not have entered into the

12 Stock Repurchase Agreement had Defendants not made their material

13 misrepresentations or omissions.  Buffin and Max Levine are thus entitled to an

14 award of compensatory damages believed to be in excess of $25 million.

15 Alternatively, Buffin and Max Levine are entitled to rescission of each Stock

16 Purchase Agreement as a result of Defendants' fraudulent conduct.

17      251.   The conduct of Defendants was committed with the intent of depriving

18 Buffin and Max Levine of their rights and causing injury to them.  The conduct was

19 despicable and subjected Buffin and Max Levine to unjust hardship.  The conduct

20 was malicious, fraudulent and oppressive, and was committed with a conscious

21 disregard for Buffin's and Max Levine's rights.  Accordingly, Buffin and Max

22 Levine are entitled to an award of punitive or exemplary damages in an amount

23 sufficient to punish Defendants and to make an example of them.

## EIGHTH CAUSE OF ACTION

### (Breach of Contract)

### *(By Steven Levine Against Community)*

27      252.   Plaintiffs repeat and reallege each and every foregoing and subsequent

28 allegation contained in the Complaint, and further allege as follows:

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

253.   On or about April 16, 2014, Peltier emailed Steven Levine with a 2.5% equity stake offer in return for Steven Levine's $50,000 investment.  In this email, Peltier referred to Steven Levine's $50,000 contribution to the Company as an investment.  Peltier also offered in this email to structure the investment as convertible debt if Steven Levine preferred.

254.   Shortly thereafter, Steven Levine spoke on the phone with Peltier and accepted the offer for 2.5% equity; he told Peltier he was not interested in the convertible debt offer.

255.   Steven Levine trusted Peltier, with whom he had a close relationship by virtue of his son's business relationship with Peltier.

256.   In or about mid-summer 2017, after his son Max Levine left the Company, Steven Levine approached Peltier about buying out his investment in the Company.  Peltier reassured Steven Levine that his investment was best left in the Company because they were working on a new strategy that could turn the Company around.  Based on this explanation from Peltier, Steven Levine decided to stop negotiating for a buyout of his investment and continued to believe his investment was secure.

257.   Even as recently as June 2019, Peltier acknowledged Steven Levine's 2.5% investment.  Around that time, Peltier approached Steven Levine through a text message and phone call about Community buying out Steven Levine's 2.5% interest.  Peltier expressed that Defendants were making similar offers to other early investors.  Notably, in this conversation, Peltier failed to disclose anything about the Company's recent successes, such as the $35 million investment led by Sound Ventures.

258.   However, later in 2019, Defendants changed their position.  They denied that Steven Levine was an investor in the Company at all, let alone a 2.5% interest holder.  This was the first time Defendants ever communicated to Steven Levine that they did not recognize him as a shareholder, let alone a 2.5%

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1   shareholder.

2   259.   It only became apparent to Steven Levine after Defendants reversed

3   course that Peltier had defrauded him and been stringing him along for years.  The

4   statements Peltier made to Steven Levine in 2014, 2017 and 2019 were all

5   fraudulent and intended to induce Steven Levine to believe his investment was

6   secure when it was not.

7   260.   Community breached its agreement with Steven Levine by, among

8   other things, failing to convey to Steven Levine shares in the Company amounting

9   to a 2.5% equity stake.

10   261.   Steven Levine performed all conditions, covenants, and promises

11   required on his part to be performed, except for those conditions, covenants, or

12   promises which were excused by Community or that Community prevented him

13   from performing by the acts or omissions on the part of Community and its agent

14   Peltier.

15   262.   This breach directly and proximately caused injury and pecuniary loss

16   to Steven Levine, for which he is entitled to an award of compensatory damages

17   believed to be in excess of $5 million.

18   263.   Alternatively, Steven Levine is entitled to a judicial order demanding

19   that Community specifically perform according to the terms of the parties'

20   agreement, including properly executing and transferring to Steven Levine shares in

21   Community reflecting his 2.5% equity interest.

22   ## NINTH CAUSE OF ACTION

23   ### (Breach of Fiduciary Duty)

24   ### *(By Steven Levine Against Peltier and Doe Defendants)*

25   264.   Plaintiffs repeat and reallege each and every foregoing and subsequent

26   allegation contained in the Complaint, and further allege as follows:

27   265.   Directors and officers of a corporation owe fiduciary duties to the

28   corporation's shareholders.  This fiduciary duty includes an obligation to recognize

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

a shareholder's status and equity stake in the corporation.

266.   On or about April 16, 2014, Peltier emailed Steven Levine with a 2.5% equity stake offer in return for Steven Levine's $50,000 investment.  In this email, Peltier referred to Steven Levine's $50,000 contribution to the Company as an investment.  Peltier also offered in this email to structure the investment as convertible debt if Steven Levine preferred.

267.   Shortly thereafter, Steven Levine spoke on the phone with Peltier and accepted the offer for 2.5% equity; he told Peltier he was not interested in the convertible debt offer.

268.   Steven Levine trusted Peltier, with whom he had a close relationship by virtue of his son's business relationship with Peltier.

269.   In or about mid-summer 2017, after his son Max Levine left the Company, Steven Levine approached Peltier about buying out his investment in the Company.  Peltier reassured Steven Levine that his investment was best left in the Company because they were working on a new strategy that could turn the Company around.  Based on this explanation from Peltier, Steven Levine decided to stop negotiating for a buyout of his investment and continued to believe his investment was secure.

270.   Even as recently as June 2019, Peltier acknowledged Steven Levine's 2.5% investment.  Around that time, Peltier approached Steven Levine through a text message and phone call about Community buying out Steven Levine's 2.5% interest.  Peltier expressed that Defendants were making similar offers to other early investors.  Notably, in this conversation, Peltier failed to disclose anything about the Company's recent successes, such as the $35 million investment led by Sound Ventures.

271.   However, later in 2019, Defendants changed their position.  They denied that Steven Levine was an investor in the Company at all, let alone a 2.5% interest holder.  This was the first time Defendants ever communicated to Steven

65
FIRST AMENDED COMPLAINT

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

Levine that they did not recognize him as a shareholder, let alone a 2.5% shareholder.

272.   It only became apparent to Steven Levine after Defendants reversed course that Peltier had defrauded him and been stringing him along for years.  The statements Peltier made to Steven Levine in 2014, 2017 and 2019 were all fraudulent and intended to induce Steven Levine to believe his investment was secure when it was not.

273.   Peltier breached his fiduciary duty to Steven Levine, a shareholder in the Company with a 2.5% equity stake, by, in 2019 and thereafter, failing and refusing to recognize Steven Levine as a shareholder of the Company and his accompanying equity stake and other shareholder rights, including by failing and refusing to transfer to Steven Levine his shares in the Company.

274.   Peltier's conduct has directly and proximately caused injury and pecuniary loss to Steven Levine for which he is entitled to an award of compensatory damages believed to be in excess of $5 million.

275.   Peltier acted with the intent of depriving Steven Levine of his rights and causing injury to him.  The conduct was despicable and subjected Steven Levine to unjust hardship.  The conduct was malicious, fraudulent and oppressive, and was committed with a conscious disregard for Steven Levine's rights.  Accordingly, Steven Levine is entitled to an award of punitive or exemplary damages in an amount sufficient to punish Peltier and to make an example of him.

## TENTH CAUSE OF ACTION

### (Fraud)

### *(By Steven Levine Against Defendants)*

276.   Plaintiffs repeat and reallege each and every foregoing and subsequent allegation contained in the Complaint, and further allege as follows:

277.   In 2014, Steven Levine made investments in the Company totaling $50,000 in return for a promise of an equity interest in the Company.  At no point

did Steven Levine and Defendants ever discuss that Steven Levine's $50,000 would be treated like a loan rather than an investment in return for an equity stake. The parties understood that the specific amount of Steven Levine's equity stake would be negotiated at a later date because the Company was in need of immediate capital in its early stages.

278. Steven Levine met Peltier on multiple occasions and trusted Peltier given Peltier's relationship with his son, Max Levine, and Buffin, who Steven Levine treated like family. Steven Levine had multiple conversations with Peltier to negotiate the amount of equity he would receive. Peltier took the lead for Community in negotiating these terms with Steven Levine and providing Steven Levine with updates on the Company's progress and its use of Steven Levine's investment.

279. On or about April 16, 2014, Peltier emailed Steven Levine with a 2.5% equity stake offer in return for Steven Levine's $50,000 investment. In this email, Peltier referred to Steven Levine's $50,000 contribution to the Company as an investment. Peltier also offered in this email to structure the investment as convertible debt if Steven Levine preferred.

280. Shortly thereafter, Steven Levine spoke on the phone with Peltier and accepted the offer for 2.5% equity; he told Peltier he was not interested in the convertible debt offer. Thus, Steven Levine purchased or otherwise acquired securities in the Company.

281. Steven Levine trusted Peltier, with whom he had a close relationship by virtue of his son's business relationship with Peltier.

282. In or about mid-summer 2017, after his son Max Levine left the Company, Steven Levine approached Peltier about buying out his investment in the Company. Peltier reassured Steven Levine that his investment was best left in the Company because they were working on a new strategy that could turn the Company around. Based on this explanation from Peltier, Steven Levine decided to

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1  stop negotiating for a buyout of his investment and continued to believe his

2  investment was secure.

3      283.   Even as recently as June 2019, Peltier acknowledged Steven Levine's

4  2.5% investment.  Around that time, Peltier approached Steven Levine through a

5  text message and phone call about Community buying out Steven Levine's 2.5%

6  interest.  Peltier expressed that Defendants were making similar offers to other early

7  investors.  Notably, in this conversation, Peltier failed to disclose anything about the

8  Company's recent successes, such as the $35 million investment led by Sound

9  Ventures.

10      284.   However, later in 2019, Defendants changed their position.  They

11 denied that Steven Levine was an investor in the Company at all, let alone a 2.5%

12 interest holder.  This was the first time Defendants ever communicated to Steven

13 Levine that they did not recognize him as a shareholder, let alone a 2.5%

14 shareholder.

15      285.   It only became apparent to Steven Levine after Defendants reversed

16 course that Peltier had defrauded him and been stringing him along for years.  The

17 statements Peltier made to Steven Levine in 2014, 2017 and 2019 were all

18 fraudulent and intended to induce Steven Levine to believe his investment was

19 secure when it was not.

20      286.   Steven Levine relied on Defendants' false or misleading

21 representations to not take action until 2019.  Steven Levine would have never

22 invested $50,000 in the Company had Defendants not promised Steven Levine an

23 equity stake in the Company in return.  He relied on the promise of equity to invest.

24 In addition, some of the $50,000 was invested, with the last $5k coming in May

25 2014, after Peltier confirmed the deal for 2.5% in the April 2014 phone call.  Steven

26 Levine would not have made the $50,000 investment if Defendants had told Steven

27 Levine that it would be treated simply as a loan to the Company.  Steven Levine's

28 reliance on these misrepresentations and omissions was foreseeable, reasonable, and

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  justified.  Steven Levine trusted Peltier, who acted as the Company's agent, to

2  deliver on his promise.

3      287.  As a direct and proximate result of Steven Levine's reliance on

4  Defendants' misrepresentations and omissions, Steven Levine has suffered injury

5  and pecuniary loss and is thus entitled to an award of compensatory damages

6  believed to be in excess of $5 million.  Punitive damages are also appropriate.

7  **ELEVENTH CAUSE OF ACTION**

8  **(Violation of § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5**

9  **Promulgated Thereunder, 17 C.F.R. § 240.10b-5))**

10  ***(By Steven Levine Against Defendants)***

11      288.  Plaintiffs repeat and reallege each and every foregoing and subsequent

12  allegation contained in the Complaint, and further allege as follows:

13      289.  Defendants, directly or indirectly, by the use of means or

14  instrumentalities of interstate commerce, including but not limited to the use of

15  phones for calls and texting, e-mail, and the internet, engaged in a course of conduct

16  that violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated

17  thereunder by (a) employing a device, scheme, or artifice to defraud Plaintiff;

18  (b) making an untrue statement of material fact or omitting to state a material fact

19  necessary in order to make the statements made, in light of the circumstances under

20  which they were made, not misleading; or (c) engaging in an act, practice, or course

21  of business which operated or would operate as a fraud or deceit upon Plaintiff, in

22  connection with obtaining Steven Levine's $50,000 investment in the Company.

23      290.  In 2014, Steven Levine made three separate investments in the

24  Company totaling $50,000 in return for a promise of an equity interest in the

25  Company.  At no point did Steven Levine and Defendants ever discuss that Steven

26  Levine's $50,000 would be treated like a loan rather than an investment in return for

27  an equity stake.  The parties understood that the specific amount of Steven Levine's

28  equity stake would be negotiated at a later date because the Company was in need of

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

immediate capital in its early stages.

291.    Steven Levine met Peltier on multiple occasions and trusted Peltier given Peltier's relationship with his son, Max Levine, and Buffin, who Steven Levine treated like family.  Steven Levine had multiple conversations with Peltier to negotiate the amount of equity he would receive.  Peltier took the lead for Community in negotiating these terms with Steven Levine and providing Steven Levine with updates on the Company's progress and its use of Steven Levine's investment.

292.    On or about April 16, 2014, Peltier emailed Steven Levine with a 2.5% equity stake offer in return for Steven Levine's $50,000 investment.  In this email, Peltier referred to Steven Levine's $50,000 contribution to the Company as an investment.  Peltier also offered in this email to structure the investment as convertible debt if Steven Levine preferred.

293.    Shortly thereafter, Steven Levine spoke on the phone with Peltier and accepted the offer for 2.5% equity; he told Peltier he was not interested in the convertible debt offer.

294.    Steven Levine trusted Peltier, with whom he had a close relationship by virtue of his son's business relationship with Peltier.

295.    In or about mid-summer 2017, after his son Max Levine left the Company, Steven Levine approached Peltier about buying out his investment in the Company.  Peltier reassured Steven Levine that his investment was best left in the Company because they were working on a new strategy that could turn the Company around.  Based on this explanation from Peltier, Steven Levine decided to stop negotiating for a buyout of his investment and continued to believe his investment was secure.

296.    Even as recently as June 2019, Peltier acknowledged Steven Levine's 2.5% investment.  Around that time, Peltier approached Steven Levine through a text message and phone call about Community buying out Steven Levine's 2.5%

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

interest.  Peltier expressed that Defendants were making similar offers to other early investors.  Notably, in this conversation, Peltier failed to disclose anything about the Company's recent successes, such as the $35 million investment led by Sound Ventures.

297.   However, later in 2019, Defendants changed their position.  They denied that Steven Levine was an investor in the Company at all, let alone a 2.5% interest holder.  This was the first time Defendants ever communicated to Steven Levine that they did not recognize him as a shareholder, let alone a 2.5% shareholder.

298.   It only became apparent to Steven Levine after Defendants reversed course that Peltier had defrauded him and been stringing him along for years.  The statements Peltier made to Steven Levine in 2014, 2017 and 2019 were all fraudulent and intended to induce Steven Levine to believe his investment was secure when it was not.

299.   Steven Levine relied on Defendants' false or misleading representations and invested $50,000 in the Company and to not take action until 2019.  Steven Levine would have never invested $50,000 in the Company had Defendants not promised Steven Levine an equity stake in the Company in return. He relied on the promise of equity to invest.  In addition, some of the $50,000 was invested, with the last $5k coming in May 2014, after Peltier confirmed the deal for 2.5% in the April 2014 phone call.  Steven Levine would not have made the $50,000 investment if Defendants had told Steven Levine that it would be treated simply as a loan to the Company.  Steven Levine's reliance on these misrepresentations and omissions was foreseeable, reasonable, and justified.  Steven Levine trusted Peltier, who acted as the Company's agent, to deliver on his promise.  The facts alleged herein indicate that Defendants acted with scienter towards Plaintiff.

300.   As a direct and proximate result of Steven Levine's reliance on Defendants' misrepresentations and omissions, Steven Levine has suffered injury

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  and pecuniary loss and is thus entitled to an award of compensatory damages
2  believed to be in excess of $5 million.

### TWELFTH CAUSE OF ACTION

### (Violation of § 20(a) of the Exchange Act, 15 U.S.C. § 78(t))

#### *(By Steven Levine Against Peltier and Doe Defendants)*

6  301.   Plaintiffs repeat and reallege each and every foregoing and subsequent
7  allegation contained in the Complaint, and further allege as follows:

8  302.   Peltier is, and was at all relevant times, the CEO and a board member
9  of the Company, and thus a controlling person of the Company within the meaning
10  of Section 20(a) of the Exchange Act.  By virtue of his executive position, Peltier
11  had the power to influence and control and did influence and control, directly or
12  indirectly, the decision-making of the Company, including the offer of a 2.5%
13  equity stake to Steven Levine in return for his $50,000 investment in the Company.

14  303.   In particular, Peltier had direct involvement in the day-to-day
15  operations and the power to control or influence the negotiations of and execution of
16  any investments made in the Company.  In fact, Peltier did exert that control and
17  influence, including by negotiating and communicating directly with Steven Levine
18  regarding his investment and 2.5% equity stake in the Company.

19  304.   As set forth above, Defendants violated Section 10(b) of the Exchange
20  Act and Rule 10b-5 by their acts or omissions alleged herein.  By virtue of his
21  position as a controlling person of the Company, Peltier is jointly and severally
22  liable pursuant to Section 20(a) of the Exchange Act.

23  305.   As a direct and proximate result of Peltier's wrongful conduct, Steven
24  Levine has suffered injury and pecuniary loss, and is thus entitled to an award of
25  compensatory damages believed to be in excess of $5 million.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

## THIRTEENTH CAUSE OF ACTION

**(Securities Fraud, Violation of California Corp. Code §§ 25401, 25501, 25504)**

***(By Steven Levine Against Defendants)***

306.   Plaintiffs repeat and reallege each and every foregoing and subsequent allegation contained in the Complaint, and further allege as follows:

307.   Section 25401 states that "[i]t is unlawful for any person to offer or sell a security in this state, or to buy or offer to buy a security in this state, by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading."

308.   Section 25501 of the Corporations Code imposes civil liability for any person who violates Section 25401.  Section 25501 states, in part, "Any person who violates Section 25401 shall be liable to the person who purchases a security from him or sells a security to him, who may sue either for rescission or for damages (if the plaintiff or the defendant, as the case may be, no longer owns the security), unless the defendant proves that the plaintiff knew the facts concerning the untruth or omission or that the defendant exercised reasonable care and did not know (or if he had exercised reasonable care would not have known) of the untruth or omission."

309.   Section 25504 extends the civil liability under Section 25501 to "every principal executive officer or director of a corporation so liable" and "every employee of a person so liable who materially aids in the act or transaction constituting the violation" (among others) who are thus jointly and severally liable "unless the other person who is so liable had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist."

310.   In 2014, Steven Levine made three separate investments in the Company totaling $50,000 in return for a promise of an equity interest in the

1   Company.  At no point did Steven Levine and Defendants ever discuss that Steven

2   Levine's $50,000 would be treated like a loan rather than an investment in return for

3   an equity stake.  The parties understood that the specific amount of Steven Levine's

4   equity stake would be negotiated at a later date because the Company was in need of

5   immediate capital in its early stages.

6       311.   Steven Levine met Peltier on multiple occasions and trusted Peltier

7   given Peltier's relationship with his son, Max Levine, and Buffin, who Steven

8   Levine treated like family.  Steven Levine had multiple conversations with Peltier to

9   negotiate the amount of equity he would receive.  Peltier took the lead for

10  Community in negotiating these terms with Steven Levine and providing Steven

11  Levine with updates on the Company's progress and its use of Steven Levine's

12  investment.

13      312.   On or about April 16, 2014, Peltier emailed Steven Levine with a 2.5%

14  equity stake offer in return for Steven Levine's $50,000 investment.  In this email,

15  Peltier referred to Steven Levine's $50,000 contribution to the Company as an

16  investment.  Peltier also offered in this email to structure the investment as

17  convertible debt if Steven Levine preferred.

18      313.   Shortly thereafter, Steven Levine spoke on the phone with Peltier and

19  accepted the offer for 2.5% equity; he told Peltier he was not interested in the

20  convertible debt offer.

21      314.   Steven Levine trusted Peltier, with whom he had a close relationship by

22  virtue of his son's business relationship with Peltier.

23      315.   In or about mid-summer 2017, after his son Max Levine left the

24  Company, Steven Levine approached Peltier about buying out his investment in the

25  Company.  Peltier reassured Steven Levine that his investment was best left in the

26  Company because they were working on a new strategy that could turn the

27  Company around.  Based on this explanation from Peltier, Steven Levine decided to

28  stop negotiating for a buyout of his investment and continued to believe his

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1    investment was secure.

2         316.   Even as recently as June 2019, Peltier acknowledged Steven Levine's

3    2.5% investment.  Around that time, Peltier approached Steven Levine through a

4    text message and phone call about Community buying out Steven Levine's 2.5%

5    interest.  Peltier expressed that Defendants were making similar offers to other early

6    investors.  Notably, in this conversation, Peltier failed to disclose anything about the

7    Company's recent successes, such as the $35 million investment led by Sound

8    Ventures.

9         317.   However, later in 2019, Defendants changed their position.  They

10   denied that Steven Levine was an investor in the Company at all, let alone a 2.5%

11   interest holder.  This was the first time Defendants ever communicated to Steven

12   Levine that they did not recognize him as a shareholder, let alone a 2.5%

13   shareholder.

14        318.   It only became apparent to Steven Levine after Defendants reversed

15   course that Peltier had defrauded him and been stringing him along for years.  The

16   statements Peltier made to Steven Levine in 2014, 2017 and 2019 were all

17   fraudulent and intended to induce Steven Levine to believe his investment was

18   secure when it was not.

19        319.   Steven Levine relied on Defendants' false or misleading

20   representations and invested $50,000 in the Company.  Steven Levine would have

21   never invested $50,000 in the Company had Defendants not promised Steven Levine

22   an equity stake in the Company in return.  He relied on the promise of equity to

23   invest.  In addition, some of the $50,000 was invested, with the last $5k coming in

24   May 2014, after Peltier confirmed the deal for 2.5% in the April 2014 phone call.

25   Steven Levine would not have made the $50,000 investment if Defendants had told

26   Steven Levine that it would be treated simply as a loan to the Company.  Steven

27   Levine's reliance on these misrepresentations and omissions was foreseeable,

28   reasonable, and justified.  Steven Levine trusted Peltier, who acted as the

Company's agent, to deliver on his promise.  The facts alleged herein indicate that Defendants acted with scienter towards Plaintiff.

320.   As a direct and proximate result of Steven Levine's reliance on Defendants' misrepresentations and omissions, Steven Levine has suffered injury and pecuniary loss and is thus entitled to an award of compensatory damages believed to be in excess of $5 million.

## FOURTEENTH CAUSE OF ACTION

### (Negligent Misrepresentation)

### *(By Steven Levine Against Defendants)*

321.   Plaintiffs repeat and reallege each and every foregoing and subsequent allegation contained in the Complaint, and further allege as follows:

322.   As alleged herein, and in the alternative to Defendants fraudulently making misrepresentations or omissions of material facts, Defendants made misrepresentations or omissions to Steven Levine regarding his investment in the Company without reasonable grounds for believing them to be true.

323.   In 2014, Steven Levine made three separate investments in the Company totaling $50,000 in return for a promise of an equity interest in the Company.  At no point did Steven Levine and Defendants ever discuss that Steven Levine's $50,000 would be treated like a loan rather than an investment in return for an equity stake.  The parties understood that the specific amount of Steven Levine's equity stake would be negotiated at a later date because the Company was in need of immediate capital in its early stages.

324.   Steven Levine met Peltier on multiple occasions and trusted Peltier given Peltier's relationship with his son, Max Levine, and Buffin, who Steven Levine treated like family.  Steven Levine had multiple conversations with Peltier to negotiate the amount of equity he would receive.  Peltier took the lead for Community in negotiating these terms with Steven Levine and providing Steven Levine with updates on the Company's progress and its use of Steven Levine's

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

investment.

325.  On or about April 16, 2014, Peltier emailed Steven Levine with a 2.5% equity stake offer in return for Steven Levine's $50,000 investment.  In this email, Peltier referred to Steven Levine's $50,000 contribution to the Company as an investment.  Peltier also offered in this email to structure the investment as convertible debt if Steven Levine preferred.

326.  Shortly thereafter, Steven Levine spoke on the phone with Peltier and accepted the offer for 2.5% equity; he told Peltier he was not interested in the convertible debt offer.

327.  Steven Levine trusted Peltier, with whom he had a close relationship by virtue of his son's business relationship with Peltier.

328.  In or about mid-summer 2017, after his son Max Levine left the Company, Steven Levine approached Peltier about buying out his investment in the Company.  Peltier reassured Steven Levine that his investment was best left in the Company because they were working on a new strategy that could turn the Company around.  Based on this explanation from Peltier, Steven Levine decided to stop negotiating for a buyout of his investment and continued to believe his investment was secure.

329.  Even as recently as June 2019, Peltier acknowledged Steven Levine's 2.5% investment.  Around that time, Peltier approached Steven Levine through a text message and phone call about Community buying out Steven Levine's 2.5% interest.  Peltier expressed that Defendants were making similar offers to other early investors.  Notably, in this conversation, Peltier failed to disclose anything about the Company's recent successes, such as the $35 million investment led by Sound Ventures.

330.  However, later in 2019, Defendants changed their position.  They denied that Steven Levine was an investor in the Company at all, let alone a 2.5% interest holder.  This was the first time Defendants ever communicated to Steven

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  Levine that they did not recognize him as a shareholder, let alone a 2.5%

2  shareholder.

3       331.   Defendants knew, or should have known, that Defendants were not

4  going to recognize Steven Levine as a shareholder in the Company.

5       332.   Defendants made the misrepresentations intending to induce Steven

6  Levine to make a $50,000 investment in the Company.  Steven Levine would have

7  never invested $50,000 in the Company had Defendants not promised Steven Levine

8  an equity stake in the Company in return.  He relied on the promise of equity to

9  invest.  In addition, some of the $50,000 was invested, with the last $5k coming in

10  May 2014, after Peltier confirmed the deal for 2.5% in the April 2014 phone call.

11  Steven Levine would not have made the $50,000 investment if Defendants had told

12  Steven Levine that it would be treated simply as a loan to the Company.

13       333.   Steven Levine's reliance on these misrepresentations was foreseeable,

14  reasonable, and justified.

15       334.   As a direct and proximate result of Steven Levine's reliance, Steven

16  Levine invested $50,000 in the Company.  This caused injury and pecuniary loss to

17  Steven Levine, and he is entitled to damages in an amount to be determined but

18  exceeding $5 million.

19                **FIFTEENTH CAUSE OF ACTION**

20                         **(Conversion)**

21              ***(By Steven Levine Against Defendants)***

22       335.   Plaintiffs repeat and reallege each and every foregoing and subsequent

23  allegation contained in the Complaint, and further allege as follows:

24       336.   On or about April 16, 2014, Peltier emailed Steven Levine with a 2.5%

25  equity stake offer in return for Steven Levine's $50,000 investment.  In this email,

26  Peltier referred to Steven Levine's $50,000 contribution to the Company as an

27  investment.  Peltier also offered in this email to structure the investment as

28  convertible debt if Steven Levine preferred.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

337.    Shortly thereafter, Steven Levine spoke on the phone with Peltier and accepted the offer for 2.5% equity; he told Peltier he was not interested in the convertible debt offer.

338.    Steven Levine trusted Peltier, with whom he had a close relationship by virtue of his son's business relationship with Peltier.

339.    In or about mid-summer 2017, after his son Max Levine left the Company, Steven Levine approached Peltier about buying out his investment in the Company.  Peltier reassured Steven Levine that his investment was best left in the Company because they were working on a new strategy that could turn the Company around.  Based on this explanation from Peltier, Steven Levine decided to stop negotiating for a buyout of his investment and continued to believe his investment was secure.

340.    Even as recently as June 2019, Peltier acknowledged Steven Levine's 2.5% investment.  Around that time, Peltier approached Steven Levine through a text message and phone call about Community buying out Steven Levine's 2.5% interest.  Peltier expressed that Defendants were making similar offers to other early investors.  Notably, in this conversation, Peltier failed to disclose anything about the Company's recent successes, such as the $35 million investment led by Sound Ventures.

341.    However, later in 2019, Defendants changed their position.  They denied that Steven Levine was an investor in the Company at all, let alone a 2.5% interest holder.  This was the first time Defendants ever communicated to Steven Levine that they did not recognize him as a shareholder, let alone a 2.5% shareholder.

342.    The Defendants therefore took the $50,000 investment but have refused to transfer to Steven Levine his shares in the Company without any authority.

343.    Defendants' conduct was the direct and proximate cause of Steven Levine's damages in an amount to be determined but exceeding $5 million.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

344.   The Company, through its agent Peltier, acted with the intent of depriving Steven Levine of his rights and causing injury to him.  The conduct was despicable and subjected Steven Levine to unjust hardship.  The conduct was malicious, fraudulent and oppressive, and was committed with a conscious disregard for Steven Levine's rights.  Accordingly, Steven Levine is entitled to an award of punitive or exemplary damages in an amount sufficient to punish the Company and Peltier and to make an example of them.

## SIXTEENTH CAUSE OF ACTION

### (Violation Of California Penal Code § 496(c))

### *(By Steven Levine Against Defendants)*

345.   Plaintiffs repeat and reallege each and every foregoing and subsequent allegation contained in the Complaint, and further allege as follows:

346.   California Penal Code section 496(a) imposes criminal penalties against any person "who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained."

347.   California Penal Code section 496(c) permits "[a]ny person who has been injured by a violation of subdivision (a) . . . [to] bring an action for three times the amount of actual damages, if any, sustained by the plaintiff, costs of suit, and reasonable attorney's fees."

348.   On or about April 16, 2014, Peltier emailed Steven Levine with a 2.5% equity stake offer in return for Steven Levine's $50,000 investment.  In this email, Peltier referred to Steven Levine's $50,000 contribution to the Company as an investment.  Peltier also offered in this email to structure the investment as convertible debt if Steven Levine preferred.

349.   Shortly thereafter, Steven Levine spoke on the phone with Peltier and

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

accepted the offer for 2.5% equity; he told Peltier he was not interested in the convertible debt offer.

350.   Steven Levine trusted Peltier, with whom he had a close relationship by virtue of his son's business relationship with Peltier.

351.   In or about mid-summer 2017, after his son Max Levine left the Company, Steven Levine approached Peltier about buying out his investment in the Company.  Peltier reassured Steven Levine that his investment was best left in the Company because they were working on a new strategy that could turn the Company around.  Based on this explanation from Peltier, Steven Levine decided to stop negotiating for a buyout of his investment and continued to believe his investment was secure.

352.   Even as recently as June 2019, Peltier acknowledged Steven Levine's 2.5% investment.  Around that time, Peltier approached Steven Levine through a text message and phone call about Community buying out Steven Levine's 2.5% interest.  Peltier expressed that Defendants were making similar offers to other early investors.  Notably, in this conversation, Peltier failed to disclose anything about the Company's recent successes, such as the $35 million investment led by Sound Ventures.

353.   However, later in 2019, Defendants changed their position.  They denied that Steven Levine was an investor in the Company at all, let alone a 2.5% interest holder.  This was the first time Defendants ever communicated to Steven Levine that they did not recognize him as a shareholder, let alone a 2.5% shareholder.

354.   The Company took the $50,000 investment but Defendants have refused to transfer to Steven Levine his shares in the Company without any authority.  Defendants have no right, title, or other valid interest in Steven Levine's shares in the Company.  The Defendants' misappropriation of Steven Levine's shares constituted theft.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

355.   The Company's conduct was the direct and proximate cause of Steven Levine's damages in an amount to be determined but exceeding $5 million.  Under California Penal Code section 496(c), Steven Levine is entitled to three times the amount of his actual damages, plus costs and attorneys' fees.

## SEVENTEENTH CAUSE OF ACTION

### (Declaratory Relief)

### *(By Steven Levine Against Defendants)*

356.   Plaintiffs repeat and reallege each and every foregoing and subsequent allegation contained in the Complaint, and further allege as follows:

357.   An actual controversy now exists between Steven Levine and Defendants.  Steven Levine, on the one hand, claims that he is a shareholder of the Company and is entitled to a 2.5% equity stake.  Defendants, on the other hand, wrongfully claim that Steven Levine is not a shareholder and/or refuse to recognize his status as a shareholder by refusing to transfer to Steven Levine his shares in the Company and/or do not recognize his 2.5% interest.

358.   Steven Levine requests a judicial declaration that he is a shareholder of the Company with an equity stake of 2.5%, or in the alternative, that Steven Levine is entitled to compensation from the Company for his 2.5% equity ownership interest.  A judicial declaration is necessary and appropriate so that the parties may ascertain their respective rights, duties, and obligations.

## EIGHTEENTH CAUSE OF ACTION

### (Financial Elder Abuse California Welfare & Institutions Code §§ 15610.30 *et seq.*)

### *(By Steven Levine Against Defendants)*

359.   Plaintiffs repeat and reallege each and every foregoing and subsequent allegation contained in the Complaint, and further allege as follows:

360.   California Welfare and Institutions Code ("WIC") section 15610.30(a)(1) and (2) state that financial abuse of an elder takes place when one

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

"[t]akes, secretes, appropriates, obtains, or retains real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both"  or "[a]ssists in taking, secreting, appropriating, obtaining, or retaining real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both."

361.   WIC section 15610.30(b) states that a person takes property for wrongful use "if, among other things, the person or entity takes, secretes, appropriates, obtains, or retains the property and the person or entity knew or should have known that this conduct is likely to be harmful to the elder or dependent adult."

362.   Steven Levine is over 65 years old; therefore, he is an elder pursuant to WIC section 15610.27.

363.   On or about April 16, 2014, Peltier emailed Steven Levine with a 2.5% equity stake offer in return for Steven Levine's $50,000 investment.  In this email, Peltier referred to Steven Levine's $50,000 contribution to the Company as an investment.  Peltier also offered in this email to structure the investment as convertible debt if Steven Levine preferred.

364.   Shortly thereafter, Steven Levine spoke on the phone with Peltier and accepted the offer for 2.5% equity; he told Peltier he was not interested in the convertible debt offer.

365.   Steven Levine trusted Peltier, with whom he had a close relationship by virtue of his son's business relationship with Peltier.

366.   In or about mid-summer 2017, after his son Max Levine left the Company, Steven Levine approached Peltier about buying out his investment in the Company.  Peltier reassured Steven Levine that his investment was best left in the Company because they were working on a new strategy that could turn the Company around.  Based on this explanation from Peltier, Steven Levine decided to stop negotiating for a buyout of his investment and continued to believe his investment was secure.

367.   Even as recently as June 2019, Peltier acknowledged Steven Levine's 2.5% investment.  Around that time, Peltier approached Steven Levine through a text message and phone call about Community buying out Steven Levine's 2.5% interest.  Peltier expressed that Defendants were making similar offers to other early investors.  Notably, in this conversation, Peltier failed to disclose anything about the Company's recent successes, such as the $35 million investment led by Sound Ventures.

368.   However, later in 2019, Defendants changed their position.  They denied that Steven Levine was an investor in the Company at all, let alone a 2.5% interest holder.  This was the first time Defendants ever communicated to Steven Levine that they did not recognize him as a shareholder, let alone a 2.5% shareholder.

369.   The Company took the $50,000 investment but Defendants have refused to transfer to Steven Levine his shares in the Company without any authority.  Defendants have no right, title, or other valid interest in Steven Levine's shares in the Company.  The Defendants' misappropriation of Steven Levine's shares constituted theft.

370.   Defendants acted with the intent of depriving Steven Levine of his rights and causing injury to him.  Defendants knew that by taking Steven Levine's investment and depriving him of his equity, they would cause him harm.

371.   Defendants' conduct was the direct and proximate cause of Steven Levine's damages in an amount to be determined but exceeding $5 million.

372.   Defendants' conduct was despicable and subjected Steven Levine to unjust hardship.  The conduct was malicious, fraudulent and oppressive, and was committed with a conscious disregard for Steven Levine's rights.  Accordingly, Steven Levine is entitled to an award of punitive or exemplary damages in an amount sufficient to punish Defendants and to make an example of them.

373.   As a result of the Company and Peltier's elder abuse, the Company and

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  Peltier are also liable for Steven Levine's reasonable attorneys' fees and costs

2  pursuant to WIC section 15657.5(a).

3  ### NINETEENTH CAUSE OF ACTION

4  ### (Unjust Enrichment)

5  ### *(By Steven Levine Against Defendants)*

6  374.   Plaintiffs repeat and reallege each and every foregoing and subsequent

7  allegation contained in the Complaint, and further allege as follows:

8  375.   Steven Levine gave the Company $50,000 in return for a 2.5% equity

9  stake in the Company.  Defendants greatly benefited from this $50,000 investment,

10  but have failed to deliver on their promise to give Steven Levine the promised 2.5%

11  equity stake in the Company.   Defendants have unjustly retained this benefit at

12  Steven Levine's expense, who without relief will receive no benefit in exchange for

13  the resources he provided to Defendants.

14  376.   The circumstances render Defendants' retention of the benefits they

15  obtained through Steven Levine's investment inequitable and unjust.  Defendants'

16  acts have prevented Steven Levine from obtaining what is rightfully his—namely, a

17  2.5% equity stake in the Company.

18  377.    Accordingly, Steven Levine is entitled to restitution against

19  Defendants in an amount to be determined but exceeding $5 million.

20  ### PRAYER FOR RELIEF

21  **WHEREFORE,** Plaintiffs respectfully pray for judgment against Defendants,

22  as follows:

23  (1)    For general and consequential damages according to proof at trial;

24  (2)    For punitive damages;

25  (3)    For treble damages under California Penal Code section 496(c);

26  (4)    For attorneys' fees;

27  (5)    For costs;

28  (6)    For prejudgment and post-judgment interest;

Miller Barondess, llp
Attorneys at Law
1999 Avenue of The Stars, Suite 1000   Los Angeles, California 90067
Tel: (310) 552-4400    Fax: (310) 552-8400

(7)     For rescission of the Stock Repurchase Agreements;

(8)     For specific performance conveying shares in the Company to Steven Levine reflecting his 2.5% interest in the Company;

(9)     For restitutionary damages;

(10)    For declaratory relief; and

(11)    For such other and further relief as the Court may deem just and proper.

DATED:  February 17, 2021          MILLER BARONDESS, LLP


By: _____

CHRISTOPHER D. BEATTY
Attorneys for Plaintiffs

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

496932.2

FIRST AMENDED COMPLAINT

1

## **<u>DEMAND FOR JURY TRIAL</u>**

2      Plaintiffs hereby demand a jury trial.

3

4  DATED:  February 17, 2021          MILLER BARONDESS, LLP

5

6

7  By: _____

8          CHRISTOPHER D. BEATTY
         Attorneys for Plaintiffs

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28