NEEL CHATTERJEE (SBN 173985)
*NChatterjee@goodwinlaw.com*
ALEXIS COLL-VERY (SBN 212735)
*ACollVery@goodwinlaw.com*
**GOODWIN PROCTER** LLP
601 Marshall Street
Redwood City, California 94063
Tel.: (650) 752-3100
Fax: (650) 853-1038

HONG-AN VU (SBN 266268)
*HVu@goodwinlaw.com*
**GOODWIN PROCTER** LLP
601 S. Figueroa Street, Suite 4100
Los Angeles, California 90017
Tel.: (213) 426-2500
Fax: (213) 623-1673

Attorneys for Defendants
COMMUNITY.COM, INC. and
MATTHEW PELTIER

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| CHARLES BUFFIN, an individual; MAXWELL LEVINE, an individual; STEVEN LEVINE, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> COMMUNITY.COM, INC., a Delaware corporation; MATTHEW PELTIER, an individual; and DOES 1 through 10, <br><br> Defendants. | Case No. 2:20-cv-07552 SVW (JPRx) <br><br> **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> Date:      May 3, 2021 <br> Time:     1:30 P.M. <br> Dept:     10A <br> Judge:    Hon. Stephen V. Wilson <br><br> Filed Concurrently With: <br> 1. Motion to Dismiss for Failure to State a Claim <br> 2. Declaration of Jade White <br> 3. Request for Judicial Notice <br> 4. Declaration of Matthew Peltier <br> 5. [Proposed] Order |

## <u>NOTICE OF MOTION AND MOTION</u>

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on May 3, 2021, at 1:30 P.M., or as soon as thereafter as counsel may be heard, in Courtroom 10A in the Central District of California, located at First Street Courthouse, 350 W. 1st Street, 10th Floor, Los Angeles, California 90012, before the Honorable Stephen V. Wilson, Defendants Community.com, Inc. and Matthew Peltier will and do hereby move to dismiss, under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted, the Fourth, Fifth, Tenth, Eleventh, Twelfth, Thirteenth, Fourteenth, and Nineteenth Causes of Action in the First Amended Complaint. Defendants previously filed a Motion to Dismiss pursuant to Rule 12(b)(6) (with the exception of the then-Eighth Cause of Action). The Court dismissed or stayed those claims in a January 19, 2021 Order (the "Order"). For this reason, Defendants address herein only those claims for which the Court granted Plaintiffs leave to amend. Defendants otherwise incorporate by reference their prior Motion to Dismiss, insofar as it addresses the stayed claims.

This Motion is based upon this Notice of Motion, the attached Memorandum of Points and Authorities in support thereof, all papers from this case on file with the Court, Defendants' Request for Judicial Notice filed herewith as well as the Request for Judicial Notice that accompanied Defendants' prior Motion to Dismiss (Dkt. No. 14), all other matters of which the Court may take judicial notice, any further evidence or argument offered to the Court at the hearing on this Motion, and any other matters that the Court may consider. This Motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on March 15, 2021.

Dated: March 17, 2021

By:  _/s/ Hong-An Vu_

Hong-An Vu
*HVu@goodwinlaw.com*
**GOODWIN PROCTER LLP**

Attorneys for Defendants
COMMUNITY.COM, INC. and
MATTHEW PELTIER

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION..................................................................................1
II.   FACTUAL BACKGROUND ..............................................................2
      A.   Buffin and Max Knowingly Sell Most of Their Shares......................2
      B.   Steven Gives Money to Max and Buffin ..................................4
      C.   Molly Swenson Interviewed in 2020 About Community...................6
      D.   Max and Buffin Play Basketball and Learn Maverick "Stuff"...........7
III.  LEGAL STANDARD .........................................................................7
IV.   ARGUMENT .......................................................................................8
      A.   Buffin and Max Released All Claims ....................................8
      B.   Max and Buffin Failed to Remedy Their Federal Securities
           Fraud Claims ...............................................................................11
           1.   Max and Buffin Failed to Remedy Lack of Actionable
                Omission or Misrepresentation...................................................11
           2.   Max and Buffin Failed to Remedy Defects in Scienter
                Allegations................................................................................14
           3.   Even a Holistic View of the Facts Fails .................................16
      C.   Steven Levine Lacks Standing Under Federal and State
           Securities Laws ............................................................................18
      D.   Steven Levine's Federal Securities Fraud Claims Remain
           Defective (11th and 12th Causes of Action)..............................19
           1.   The Transaction Took Place Prior to the Disclosures in
                Question ................................................................................19
           2.   Steven Fails to Allege How He Would Have Acted
                Differently in Response to Peltier ...........................................20
      E.   Steven Has Not Remedied the Defects in His State Securities
           Fraud Claim (13th Cause of Action)......................................21
      F.   Steven Levine Failed to Remedy the Defects in His Fraudulent
           and Negligent Misrepresentation Claims (10th and 14th Causes
           of Action) ..................................................................................23
      G.   Unjust Enrichment is Not a Freestanding Claim and it is
           Inadequately Alleged (19th Cause of Action) ...................24
V.    CONCLUSION ..................................................................................25

MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Astiana v. Hain Celestial Grp., Inc.*,

5
　783 F.3d 753 (9th Cir. 2015) ...................................................................24, 25

6

*Bell Atlantic Corp. v. Twombly*,

7
　550 U.S. 544 (2007) .......................................................................................7

8

*Branch v. Tunnell*,

9
　14 F.3d 449 (9th Cir. 1994) ............................................................................8

10

*In re Burlington Coat Factory Sec. Litig.*,
　114 F.3d 1410 (3d Cir. 1997) ..........................................................................8

11

12

*Conroy v. Regents of Univ. of Cal.*,
　45 Cal. 4th 1244 (2009)...................................................................................23

13

14

*Daniels v. Select Portfolio Servicing, Inc.*,
　246 Cal. App. 4th 1150 (2016) .......................................................................23

15

16

*Deng v. Searchforce, Inc.*,
　No. C 11-00254 WHA, 2011 WL 940828
　(N.D. Cal. Mar. 17, 2011) .............................................................................9

17

18

*Desert Land, LLC v. Owens Financial Group, Inc.*,
　154 Fed. App'x 586 (9th Cir. 2005)...........................................................18, 19

19

20

*Doe v. Gangland Prods., Inc.*,
　730 F.3d 946 (9th Cir. 2013) .........................................................................23

21

22

*Durell v. Sharp Healthcare*,
　183 Cal. App. 4th 1350 (2010).......................................................................24

23

24

*E.I. DuPont de Nemours & Co. v. Fla. Evergreen Foliage*,
　744 A.2d 457 (1999).......................................................................................11

25

26

*Employee Painters' Trust v. J & B Finishes*,
　77 F.3d 1188 (9th Cir. 1996)........................................................................9, 13

27

28

*Facebook, Inc. v. Pac. Nw. Software, Inc.*,
　640 F.3d 1034 (9th Cir. 2011) ........................................................................10

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Flowshare, LLC v. GeoResults, Inc.*,
   No. N17C-07-227 EMD, 2018 WL 3599810 (Del. Super. Ct. July
   25, 2018) ................................................................................................. 11

*Gigliotti v. Mathys*,
   129 F. Supp. 2d 817 (D. V.I. 2001) ...................................................... 19

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014) ....................................................................... 18, 19

*Harsco Corp. v. Segui*,
   91 F.3d 337 (2d Cir. 1996) ............................................................ 10, 11

*Hawkins v. First Horizon Home Loans*,
   No. S-10-1876 FCD/GGH, 2010 WL 4823808
   (E.D. Cal. Nov. 22, 2010) ...................................................................... 7

*Hildes v. Andersen*,
   No. 08-cv-0008-BEN (RBB), 2010 WL 4811975
   (S.D. Cal. Nov. 8, 2010) ............................................................... 19, 20

*In re Invensense, Inc. Sec. Litig.*,
   No. 15-CV-00084-JD, 2016 WL 1182063
   (N.D. Cal. Mar. 28, 2016) .................................................................... 12

*Jogani v. Superior Court*,
   165 Cal. App. 4th 901 (2008) ............................................................... 25

*Jordan v. Wonderful Citrus Packing LLC*,
   No. 1:18-CV-00401-AWI-SAB, 2018 WL 4350080
   (E.D. Cal. Sep. 10, 2018) ..................................................................... 24

*Karmilowicz v. Hartford Fin. Servs. Grp.*,
   No. 11 Civ. 539 (CM), 2011 WL 2936013 (S.D.N.Y. July 14, 2011) .............. 22

*Meinhold v. Sprint Spectrum, L.P.*,
   N. 07-cv-0456 FCD EFB, 2007 WL 2904003 (E.D. Cal. Oct. 2,
   2007) ..................................................................................................... 19

*Mills v. Polar Molecular Corp.*,
   12 F.3d 1170 (2d Cir. 1993) ................................................................. 19

iii

1
2

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

3
4
*Nguyen v. Endologix, Inc.*,
   962 F.3d 405 (9th Cir. 2020)........................................................14, 15

5
6
*In re NVIDIA Corp. Sec. Litig.*,
   768 F.3d 1046 (9th Cir. 2014)........................................................18

7
8
*Parrino v. FHP, Inc.*,
   146 F.3d 699 (9th Cir. 1998)........................................................8, 22

9
10
*Petro-Ventures, Inc. v. Takessian*,
   967 F.2d 1337 (9th Cir. 1992)........................................................10

11
*Raschio v. Sinclair*,
   486 F.2d 1029 (9th Cir. 1973)........................................................19

12
13
14
*Retail Wholesale & Dep't Store Union Local 338 Ret. Fund. v.
   Hewlett-Packard Co.*,
   845 F.3d 1268 (9th Cir. 2017)........................................................11

15
16
*Rutherford Holdings, LLC v. Plaza Del Rey*,
   223 Cal. App. 4th 221 (2014)........................................................25

17
18
*Salameh v. Tarsadia Hotel*,
   726 F.3d 1124 (9th Cir. 2013)........................................................18

19
20
*Schneider v. Traweek*,
   No. CV 88-0905 RG (KX), 1990 WL 169856 (C.D. Cal. Sept. 5,
   1990)........................................................20

21
22
*Seven Invs., LLC v. AD Capital, LLC*,
   32 A.3d 391 (Del. Ch. 2011)........................................................9, 10

23
24
*Smolen v. Deloitte, Haskins & Sells*,
   921 F.2d 959 (9th Cir. 1990)........................................................20

25
26
*Starcity Cap., LLC v. Bio-Matrix Sci. Grp., Inc.*,
   No. 13-CV-1394 BEN (WMC), 2014 WL 851067 (S.D. Cal. Mar.
   3, 2014)........................................................12

27
28
*Steckman v. Hart Brewing, Inc.*,
   143 F.3d 1293 (9th Cir. 1998)........................................................8, 22

iv

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007) ............................................................. 14, 16

*United States v. Ritchie,*
    342 F.3d 903 (9th Cir. 2003) .................................................. 8

*Veltex Corp. v. Matin,*
    No. CV 10-1746 ABC, 2010 WL 3834045 (C.D. Cal. Sept. 27,
    2010) ......................................................................................... 8, 18

*Vess v. Ciba-Geigy Corp. USA,*
    317 F.3d 1097 (9th Cir. 2003) ................................................ 8

*Vidor v. Am. Int'l Grp.,*
    No. C 11-315 SI, 2011 WL 2746848 (N.D. Cal. July 13, 2011) ...................... 24

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods.
    Liab. Litig.,*
    MLD No. 2672 CRB (JSC), 2017 WL 3058563 (N.D. Cal. July 19,
    2017) ......................................................................................... 10

*Zucco Partners, LLC v. Digimarc Corp.,*
    552 F.3d 981 (9th Cir. 2009) .................................................. 15, 16

**Statutes**

15 U.S.C. § 78cc(a) ..................................................................... 10

15 U.S.C. § 78u-4(b)(1)(A) ......................................................... 11

15 U.S.C. § 78u-4(b)(1)(B) ......................................................... 11, 12

15 U.S.C. § 78u-4(b)(2)(A) ......................................................... 14

California Civil Code § 1542 ...................................................... 9

California Penal Code § 496(c) .................................................. 1

Fed. R. Civ. P. 9(b) ....................................................... *passim*

Fed. R. Civ. P. 12(b)(6) .............................................................. 7, 8

PSLRA ......................................................................... *passim*

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

Rule 10b-5.................................................................................................18, 19

Securities and Exchange Act § 29(a).......................................................... 10

**Other Authorities**

Thomas Lee Hazen, Treatise on the Law of Securities Regulation
 § 2.79 (2020).......................................................................................... 19

MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

I.      **INTRODUCTION**

Having crafted their complaint with 20/20 hindsight, Plaintiffs Max Levine ("Max"), Charles Buffin ("Buffin"), and Steven Levine ("Steven") struggle to reengineer their previously dismissed securities and related fraud-based claims where no facts exist for doing so.[1] The First Amended Complaint ("FAC") hinges on two basic, newly minted allegations: 1) Defendant Community was infused with "in excess of $2 million" before Max and Buffin sold a portion of their stock back to the Company in November 2018; and 2) during a December 2018 basketball game, an employee of "one of Community's [nonspecific] advisors" shared confidential "Maverick *stuff*" with Buffin and Max, including that "Maverick is coming onboard." This new chronology of events does not fill in and bolster the chronology of events alleged in the initial complaint; it contradicts it. But no matter how hard they twist the timeline to contrive an investment to a time preceding their sale to allege that they were misled about the state of the Company's finances, the facts do not exist. To substantiate their timeline, Plaintiffs turn to a video interview posted on YouTube of former-Maverick "Chief Impact Officer" Molly Swenson ("Swenson"), and contort her recitation of the history behind Community to suit their version of the facts. A review of the interview—the entire transcript of the interview is submitted as part of Defendants' Request for Judicial Notice—demonstrates this manipulation. And although Max and Buffin continue to maintain they would not have sold their shares to the Company had they known Ashton Kutcher and Guy Oseary were investing, judicially noticeable facts evidence that they were aware that new investors existed and that Defendants were unwilling to share their identities, but nevertheless Max and Buffin sold most, but not all, of their stock. None of the new allegations remedies

---

[1] In its Order, the Court stayed Buffin's and Max's state law claims (California securities fraud and negligent misrepresentation), and several of Steven's state law claims (breach of fiduciary duty, conversion, Penal Code § 496(c), and financial elder abuse). Plaintiffs do not address those claims in this Motion but, to the extent necessary, incorporate by reference the arguments supporting dismissal of those claims. Defendants are prepared to address those issues further at the hearing on this Motion or if otherwise directed by the Court.

1

the Court's unambiguous concerns about the sufficiency of Plaintiffs' claims: Max and Buffin do not allege scienter, a material misstatement or omission or, even taken as a whole, a viable inference that Defendants tricked them into selling their shares.

As for the other Levine, Steven, he alleges that he never would have given money to his son, Max, had he known that Defendants would not recognize his shareholder status. The problem: Steven gave the money he calls an investment to his son before Defendant Matthew Peltier ("Peltier") was even on the scene—and, when the company was "little more than an idea." These allegations have not changed. Instead, Steven now complains that his co-plaintiffs, Max and Buffin, agreed to give him a 2.5% equity stake in the Company but Peltier "reversed course," and Defendants now refuse to formally recognize his equity stake. In dismissing Steven's claims originally, the Court unambiguously encouraged Steven to explicitly allege that "Peltier told Steven Levine that he owned equity." Order, 12 (Dkt. No. 25). He has not done so—no such allegation exists in the FAC. That is because, as the Court has stated, "the allegations are consistent with Peltier recognizing, and proposing to pay back, a debt that Steven Levine is characterizing through pleadings as an equity interest." *Id.*

Buffin's and Max's federal securities fraud claims should be dismissed with prejudice, because they have not remedied the defects identified by the Court. Steven's amended pleadings fare no better and, thus, his securities fraud and fraud-based state law claims also should be dismissed without leave to replead.

## II.   FACTUAL BACKGROUND

### A.   Buffin and Max Knowingly Sell Most of Their Shares

At the end of 2013, Buffin and Max met Peltier at a networking event and started working with him on an internet platform they had created earlier that year. *See* FAC ¶¶31-35 (Dkt. No. 31). Although originally hired as a product manager, Peltier was named CEO in April 2014, at which time Buffin, Max and Peltier "altered the capital structure of the Company," giving 40% to Peltier and 15% each to Buffin

and Max. *See id.* at ¶¶31-38. The FAC alleges that "the remaining stock was either reserved for the stock pool or vested in others not a party to this lawsuit." *See id.*, ¶38. None of the stock is alleged to have been allocated to Steven who, Plaintiffs' contend, had already infused cash into the Company and received a promise from Max and Buffin for equity. *Id.* ¶¶115-117.

In 2017, Community was struggling to sign up users or scale its platform. *Id.*, ¶¶44-45. That Summer, Buffin and Max left the Company to pursue other ventures, but retained their equity stakes. *Id.* ¶¶47-48. Approximately one year later, in June 2018, Peltier called Buffin to "float[ ] the idea of the Company repurchasing all of Buffin's and Max Levine's outstanding shares." *Id.* ¶74. The parties negotiated the potential share repurchase through the summer and fall of 2018, via text and over the phone. *Id.* ¶¶74, 77, 78, 98; Declaration of Matthew Peltier in Support of Request for Judicial Notice ("Peltier Decl."), Ex. C. Peltier also told Buffin that Community was receiving a $500,000 investment and hoped for additional funding from "two partner/co founder types." *Id.*, Ex. C, 2-3. On November 1, 2018, nearly a month before Community repurchased Plaintiffs' stock, Buffin asked for the identities of the "two partner/co founder types," and Peltier refused to disclose them. FAC ¶93; *see also* Peltier Decl. Ex. C, 3.

Peltier sent Buffin and Max a draft of the repurchase agreement. FAC ¶96; *see also* Peltier Decl., Ex. C, 14. Pursuant to the Stock Repurchase Agreements ("SRAs"), both Buffin and Max represented that they had an opportunity to ask questions and receive answers from the Company, including about transactions that "have been, are being or may be contemplated by the Company (including a potential financing transaction with certain strategic investors, including among others, Salesforce"). *See id.*, Exs. F, G at § 6. The SRAs also include a broad, mutual release of known and unknown claims. *Id.* § 7. Buffin and Max also expressly acknowledged:

> that (i) if not sold pursuant to this Agreement, the price of the Repurchased Shares may significantly appreciate over time; (ii) the

> price at which the Company is offering to repurchase the Repurchased Shares may not be the highest price that [Plaintiffs] could obtain for the Repurchased Shares in the future; and (iii) [Plaintiff] is giving up the opportunity to sell the Repurchased Shares at a higher price and to receive the benefit of future appreciation, if any, in the value of the Repurchased Shares.
>
> . . .
>
> [Plaintiffs] further acknowledge[d] that the Company is a private company and that the capital stock of the Company is not traded on any stock exchange and that the fair market value of the Repurchased Shares may be substantially higher than the Purchase Price.

*Id*. at § 6. Plaintiffs also acknowledged that "[i]n making [Plaintiffs'] decision to sell the Repurchased Shares, [Plaintiffs are] relying solely on their own knowledge and experience and the representations and warranties of the Company set forth in Section 3 [of the SRAs]." *Id.*, § 5.

Max and Buffin reviewed and commented on the SRAs; they were represented by counsel who also relayed comments. Peltier Decl., Ex. C, 18. Notwithstanding the express representations in the SRAs and the broad release and waiver, Max and Buffin each executed an SRA. FAC ¶10. Amazingly, for the first time, Max and Buffin now assert in the FAC that they did not read that portion of the SRAs that expressly identified Salesforce and other potential investors. *Id.*, ¶100.

After reading a glowing report in TechCrunch on Community's success (*id.,* ¶112), Buffin and Max initiated this action claiming that they would never have sold the shares had they known that Kutcher and Oseary were the individuals who Peltier told them about but declined to identify. *See id.*, ¶105.

**B.    Steven Gives Money to Max and Buffin**

According to the FAC "[t]he Company's first investor was Max's father, Plaintiff Steven Levine," who "invested $50,000 in Community when it was little more than an idea." *Id.,* ¶5. "When the Company first approached Steven Levine seeking an investment, Peltier had not yet joined the Company." *Id.,* ¶115. "Steven Levine discussed with both Max and Buffin that Steven would receive equity in

4

return for his investment in the Company." *Id.,* ¶117. The Levines and Buffin agreed that "the specific percentage of [Steven's] equity stake would be determined at a later date." *Id.,* ¶117. None of these alleged discussions involved Peltier, who had yet to join the Company.

The FAC alleges that after Peltier joined the Company and took over as CEO ("[i]n or around April 2014" (*id.*, ¶38)), he was left to "finaliz[e] the specific terms of Steven Levine's equity interest." *Id.,* ¶118. In a matter of days, according to the FAC "Steven Levine's equity investment was documented in an April 16-17, 2014 email chain between Steven Levine and Peltier." *Id.,* ¶122; Peltier Decl., Ex. D [April 16, 17, 2014, emails.] On April 16, Peltier "propos[ed] an offer of 2.5% equity for [Steven's] investment." FAC ¶122; Peltier Decl., Ex. D [4/16 @ 4:01 PM]. In that same communication, Peltier detailed the breakdown of Steven's financial "commitment" and proposed "an offer of 2.5% equity for [his] investment [noting a]gain, the proposed convertible note is still on the table as well." *See* FAC ¶122 (internal quotations omitted); Peltier Decl., Ex. D [4/16 @ 4:01 PM]. Plaintiffs allege that on "[t]hat same day, [during a phone call] Steven Levine told Peltier that he was accepting the equity offer rather than the convertible note proposal." FAC ¶123.

Yet, the very next morning, Steven wrote "so there is no misunderstanding from our conversation last nite . . . [t]his convertible note deal for me is ok as long as I get 4% of company and can only be diluted to 3% of the company[.]" *See, id.,* ¶122; Peltier Decl., Ex. D [4/17 @ 10:33 AM]. Peltier responded that he would "have more information of the convertible note terms soon." *Id.*, Ex. D [4/17 @ 2:47 PM] The FAC alleges no facts about how or when the parties purportedly reached an agreement for stock—not debt—after April 17. And the FAC specifically alleges that the cap table was reconfigured at this time to recognize Peltier's new role but, tellingly, does not allege Steven was allotted any stock. FAC, ¶38.

After Max and Buffin left the Company in 2017, Steven approached Peltier about buying out his investment in the Company. FAC ¶256. He also emailed Peltier

with a record of the $50,000 he gave to Max and Buffin. *Id.,* ¶128; Peltier Decl., Ex. E [attachment, 4/17 @ 10:28 AM]. Peltier asked Steven to provide bank and transfer statements. *Id.*, Ex. E [8/7 @ 9:39 AM]. Steven does not allege to have followed-up on this effort to have his $50,000 returned. FAC ¶256.

Plaintiffs, instead, allege that two years later, in June 2019, Peltier acknowledged Steven's 2.5% investment. *Id.,* ¶257. Plaintiffs do not, however, specify how Peltier acknowledged the investment; instead they allege Peltier "offered to return Steven['s] investment through a 'consulting agreement.'" *Id.*, ¶131. Steven alleges that his shares were not formally recognized and the Company failed "to convey to Steven shares in the Company amounting to a 2.5% equity stake" at any time, including the many years his son was employed by the Company. *Id.,* ¶260; *see* Peltier Decl., Ex. D [4/17 Email]. Nonetheless, he claims to have "purchased or otherwise acquired securities." FAC ¶280.

## C.   Molly Swenson Interviewed in 2020 About Community

The FAC contains numerous allegations based on an April 2020 YouTube interview of Molly Dewolf Swenson, the former "Chief Impact Officer" of Maverick, Oseary's investment fund. FAC ¶52; *see also id.,* ¶¶11, 53-57, 59, 60, 67, 103, 109, 142, 150, 161, 169, 178, 191, 199, 218, 226, 237, 245; Declaration of Jade White in Support of Motion to Dismiss for Failure to State a Claim ("White Decl."), ¶2 and Ex. B. The cherry-picked quotes do not recount accurately the story she shared in the interview.

During the interview Swenson recounts that, in March 2018, Maverick hired her to help Oseary harness the celebrity and social media resources to which he had access to make an impact and "do something good." *See* FAC ¶52; White Decl., Ex. A, 13:25 through 14:27; *id.,* Ex. B, 6. Swenson describes that months later, in Summer 2018, she met Peltier and shared the Community platform with Oseary, who then shared it with Kutcher. FAC ¶¶54-56; White Decl., Ex. A, 19:05 through 19:37; *id.,* Ex. B, 7-8. As the story goes, Oseary then told Swenson to "test [the platform]

6

out with one of the Maverick artists." FAC ¶¶60, 150, 169, 178, 199, 226, 245; White
Decl., Ex. A, 43:07 through 44:23; *id.,* Ex. B, 18. According to Swenson and the FAC
(¶60), Maverick artist G-Eazy tested the platform during the course of his tour, which
Swenson noted ended in "November 2018." Swenson recalled that she "went all in
on Community . . . when [she] saw it used as a mobilization tool" in November 2018,
allowing G-Eazy to reach "50,000 kids . . . over the course of [his] tour . . . rais[ing]
about a hundred thousand dollars super quickly" and giving Marc Benioff from
Salesforce an 80% response rate on his Community-based messaging in connection
with a political campaign. White Decl., Ex. A, 43:07 through 45:02; *id.,* Ex. B, 18-
19. "That," Swenson said, "was the moment for [her]," and Oseary. *Id.,* Ex. A, 45:59
through 46:24; *id.,* Ex. B, 19.

### D. Max and Buffin Play Basketball and Learn Maverick "Stuff"

According to the FAC, sometime in December 2018, Max and Buffin learned
confidential "Maverick stuff" from an employee of "one of Community's advisors."
FAC ¶104. The employee apparently conveyed that the "Company was starting to
grow rapidly because it was working with Maverick, including Oseary," (*id.,* ¶104),
and "Maverick is coming onboard." *Id.,* ¶107. Buffin and Max allege to have been
"shocked" by this revelation, so they texted "Peltier and mentioned the Maverick
news, wanting to learn the backstory . . . Peltier ignored that request." *Id.,* ¶106. The
"Maverick news," according to Plaintiffs' source "was not public yet." *Id.,* ¶107.

## III. LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim under Fed. R. Civ.
P. 12(b)(6), a complaint must contain factual allegations sufficient "to raise a right to
relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544,
555 (2007). A separate, higher standard applies to fraud-based claims. Fed. R. Civ.
P. 9(b). Rule 9(b) requires each plaintiff to allege factual details regarding "the who,
what, when, where, and how" of the alleged fraud. *Hawkins v. First Horizon Home
Loans*, No. S-10-1876 FCD/GGH, 2010 WL 4823808, at *8 (E.D. Cal. Nov. 22,

2010) (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)). These higher particularity requirements extend to all claims sounding in fraud. *Id.* at 1107. "The Private Securities Litigation Reform Act of 1995 ("PSLRA") modifies Rule 9(b) to add further pleading requirements for securities claims. . . . ***The PSLRA was designed to eradicate 'pleading fraud by hindsight.'***" *Veltex Corp. v. Matin*, No. CV 10-1746 ABC (PJWx), 2010 WL 3834045, at *3 (C.D. Cal. Sept. 27, 2010) (emphasis added) (citation omitted).

While a court should construe all well-pled facts in favor of a plaintiff, a court is "not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint." *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295-96 (9th Cir. 1998). Moreover, the Court may consider authenticated documents incorporated by reference into the complaint. *United States v. Ritchie*, 342 F.3d 903, 907-08 (9th Cir. 2003). Documents that form the basis of a plaintiff's case or documents that are quoted extensively should be considered because such documents are not truly "outside" the complaint. *Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir. 1994). The rule is designed to prevent a plaintiff from quoting "an isolated statement from a document" in the complaint, when the complete document refutes the allegations. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (consideration of entire document made clear that isolated statement was not fraudulent); *accord Parrino v. FHP, Inc.*, 146 F.3d 699, 705-06 (9th Cir. 1998) (applying rule to documents "crucial to the plaintiff's claims" to prevent "plaintiffs from surviving a Rule 12(b)(6) motion by deliberately omitting references to documents upon which their claims are based.").

## IV.   ARGUMENT

### A.   Buffin and Max Released All Claims

On Defendants' initial motion to dismiss, the Court took judicial notice of, and relied upon, the SRAs in finding that Buffin and Max had acknowledged "that they were informed about 'a potential financing transaction with certain strategic

8

investors, including, among others Salesforce.'"[2] Order, 2.[3] The plain terms of the SRAs' release bars Plaintiffs' claims. *See Seven Invs., LLC v. AD Capital, LLC*, 32 A.3d 391, 396-401 (Del. Ch. 2011) (dismissing fraud, unjust enrichment, breach of fiduciary duty, and misappropriation of company funds claims because they fell "within the plain language of the release").[4] In the SRAs, each of Buffin and Max released Community "and its officers, directors, [and] employees" of all known and unknown claims "existing at the Closing [of the repurchase transaction] or which . . . may exist after the Closing related to the Repurchased Shares," "from or in connection with any act, omission or state of facts taken or existing on or prior to the Closing Date." Peltier Decl., Exs. F, G at § 7. The parties further agreed to release all unknown claims by waiving their rights under California Civil Code § 1542. *See id.*

Defendants suspect Plaintiffs again will argue the Court may not consider the SRAs' release because the FAC does not specifically refer to the release and any related argument constitutes a "fact issue." In fact, each of Buffin's and Max's securities fraud claims stems from the stock repurchase transaction, which is memorialized in the SRAs. *See, e.g.*, FAC at Causes of Action Four, Five and Six. Plaintiffs refer to the SRAs throughout the FAC including to support their allegations that Peltier failed to disclose "a potential financing transaction with certain strategic investors." *Id.,* ¶99. Moreover, Plaintiffs' seek rescission of the SRAs because, they allege, "Buffin and Max Levine would not have entered into the Stock Repurchase Agreement had Defendants not made their material misrepresentations or omissions." *Id.,* ¶174. *See Deng v. Searchforce, Inc.*, No. C 11-00254 WHA, 2011 WL 940828, at *3 (N.D. Cal. Mar. 17, 2011). All of Buffin's and Max's securities

---

[2] Plaintiffs now allege they did not read their own Acknowledgements. FAC ¶100. A person who signs a contract is presumed to know what it says, and is bound to the terms he would have known about, had he read the contract. *Employee Painters' Trust v. J & B Finishes*, 77 F.3d 1188, 1192 (9th Cir. 1996).
[3] Defendants have concurrently filed a Request for Judicial Notice, which renews its initial request (Dkt. No. 14) and includes additional documents that are incorporated by reference in the FAC.
[4] Pursuant to the SRAs' governing law clause, Delaware law applies to all claims arising from the SRAs. *See* Peltier Decl., Exs. F, G, at § 9.2.

9

fraud claims fall squarely within the express terms of the release and are barred as a matter of law. "[A]n effective release terminates the rights of the party executing and delivering the release and . . . is a bar to recovery on the claim released." *Seven Invs., LLC*, 32 A.3d at 396 (citations omitted).

The release is consistent with a judicially-recognized exception to Section 29(a) of the Securities and Exchange Act. Section 29(a) generally voids "[a]ny condition, stipulation, or provision binding any person to waive compliance with" the securities laws. *Facebook, Inc. v. Pac. Nw. Software, Inc*., 640 F.3d 1034, 1040 (9th Cir. 2011) quoting 15 U.S.C. § 78cc(a). General releases that are "signed in a commercial context by parties in a roughly equivalent bargaining position and with ready access to counsel" and are "unambiguous in conveying the intent of the parties to release all unknown claims" do not run afoul of Section 29(a). *Petro-Ventures, Inc. v. Takessian*, 967 F.2d 1337, 1340, 1342 (9th Cir. 1992); *see also Facebook*, 640 F.3d at 1040 (enforcing general release of securities violations where agreement was heavily negotiated). In fact, a release in such an agreement would be useless to end litigation if it could not include claims arising from the negotiations. *Id.* This is especially true when, as in the present matter, the parties include a "no reliance" clause indicating that they relied solely on their own knowledge and the representations in the agreement. Peltier Decl., Exs. D, E at § 5; *see Harsco Corp. v. Segui*, 91 F.3d 337, 343 (2d Cir. 1996); *accord In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig*., MLD No. 2672 CRB (JSC), 2017 WL 3058563, at *5 (N.D. Cal. July 19, 2017) (holding plaintiff could not reasonably rely on statements outside offering memorandum containing a non-reliance disclaimer).

Buffin and Max were represented by counsel and negotiated specific modifications to the initial draft. Peltier Decl., Ex. C, 18. They specifically acknowledged that they could get a higher repurchase price outside of the SRAs, and they agreed they were not relying on anything other than their own experience and knowledge and the SRAs' representations and warranties. *See* White Decl., Exs. F,

10

G at § 6.  These provisions are enforceable, because "nothing in the complaint or the Agreement indicates [that Plaintiffs were] duped into waiving the protections of the securities laws." *Harsco*, 91 F.3d at 344.[5]

### B. Max and Buffin Failed to Remedy Their Federal Securities Fraud Claims

The Court previously dismissed Buffin's and Max's federal securities fraud claims because they failed to adequately allege the requisite scienter and an actionable omission or misrepresentation. Order, 5-8. The Court also found that "the allegations holistically [do] not strengthen Plaintiffs' proposed inference" that "between May and November 2018, Peltier knew or was deliberately reckless about the prospects that Community would receive an investment at some point before July 2019 fundamentally altering Community's trajectory." *Id.,* at 7. Plaintiffs failed to remedy these fatal defects.[6]

#### 1. Max and Buffin Failed to Remedy Lack of Actionable Omission or Misrepresentation

Under the PSLRA and Rule 9(b), Plaintiffs must allege a misrepresentation or a misleading omission with particularity and explain why it is misleading. *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund. v. Hewlett-Packard Co*., 845 F.3d 1268, 1274 (9th Cir. 2017) (citing 15 U.S.C. § 78u-4(b)(1)(A)-(B)). If an allegation regarding the statement or omission is made on information and belief, the complaint must allege "with particularity all facts on which that belief is formed." *Starcity Cap., LLC v. Bio-Matrix Sci. Grp., Inc*., No. 13-CV-1394 BEN (WMC),

---

[5] Delaware law is in accord. If a "released fraud claim was within the contemplation of the releasing party," it is enforceable. *E.I. DuPont de Nemours & Co. v. Fla. Evergreen Foliage*, 744 A.2d 457, 461 (1999). Negotiated non-reliance provisions among sophisticated parties will be enforced. *See Flowshare, LLC v. GeoResults, Inc*., No. N17C-07-227 EMD CCLD, 2018 WL 3599810, at *4 (Del. Super. Ct. July 25, 2018) (noting that Delaware courts will enforce a "clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside of the contract's four corners in deciding to sign the contract") (citation omitted).

[6] Plaintiffs' claim under Section 20(a)—Claim 5—must fail because the Section 10(b) claim is fatally flawed.

11

2014 WL 851067, at *2 (S.D. Cal. Mar. 3, 2014) quoting 15 U.S.C. § 78u–4(b)(1)(B). A complaint must reveal "facts demonstrating the reliability of [plaintiff's] assertions." *In re Invensense, Inc. Sec. Litig.*, No. 15-CV-00084-JD, 2016 WL 1182063, at *5 (N.D. Cal. Mar. 28, 2016) (citation omitted).

Plaintiffs still have not satisfied the requisite pleading standards. The basis for Plaintiffs' newly alleged misstatements and omissions is that, supposedly, in October 2018, Community was infused with a $2 million investment. FAC ¶65. The new allegations reveal nothing. Specifically, Plaintiffs allege that they do not know "the exact date [Kutcher and Oseary's personal investments] were agreed to and formalized [but] it was no later than October 13, 2018." *Id.,* ¶64.[7] They then assert, with no personal knowledge: "On or about that date, Peltier shared the deal documents with Community's investors (but not Max Levine or Buffin)," (*id.,* ¶64), and "In this same October 2018 communication, Peltier also announced to the investors (but not Max Levine or Buffin) that he had raised more than $2 million for the Company as part of these new transactions." *Id.,* ¶65. Under the PLSRA, "a plaintiff must provide, in great detail, all the relevant facts forming the basis of her belief. It is not sufficient for a plaintiff's pleadings to set forth a belief that certain unspecified sources will reveal . . . facts that will validate her claim." *In re Invensense, Inc. Sec. Litig*, 2016 WL 1182063, at *5 (citation omitted).

The FAC does not include adequate corroborating details. Plaintiffs do not mention, for instance, the sources of the information with respect to the "deal documents," how they learned of the "deal documents," who drafted them, or which investors received them. Nor do Max and Buffin include an adequate description of the documents' contents which, if they did exist, would include specifics about the investment and the investors, including a precise date and amount of the alleged

---

[7] This new conclusory allegation creates an entirely new timeline inconsistent with the timeline alleged in Plaintiffs' initial complaint. The lack of specific facts supporting this allegation, the entirety of the Swensen Interview (and not the cherry-picked quotes), and the contradictions in the chronology of events described in the two complaints cast serious doubt on inferences Plaintiffs invite this Court to make.

investment. A proper complaint, which purports to rely on the existence of nonspecific "deal documents," would contain at least some specifics from those documents, as well as such facts as may indicate their reliability. And they would identify the source of this information—who told them about this alleged communication from Peltier and its contents? Unlike many securities complaints, Plaintiffs here do not contend they are relying on confidential witnesses. The FAC simply is completely devoid of the necessary facts. And, thus, Plaintiffs' assertions that Peltier "did not disclose that Community had closed a multimillion dollar investor round more than a month *before* Buffin and Max Levine sold their shares," (FAC ¶11), or that Peltier's statement that there was "no set share value as we've never done a 409A," (*id.,* ¶86), do not amount to an actionable misrepresentation or omission under the PLSRA or Rule 9(b).

Plaintiffs also newly allege that Peltier "referred to a 'small' bridge that would allow the Company to keep its doors open for another few months," but did not "mention a potential financing transaction with strategic investors or Salesforce." *Id.,* ¶99. This allegation is undercut by Plaintiffs' admission that Peltier "alluded to having two new founders coming on board," (*id.,* ¶9; Ex. C, 3), and the explicit SRA provision that Max and Buffin were aware of "potential financing transaction with certain strategic investors, including, among others, Salesforce." *See* Peltier Decl., Exs. F, G at § 6. Buffin and Max now allege that Defendants "slipped in" the "strategic investor" clause but "[n]either Buffin nor Max read or noticed the clause before signing." FAC ¶100. "A party who signs a written agreement is bound by its terms, even though the party neither reads the agreement nor considers the legal consequences of signing it." *Employee Painters' Trust*, 77 F.3d at 1192.

Plaintiffs also allege that the statement in the SRAs is, itself, "inaccurate because it refers to a potential financing when, in fact, a $2 million plus financing had been consummated no later than October 13, 2018." *Id.,* ¶101. As discussed above, Plaintiffs fail to allege a factual basis for their belief that such an investment

1    was consummated before they signed the SRAs.

2         Plaintiffs' new, conclusory allegations of alleged misrepresentations and

3    omissions continue in their failing to satisfy Rule 9(b) and the PLSRA.

4              2.    **Max and Buffin Failed to Remedy Defects in Scienter**

5                    **Allegations**

6         "To allege the required scienter, a complaint must allege that the defendants

7    made false or misleading statements either intentionally or with deliberate

8    recklessness." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020) (citation

9    and quotation marks omitted). Alleging scienter under the PSLRA, the plaintiff must,

10   "with respect to each act or omission alleged to violate this chapter, state with

11   particularity facts giving rise to a strong inference that the defendant acted with the

12   required state of mind." 15 U.S.C. § 78u-4(b)(2)(A); *see also Tellabs, Inc. v. Makor*

13   *Issues & Rights, Ltd*., 551 U.S. 308, 324 (2007). The Ninth Circuit requires a direct

14   comparison of the plausibility of competing inferences, considering "not only

15   inferences urged by the plaintiff, . . . but also competing inferences rationally drawn

16   from the facts alleged. . . . an inference of scienter must be more than merely plausible

17   or reasonable—it must be cogent and at least as compelling as any opposing inference

18   of nonfraudulent intent." *Id.,* at 314.

19        Plaintiffs still fail to allege scienter. The Court dismissed the federal securities

20   claims because the allegations "that subsequent events reveal that Community's

21   future success was already assured during the negotiations . . . is not as compelling

22   as the innocent [inference]." Order, 6. Plaintiffs attempt to remedy this defect by

23   alleging that "the supposed Hobson's choice of selling your shares for $20k or get

24   nothing in bankruptcy were false and misleading . . . because Peltier could not have

25   believed they were true at the time they were made. . . . There was no threat of

26   bankruptcy at the time these statements were made." FAC ¶¶141-142. These

27   allegations are premised, not on personal knowledge, but on the conclusory,

28   speculative allegations that Community had "received in excess of $2 million in

                                            14

investments." *Id.,* ¶142; *see also id.,* ¶¶62-65.

As discussed above in Section B(1), Plaintiffs' new allegation of an actual investment on or before October 13, 2018 appears wholly manufactured. Plaintiffs admit they are unaware of the actual date of the $2 million investment, but assert it must have been before October 13, 2018, based on new nonspecific allegations of the existence of unspecified "deal documents" that Peltier supposedly shared with unnamed investors (but not Buffin or Max). The source of this supposed information remains entirely unidentified. When confidential witnesses "are introduced to establish scienter [they] must be described with sufficient particularity to establish their reliability and personal knowledge." *Zucco Partners, LLC v. Digimarc Corp*., 552 F.3d 981, 995 (9th Cir. 2009). Here, Plaintiffs do not even attempt to hide behind a confidential witness—they just assert a bald (and false) statement without any specifics. This does not come close to suggesting that the Company had closed a significant transaction, and Peltier concealed the information. In fact, there are numerous other explanations inconsistent with alleged fraud for the supposed communication with certain investors: a) a non-binding term sheet, b) a non-disclosure agreement to permit Oseary and Kutcher to conduct due diligence, c) a collaboration agreement, d) a deal with a completely different investor, or e) no investment at all. Neither the Court nor the Defendants can tell, however, because Plaintiffs failed to provide the "who, what, where, and when" required by the PSLRA. Plaintiffs have not meaningfully moved the inference that Community may have been negotiating a deal with Kutcher and Oseary to a compelling inference that Community misled them about a consummated deal. *See Nguyen*, 962 F.3d at 414.

Plaintiffs also attempt to allege scienter by asserting that, on a basketball court in December 2018, an employee of a non-specific Community "advisor" reported that "Maverick is coming onboard" and that the "information was not public." FAC ¶107. While the statement "Maverick *is* coming onboard," suggests imminence, the source did not say Maverick *had come onboard*. This is inconsistent with the

statement of a consummated $2 million deal in October, 2018. Moreover, Plaintiffs (and the employee) otherwise only indicate the conveyance of "Maverick stuff." Certainly, if the employee told Buffin and Max anything specific or worthwhile, those statements would be alleged in the FAC. These allegations remain far too vague and ambiguous to satisfy Rule 9(b) and the PSLRA. The new allegations still do not provide any specificity with regard to what Maverick's role would be, what "coming onboard" meant, or when Maverick would get involved. The fact that the information was "not public" and Peltier refused to comment (and then reprimanded the person who leaked non-public information), suggests any pending transaction was not final, even as of December 2018, and thus remained uncertain. Furthermore, the alleged December 2018 conversation is consistent with Kutcher and Oseary continuing to vet the Company *prior to* making a significant investment because, as Max and Buffin allege, Kutcher's January 2019 text was a "publicity stunt to stir interest in Community." *Id.,* ¶108. Such a "publicity stunt" is consistent with an inference that Kutcher and Oseary were testing the waters before investing, not fraud. Rejection of Plaintiffs' theory is warranted here. *Tellabs, Inc*., 551 U.S. at 324.

### 3.   Even a Holistic View of the Facts Fails

Courts first look to whether any individual allegations suffice; if they do not, courts conduct a "'holistic' review" considering the allegations together. *See Zucco Partners, LLC*, 552 F.3d at 992. But, considering Plaintiffs' allegations holistically does not strengthen the proposed inference that Peltier intentionally misled Plaintiffs. Although Plaintiffs provide more words about Kutcher's and Oseary's early involvement, the allegations do not push the innocent inference that Peltier was struggling to keep Community afloat to an inference that the Company had actually been infused with millions when Plaintiffs executed the SRAs.

In an effort to bolster their vague allegations that Kutcher and Oseary "made significant personal investments into the Company," (FAC ¶63), before Plaintiffs sold their shares, Plaintiffs offer the misleading and incomplete recount of statements

16

made by then-Maverick employee, Molly Swenson. *Id.*, ¶¶11, 52-57, 59, 60, 67, 103, 109, 142, 150, 161, 169, 178, 191, 199, 218, 226, 237, 245; *cf.* White Decl., ¶2, Exs. A, B. As described above in Section C in detail, Swenson's interview places the "Aha!" moment for Swenson (who was acting on Oseary's behalf) in November 2018, when G-Eazy and Salesforce demonstrated the "mobilization" value of the platform. FAC ¶52; White Decl., Ex. A, 43:07 through 44:23; *id.,* Ex. B, 18, 19. Plaintiffs' assertion that Peltier forged a deal with Oseary and Kutcher "no later than October 13, 2018," (FAC ¶64), is inconsistent with Plaintiffs' own alleged source.

Notably, Plaintiffs allege that they approached Peltier to "learn the backstory" in connection with Maverick's involvement, but "Peltier ignored that request in a responsive text." *Id.,* ¶106. This is not the only allegation that demonstrates Plaintiffs' cavalier attitude about what they now consider material facts. Instead, Plaintiffs allege Buffin asked about the new cofounders, before they agreed to sell shares back, , , and Peltier refused to tell them. *Id.,* ¶9. Then—despite Peltier's refusal to disclose this information—they signed the SRAs, selling most of their shares back to the Company, without (supposedly) reading their own "Acknowledgments" in the agreement—including acknowledgments that they were aware of strategic investors and could likely make more money selling shares to another party. *Id.,* ¶100. And, then, they allege "shock" by the news that Oseary is involved, mere days after selling their shares back, but nonetheless did not press Peltier on this important "backstory." *Id.,* ¶¶104-106. And, they allege, they knew nothing of Kutcher's involvement until the end of January 2019. *Id.,* ¶108. All of these allegations run contrary to Plaintiffs hindsight-theory that celebrity involvement in the Company "was material to their decision on whether to sell back their Company shares." *See*, *e.g*., *id.*, ¶151. Indeed, they did not even file the original complaint until 20 months after Kutcher's "publicity stunt." *Id.,* ¶108. And, that is because the news of Kutcher and Oseary was not relevant until July 2019 when TechCrunch announced their involvement in the Company's success. *Id.,* ¶112. This is precisely the type of "fraud by hindsight" the

17

PSLRA is designed to prevent. *See Veltex Corp.*, 2010 WL 3834045, at *3. Their claims must be dismissed.

## C.    Steven Levine Lacks Standing Under Federal And State Securities Laws

The Court previously "observ[ed] that Steven Levine's [securities fraud] theory may fail to meet the requirement that the alleged misrepresentation be in connection with the purchase or sale of securities." Order, 10 n.2. In response, Plaintiff newly alleges that he "purchased or otherwise acquired securities in the Company," because "Peltier . . . accepted the offer for 2.5% equity[.]" FAC ¶280. The conclusory "purchase" allegation is insufficient to confer standing on Steven.

To recover damages for violations of section 10(b) and Rule 10b-5, a plaintiff must prove the elements of common law fraud with a "connection between the misrepresentation or omission and the purchase or sale of a security." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (internal citations and quotation marks omitted); *see also In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1051–52 (9th Cir. 2014) (reciting the elements of a 10b-5 claim). The same "purchase or sale" requirement applies under California state securities laws, including Section 25401. *Salameh v. Tarsadia Hotel*, 726 F.3d 1124 (9th Cir. 2013) (a California state securities claim requires the purchase or sale of a security).

Steven has never been a Community shareholder. Indeed, Steven's assertion that "Community breached its agreement with Steven Levine by, among other things, failing to convey to Steven Levine shares in the Company amounting to a 2.5% equity stake" belies his allegation of fraud. The "mere involvement of shares of stock does not bring a transaction within Rule 10b-5." *Desert Land, LLC v. Owens Financial Group, Inc.*, 154 Fed. App'x 586, 587 (9th Cir. 2005). And, the "mere allegation that a contractual breach involved a security does not confer standing to assert a 10b–5 action." *Id.* quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993) ("The failure to carry out a promise made in connection with a securities

transaction is normally a breach of contract."); *Gigliotti v. Mathys*, 129 F. Supp. 2d 817, 823, n.13 (D. V.I. 2001) (holding that "mere involvement of shares of stock does not bring a transaction within Rule 10b-5, unless the value of the securities (or consideration) involved is misrepresented"). Therefore, Steven lacks standing to bring claims for federal and state securities violations and his Eleventh and Twelfth claims for relief must be dismissed with prejudice.

### D.   Steven Levine's Federal Securities Fraud Claims Remain Defective (11th and 12th Causes of Action)

The Court dismissed Steven's federal securities claims because his theory—that Peltier misrepresented that the Company would recognize Steven's purported 2.5% equity interest—lacked any allegations of reliance. "The reliance element ensures that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury." *Halliburton Co.*, 573 U.S. at 267 (citation and quotation marks omitted).

#### 1.   The Transaction Took Place Prior to the Disclosures in Question

Plaintiffs' amended allegations have not remedied the fact that Steven made his $50,000 contributions to his son Max *before* Peltier joined the Company (FAC ¶115) and "when [the Company] was little more than an idea." *Id.*, ¶5. "If the transaction takes place prior to the disclosures in question, reliance cannot be established." Thomas Lee Hazen, Treatise on the Law of Securities Regulation § 12.79 (2020). The Ninth Circuit long ago recognized this principle, *see Raschio v. Sinclair*, 486 F.2d 1029, 1030 (9th Cir. 1973), and district courts have continued to adhere to it. *See, e.g., Hildes v. Andersen*, No. 08-cv-0008-BEN (RBB), 2010 WL 4811975, at *2 (S.D. Cal. Nov. 8, 2010); *Schneider v. Traweek*, No. CV 88-0905 RG (KX), 1990 WL 169856, at *12 (C.D. Cal. Sept. 5, 1990). For this reason alone, Steven's federal securities claims should be dismissed with prejudice.

1

2

2.      **Steven Fails to Allege How He Would Have Acted Differently in Response to Peltier**

3       Plaintiffs originally alleged that Steven "relied by 'not tak[ing] action' until

4   2019." Order, 11. The Court found that allegation insufficient to satisfy the reliance

5   prong in federal securities claims, noting that Steven failed to allege "how he would

6   have invested—or done anything else differently—had Peltier informed him earlier

7   that his purported equity interest would not be recognized." *Id.* The FAC continues

8   to lack sufficient factual support for the notion that Steven reasonably relied on any

9   statement or omission Defendants made. In the FAC Steven now alleges that he

10  "would have never invested $50,000 in the Company had Defendants not promised

11  [him] an equity stake in the Company *in return*." FAC ¶286 (emphasis added). The

12  FAC contradicts this theory when Plaintiffs allege that "Steven Levine discussed with

13  both *Max Levine and Buffin* that Steven Levine would receive equity in return for his

14  investment in the Company." *Id.,* ¶117 (emphasis added). Plaintiffs further allege that

15  the *Levines and Buffin* agreed that "the specific percentage of [Steven's] equity stake

16  would be determined at a later date." *Id.* (emphasis added). "[A] plaintiff must show

17  reliance upon the misrepresentations in entering into the transaction that caused the

18  harm." *Smolen v. Deloitte*, *Haskins & Sells*, 921 F.2d 959, 963 (9th Cir. 1990). Steven

19  has failed to do so, because he admits that he gave the money to his son even before

20  Peltier joined the Company and when the Company was "little more than an idea."

21  FAC ¶¶ 5, 115; Peltier Decl., Ex. D.

22      Steven also alleges in passing that Peltier did not disclose in 2019 that the

23  Company was successful. FAC ¶¶132-133. This allegation is superfluous. According

24  to the FAC "Peltier approached Steven Levine . . . about Community buying out

25  Steven Levine's 2.5% interest." *Id.,* ¶283. Steven does not allege reliance on the

26  alleged omission in taking any act; in fact, he took no action. Steven did not purchase

27  or sell any securities, thus there is no basis for a securities fraud claim as of 2019.

28

These allegations turn the rest of the FAC on its head. The basic premise of the FAC according to Buffin and Max, is that, had Plaintiffs known the Company was successful, Max and Buffin would not have agreed to sell the majority of their shares back to the Company. *Id.,* ¶174. And that is precisely what Steven did—he chose to hold on to whatever interest in the Company he had. And, while Plaintiffs allege that Steven "relied on Defendants' false or misleading representations to not take action until 2019," (*id.,* ¶286), when Peltier "reassured Steven Levine that his investment was best left in the Company because they were working on a new strategy that could turn the Company around," (*Id.,* ¶256), Peltier's prediction turned out to be true. Steven has not alleged a material misrepresentation or omission.[8]

### E.   Steven Has Not Remedied the Defects in His State Securities Fraud Claim (13th Cause of Action)

The Court dismissed Plaintiff's state securities fraud claim with leave to amend, because Steven failed to "specify with particularity the false statements or material omissions at issue." Order, 12. Indeed, the Court tossed Plaintiff a softball noting that, despite the general allegations, the complaint "does not say explicitly that Peltier told Steven Levine that he owned equity." *Id.* The FAC also does not allege, explicitly, that "Peltier told Steven Levine that he owned equity." Instead, Steven now alleges that "Peltier confirmed the deal for 2.5% in the April 2014 phone call." FAC ¶319. Steven's refusal to allege in a court document that Peltier *told him that he owns equity* speaks volumes. Peltier said no such thing. Instead, the April 16 and 17, 2014, emails—to which Plaintiffs extensively but selectively refer to support their fraud claims—contradict any notion that Steven and Peltier actually reached a deal for 2.5% equity. Peltier Decl., Exs. D, E.

As for Steven's prior failure to specify with particularity false statements or material omissions (Order at 12), the FAC falls flat there, as well. Steven added some

---

[8] Steven's claim under Section 20(a)—Claim 12—must fail because his Section 10(b) claim is fatally flawed. *See infra*, Sections D, E.

new verbiage to his state securities fraud claim, but he failed completely to allege a single false statement or material omission. Instead, he alleges that in March 2014, "Peltier emailed Steven . . . giving him an update," "a few days later, . . . Peltier sent Steven . . . another investor update," and "Peltier ultimately proposed that Steven . . . take a 2.5% equity stake in the Company in return for his investment." FAC ¶¶119-122. Plaintiffs concede that these communications are "documented" in various emails, including an April 16-17, 2014, email chain. *See*, Peltier Decl., Exs. D, E. But, Plaintiffs do not explain what is false or misleading about these 2014 communications.

The FAC alleges that, on April 16, Peltier "propos[ed] an offer of 2.5% equity for [Steven's] investment." FAC ¶122; Peltier Decl., Ex. D [4/16 @ 4:01 PM].[9] In that same communication, Peltier detailed the breakdown of Steven's financial "commitment." *Id.* Plaintiffs allege that on this "same day [April 16], Steven . . . and Peltier had a phone call during which Steven . . . told Peltier that he was accepting the equity offer." FAC ¶123. If true, Steven must have had a change of heart, because the next day Steven wrote "so there is no misunderstanding from [his conversation with Peltier on April 16] . . . [t]his convertible note deal for me is ok as long as I get 4% of company and can only be diluted to 3% of the company." Peltier Decl., Ex. D [4/17 @ 10:33 AM].

---

[9] In the Court's Order granting in part and denying in part Defendants' Motion to Dismiss the original complaint, the Court declined to take judicial notice of emails referenced in the Complaint to the extent the emails were offered as a defense to the breach of contract claims. Order, 14-15. The April 2014, emails are generously quoted as a basis for the alleged fraud perpetrated by Defendants. Defendants offer the emails here because the FAC quotes selectively from the emails to distort the timeline of communications; the emails thus offer the complete factual background. They are not offered as a defense; they are offered for the content in the communications and to prevent the type of selective quotation that is improper and misleading. *See, e.g., Karmilowicz v. Hartford Fin. Servs. Grp.*, No. 11 Civ. 539 (CM)(DCF), 2011 WL 2936013, at *5 (S.D.N.Y. July 14, 2011); *Parrino*, 146 F.3d at 705-06 (court may consider extrinsic documents when 1) authenticity is not in issue, 2) plaintiff is on notice of document contents, and 3) plaintiff's claim depends on the document). *Steckman*, 143 F.3d at 1295–96 (holding that a court is "not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint").

MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

Plaintiffs also allege that in mid-summer 2017, Steven spoke with Peltier "and offered Community a discount in exchange for the return of his $50,000 investment." FAC ¶128. Steven further alleges that, during that 2017 call, Peltier "reassured Steven" that his money was best left with Community because Peltier "was working on a new strategy that could turn the Company around." *Id.,* ¶129. Peltier's statement turned out to be true. *See, id.,* ¶133 (identifying $35 million investment). Again, Steven identifies no misstatement. Steven then alleges that, in 2019, Peltier offered to have Community "repurchase Steven Levine's shares." *Id.,* ¶131. Like Max and Buffin, Steven asked Peltier "what was going on with the Company to prompt the repurchase offer[, and] Peltier did not provide . . . any substantive information." *Id.,* ¶132. The FAC is devoid of any suggestion that Steven actually attempted to sell his alleged equity. Regardless of the type of investment Steven is to alleged to have negotiated, not a single allegation—including about statements made in 2014, 2017 and 2019—suggests Peltier's statements or omissions were false or misleading or induced Steven to contribute $50,000 to the Company.

## F.     Steven Levine Failed to Remedy the Defects in His Fraudulent and Negligent Misrepresentation Claims (10th and 14th Causes of Action)

Steven's fraud and negligent misrepresentation claims fail for the same reason as his federal securities claim—failure to plead reliance. Plaintiffs must allege justifiable reliance in order to state a fraud claim. *Doe v. Gangland Prods., Inc.,* 730 F.3d 946, 960 (9th Cir. 2013). The elements for "negligent misrepresentation are nearly identical . . . requiring the absence of reasonable grounds for believing the misrepresentation to be true instead of knowledge of its falsity." *Daniels v. Select Portfolio Servicing, Inc*., 246 Cal. App. 4th 1150, 1166 (2016).

Under California law, a plaintiff relies on a misrepresentation if he would have behaved differently absent the misrepresentation. *See Conroy v. Regents of Univ. of Cal*., 45 Cal. 4th 1244, 1256 (2009). As with the federal securities allegations, the

FAC does not remedy the defects leading to the Court's dismissal order—namely that Steven "had already invested before Peltier's purported misrepresentations, and . . . has not pled any action he would have taken absent the misrepresentation." Order, 11. Instead, Steven alleges he "would have never invested $50,000 in the Company had Defendants not promised [him] an equity stake in the Company in return." FAC ¶¶286 (Fraud), 319 (Negligent Misrepresentation). As discussed above, however, by Plaintiffs' own admission, Steven's son Max and his partner Buffin purportedly made these promises to him before Peltier even joined the Company and after Steven gave money to his son. FAC ¶¶117-118. *Vidor v. Am. Int'l Grp.*, No. C 11-315 SI, 2011 WL 2746848, at *3 (N.D. Cal. July 13, 2011), *aff'd*, 491 F. App'x 828 (9th Cir. 2012) (finding plaintiff cannot establish reliance on any alleged misstatements by where alleged misstatements were made after he purchased Equity Units); *Meinhold v. Sprint Spectrum, L.P.*, N. 07-cv-0456 FCD EFB, 2007 WL 2904003, at *4 (E.D. Cal. Oct. 2, 2007) ("A plaintiff cannot rely on a misrepresentation of which she had no knowledge at the time she changed position." (citations omitted)).

### G.   Unjust Enrichment is Not a Freestanding Claim and it is Inadequately Alleged (19th Cause of Action)

California does not recognize unjust enrichment as a freestanding claim for relief. *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) (*citing Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1370 (2010); *Jogani v. Superior Court*, 165 Cal. App. 4th 901, 911 (2008)). Nonetheless, in the Ninth Circuit, "[w]hen a plaintiff alleges unjust enrichment, a court may construe the cause of action as a quasi-contract claim seeking restitution." *Jordan v. Wonderful Citrus Packing LLC*, No. 1:18-CV-00401-AWI-SAB, 2018 WL 4350080, at *4 (E.D. Cal. Sep. 10, 2018). The "theory underlying a[n unjust enrichment] claim [is] that a defendant has been unjustly conferred a benefit through mistake, fraud, coercion, or request." *Id.* According to the FAC however, Steven gave money to Max before the Company was formed and Peltier was onboard. FAC ¶¶4-5. Steven cannot, therefore, adequately

plead a claim for unjust enrichment or quasi-contract seeking restitution, when any benefit conferred by the "monies" Steven contributed was "for Max & MLCB." Ex. D; *see Astiana*, 783 F.3d at 762.

Furthermore, while courts may "construe the [unjust enrichment] cause of action as a quasi-contract claim seeking restitution," "[a]n action based on an implied-in-fact or quasi-contract cannot lie where there exists between the parties a valid express contract covering the same subject matter." *Rutherford Holdings, LLC v. Plaza Del Rey*, 223 Cal. App. 4th 221, 231 (2014) (citation omitted). Here Steven has successfully alleged an express contract, which already addresses his contractual relationship with Defendants. FAC ¶¶252-263. Steven, thus, has no quasi-contract claim. Steven's unjust enrichment claim should be dismissed.

## V.    CONCLUSION

For the foregoing reasons, Defendants respectfully requests that the Court Plaintiffs' Fourth, Fifth, Tenth, Eleventh, Twelfth, Thirteenth, Fourteenth, and Nineteenth Causes of Action with prejudice.

Dated:      March 17, 2021                          By:   */s/ Hong-An Vu*
                                                          Hong-An Vu
                                                          *HVu@goodwinlaw.com*
                                                          **GOODWIN PROCTER LLP**
                                                          601 S. Figueroa Street, Suite 4100
                                                          Los Angeles, California 90017
                                                          Tel.: (213) 426-2500
                                                          Fax: (213) 623-1673

                                                          Attorneys for Defendants
                                                          COMMUNITY.COM, INC. and
                                                          MATTHEW PELTIER

MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM